IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-108

No. 425A21-2

Filed 4 November 2022

HOKE COUNTY BOARD OF EDUCATION, *et al.*;

CHARLOTTE-MECKLENBURG BOARD OF EDUCATION; and

RAFAEL PENN, *et al.*,

v.

STATE OF NORTH CAROLINA;

STATE BOARD OF EDUCATION;

CHARLOTTE-MECKLENBURG BOARD OF EDUCATION; and

PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate, and TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives.

Appeal pursuant to N.C.G.S. § 7A-31(b) from the 10 November 2021 order by Judge W. David Lee in Superior Court, Wake County, and from the 26 April 2022 order of Judge Michael L. Robinson in Superior Court, Wake County. On 21 March 2022, pursuant to N.C.G.S. § 7A-31(a) and Rule 15(e) of the North Carolina Rules of Appellate Procedure, the Supreme Court allowed the State's petition for discretionary review prior to determination by the Court of Appeals. Heard in the Supreme Court on 31 August 2022.

*Parker Poe Adams & Bernstein, LLP, by Melanie Black Dubis, Scott E. Bayzle and Catherine G. Clodfelter; and Armstrong Law, PLLC, by H. Lawrence Armstrong for Hoke County Board of Education, et al.*

*Lawyers Committee for Civil Rights Under Law, by Christopher A. Brook, David Hinojosa, and Michael P. Robotti,for Penn, Rafael, et al.*

*Joshua Stein, Attorney General, by Amar Majmundar, Senior Deputy Attorney General, W. Swain Wood, First Assistant Attorney General, Ryan Park, Solicitor General, Sripriya Narasimha, Deputy General Counsel, and South A. Moore, Assistant General Counsel, for the State.*

*Joshua Stein, Attorney General, by Matthew Tulchin, Special Deputy Attorney General, Tiffany Y. Lucas, Deputy General Counsel, for the State Board of Education.*

*Womble Bond Dickinson (U.S.) LLP, by Matthew F. Tilley, Russ Ferguson, W. Clark Goodman, and Michael A. Intersoll, for Philip E. Berger, et al.*

*Higgins Benjamin, PLLC, by Robert N. Hunter, Jr., for Nels Roseland, Controller of the State of North Carolina.*

*Jane R. Wettach and John Charles Boger, for Professors and Long-Time Practitioners of Constitutional and Educational Law, amici curiae.*

*Duke Children's Law Clinic, by Peggy D. Nicholson and Crystal Grant; Education Law Center, by David Sciarra, for Duke Children's Law Clinic, Center for Educational Equity, Southern Poverty Law Center, and Constitutional and Education Law Scholars, amici curiae.*

*Elizabeth Lea Troutman, Eric M. David, Daniel F.E. Smith, Kasi W. Robinson, Richard Glazier, and Matthew Ellinwood, for North Carolina Justice Center, amicus curiae.*

*John R. Wester, Adam K. Doerr, Erik R. Zimmerman, Emma W. Perry, Patrick H. Hill, and William G. Hancock, for North Carolina Business Leaders, amici curiae.*

*Jeanette K. Doran, for North Carolina Institute for Constitutional Law and John Locke Foundation, amici curiae.*

HUDSON, Justice.

¶ 1        A quarter-century ago, this Court recognized that the North Carolina Constitution vests in all children of this state the right to the opportunity to receive a sound basic education and that it is the constitutional duty of the State to uphold that right. *Leandro v. State*, 346 N.C. 336, 345 (1997) (*Leandro I*). In 2004, we affirmed the trial court's determination "that the State had failed in its constitutional duty to provide certain students with the opportunity to attain a sound basic education," and that "the State must act to correct those deficiencies." *Hoke County Bd. of Educ. v. State*, 358 N.C. 605, 607, 647–48 (2004) (*Leandro II*). At that still-early stage of the litigation, this Court deferred to the legislative and executive branches to craft and implement a remedy to this failure. *Id.* at 643. However, we also expressly noted that

> when the State fails to live up to its constitutional duties, a court is empowered to order the deficiency remedied, and if the offending branch of government or its agents either fail to do so or have consistently shown an inability to do so, a court is empowered to provide relief by imposing a specific remedy and instructing the recalcitrant state actors to implement it.

*Id.* at 642.

¶ 2        In the eighteen years since, despite some steps forward and back, the foundational basis for the ruling of *Leandro II* has remained unchanged: today, as in 2004, far too many North Carolina schoolchildren, especially those historically

marginalized,[1] are not afforded their constitutional right to the opportunity to a sound basic education. As foreshadowed in *Leandro II*, the State has proven—for an entire generation—either unable or unwilling to fulfill its constitutional duty.

¶ 3     Now, this Court must determine whether that duty is a binding obligation or an unenforceable suggestion. We hold the former: the State may not indefinitely violate the constitutional rights of North Carolina schoolchildren without consequence. Our Constitution is the supreme law of the land; it is not optional. In exercising its powers under the Appropriations Clause, the General Assembly must also comply with its duties under the Education Provisions.

¶ 4     Accordingly, in response to decades of inaction by other branches of state government, the judiciary must act. This Court has long recognized that our Constitution empowers the judicial branch with inherent authority to address constitutional violations through equitable remedies. *See, e.g.*, *Wilson v. Jenkins*, 72 N.C. 5, 6 (1875); *In re Alamance Cnty. Court Facilities*, 329 N.C. 84, 94 (1991) (*Alamance*). Today, to remedy that inaction, we exercise that power. For twenty-five years, the judiciary has deferred to the executive and legislative branches to implement a comprehensive solution to this ongoing constitutional violation. Today, that deference expires. If this Court is to fulfill its own constitutional obligations, it

---

[1] For instance, students from economically disadvantaged families and communities, students with learning differences, English-language learners, and students of color. *See, e.g.*, *Leandro II*, 328 N.C. at 632, n.13, 636, n. 16 (defining "at-risk").

can no longer patiently wait for the day, year, or decade when the State gets around to acting on its constitutional duty "to guard and maintain" the constitutional rights of North Carolina schoolchildren. Further deference on our part would constitute complicity in the violation, which this Court cannot accept. Indeed, ultimately "[i]t is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens." *Corum v. Univ. of N.C.*, 330 N.C. 761, 783 (1992).

¶ 5        After decades of largely choosing to watch this litigation from the sidelines, Legislative Defendants now intervene to allege a variety of procedural and substantive infirmities. They argue that despite twenty-eight years of focusing on statewide problems and statewide solutions, this case really involves only Hoke County. They argue that the passage of the 2021 Budget Act fulfills their constitutional duties under *Leandro*. They argue that because this case implicates education policies, it raises non-justiciable political questions. They argue that prior to their intervention, this case constituted a friendly suit with no actual controversy before the court.

¶ 6        These claims unequivocally fail. They are untimely, distortive, and meritless. At best, they reveal a fundamental misunderstanding of the history and present reality of this litigation. At worst, they suggest a desire for further obfuscation and recalcitrance in lieu of remedying this decades-old constitutional violation. In any event, they do not prevent this Court from exercising its inherent authority to realize

the constitutional right of North Carolina children to the opportunity to a sound basic education.

¶ 7        Accordingly, we affirm and reinstate the trial court's 10 November 2021 Order's directive instructing certain State officials to transfer the funds necessary to comply with Years 2 and 3 of the State's Comprehensive Remedial Plan. We vacate in part and reverse in part the trial court's April 2022 Order removing that transfer directive. We remand the case to the trial court for the narrow purpose of recalculating the amount of funds to be transferred in light of the State's 2022 Budget. Once those calculations have been made, we instruct the trial court to order those State officials to transfer those funds to the specified State agencies. To enable the trial court to do so, we stay the 30 November 2021 Writ of Prohibition issued by the Court of Appeals.[2] Finally, we instruct the trial court to retain jurisdiction over the parties to monitor State compliance with this order. In so doing, we uphold our own obligation to safeguard the constitutional rights of North Carolina's schoolchildren while still allowing for our coequal branches to correct course in the years to come.

## I.    Factual and Procedural History

¶ 8        The long history of this litigation is well documented. Nevertheless, the extraordinary nature of the remedy we order today—and Legislative Defendants'

---

[2] On its own motion, today the Court is issuing a Special Order to stay this Writ.

attempt to rewrite and relitigate the case's history—demands a summary of the equally extraordinary path that now renders that remedy necessary.

**A.** *Leandro I*: **Establishing the Right**

In May 1994, students and families from five rural North Carolina school districts united to sue the State and the State Board of Education for failing to provide adequate educational opportunities. These students and families—including Robert Leandro and his mother Kathleen, after whom the case would be named— represented students and schools at all levels of K–12 education, from Rollins Elementary School in Henderson to Carroll Middle School in Lumberton to Hoke County High School in Raeford. The Boards of Education of the five rural counties— Hoke, Halifax, Robeson, Cumberland, and Vance—likewise joined the students and families as plaintiffs in the suit (collectively referred to as Plaintiffs).

Specifically, Plaintiffs brought a declaratory judgment action "based on state constitutional and statutory provisions that entitle all North Carolina children to receive adequate and equitable educational opportunities, no matter where in the State they may live." Plaintiffs' complaint alleged that "[s]uch opportunities have been denied to children in some of the poorest school districts in the State[ ] as a result of an irrational, unfair, and unconstitutional funding system."

To support this claim, Plaintiffs identified specific examples of inadequate educational opportunities resulting from inadequate funding. For instance, Plaintiffs

noted facilities issues such as a "lack [of] adequate classroom space," instructional issues such as a lack of basic science equipment and up-to-date textbooks, and personnel issues such as a lack of well qualified teachers. "The end result of the[se] inferior education opportunities caused by this unconstitutional system[,]" Plaintiffs alleged, "is poorly educated students."

¶ 12      That end result showed in student achievement. Plaintiffs noted that under numerous tests, "the majority of children in plaintiff districts have been unable to satisfy the State's standards for basic proficiency." Likewise, Plaintiffs showed that the performance of students in plaintiff districts on the Scholastic Aptitude Test (SAT) for college admission lagged well below the statewide average, and that students from plaintiff districts who *do* graduate and enter or attempt to enter college faced significant challenges due to their lack of foundational educational opportunities.

¶ 13      Plaintiffs further noted that the funding differences between wealthy and poor districts at the heart of these disparities "are not accounted for by the amount of tax effort exerted by districts." Indeed, "[t]he average tax effort of plaintiff districts—that is, the amount of local dollars spent on education for every dollar of property tax valuation—is substantially *higher* than the average tax effort in the wealthiest North Carolina school districts." (emphasis added). Rather, Plaintiffs alleged, the

significant gap in education funding and subsequent gap in educational opportunities

falls on the shoulders of the State.

¶ 14        Cumulatively, Plaintiffs alleged that the consequences of these inadequate

educational opportunities could not be more dire:

> Plaintiff students and other students from plaintiff
> districts face a lifetime of relative disadvantage as a result
> of their inadequate educational opportunities. They have
> diminished prospects for higher education, for obtaining
> satisfying employment, and for providing well for
> themselves and their families. They face increased risks of
> unemployment, welfare dependency, drug and alcohol
> addiction, violence, and imprisonment. Thus the inferior
> educational opportunities in plaintiff districts perpetuate a
> vicious cycle of poverty and despair that will, unless
> corrected, continue from one generation to the next. This
> cycle entails enormous losses, both in dollars and in human
> potential, to the State and its citizens.

¶ 15        Based on this factual foundation, Plaintiffs alleged that the failure of the State

and State Board of Education "to provide plaintiff schoolchildren with adequate

educational opportunities violates Articles I and IX of the [North Carolina]

Constitution."[3] Accordingly, Plaintiffs' complaint asked the court to:

> [Declare] that education is a fundamental right, and that
> the public education system of North Carolina, including
> its system of funding, violates the Constitution of North
> Carolina by failing to provide adequate educational
> opportunities . . . ;
>
> [Declare] that the education system of North Carolina

---

[3] Plaintiffs likewise asserted claims based on equal protection, equal educational
opportunities, due process, and statutory rights.

must be reformed so as to assure that all North Carolina schoolchildren, no matter where they may live in the State, receive adequate educational opportunities, . . . ;

[Declare] that, to assure adequate educational opportunities, the State must provide for the necessary resources, including well qualified teachers and other school personnel in fully sufficient numbers, adequate school buildings, equipment, technology, and instructional materials; . . . .

[Declare] that the public education system of North Carolina, including its system of funding, must recognize and provide for the needs of at[-]risk schoolchildren and others who are educationally disadvantaged;

Order defendants to take all steps necessary to provide plaintiff school boards with the funds necessary to provide their students with an adequate education;

[R]etain jurisdiction over this case to ensure full compliance with the [c]ourt's decree; [and]

[Order] such other equitable relief including relief by way of injunction or mandamus as the [c]ourt deems proper.

In October 1994, students and families from five urban school districts, along with the districts themselves, joined Plaintiffs' suit as "Plaintiff Intervenors." Plaintiff Intervenors—representing schools in Buncombe, Charlotte-Mecklenburg, Durham, Wake, and Forsyth Counties—alleged that the State's educational funding system also failed to account for "the burdens faced by urban school districts that must educate large numbers of students with extraordinary educational needs." Accordingly, Plaintiff Intervenors raised the same constitutional claims and requests as Plaintiffs, asserting that "[a]s a result of defendants' violations of their

constitutional duty, [Plaintiff Intervenors] have been denied access to an adequate public school education" under the North Carolina Constitution.

¶ 17     In response, the State and the State Board of Education (collectively, the State or State Defendants) moved to dismiss Plaintiffs' complaint. State Defendants claimed that the trial court lacked jurisdiction over the complaint because the issues raised were non-justiciable, State Defendants were shielded by sovereign immunity, and Plaintiffs failed to state a claim upon which relief could be granted. Defendants contended that the North Carolina constitution does not "create[ ] a right to an adequate education in the public schools, greater than the right to attend a free public school for nine months a year in which equal opportunities are afforded as provided by Article IX of the Constitution," and therefore that "neither the State nor the State Board of Education has deprived any plaintiff of any right under the North Carolina Constitution."

¶ 18     After a hearing, the trial court denied State Defendants' motion to dismiss. State Defendants appealed this ruling to the North Carolina Court of Appeals.

¶ 19     In March 1996, the Court of Appeals reversed the trial court's denial of State Defendants' motion to dismiss. *Leandro v. State*, 122 N.C. App. 1 (1996). The Court of Appeals held that "the fundamental educational right under the North Carolina Constitution is limited to one of equal *access* to education, and it does not embrace a qualitative standard." *Id.* at 11 (emphasis added). "Thus," the court stated,

"[Plaintiffs'] claims that the Constitution provides a fundamental right to *adequate* educational opportunities, and that the State has violated that alleged right, should have been dismissed for failure to state a claim upon which relief can be granted." *Id.* Plaintiffs subsequently appealed this ruling to this Court.

¶ 20 In July 1997, this Court unanimously reversed.[4] *Leandro I*, 346 N.C. at 358. As an initial matter, the Court addressed the State's argument that courts could not hear cases on claims of educational adequacy because they raised "nonjusticiable political questions." *Id.* at 344–45. The Court squarely rejected this notion. *Id.* Rather, "[w]hen a government action is challenged as unconstitutional, the courts have a duty to determine whether that action exceeds constitutional limits." *Id.* at 345. "Therefore," the Court held, "it is the duty of this Court to address plaintiff-parties' constitutional challenge to the state's public education system." *Id.*

¶ 21 Next, the *Leandro I* Court addressed the primary question of that case: whether the North Carolina Constitution establishes the right to *qualitatively adequate* educational opportunities, rather than mere educational *access*. *Id.* Here, the Court unanimously agreed with Plaintiffs' claim: the educational rights enshrined in our Constitution do not merely protect a student's ability to *access* an

---

[4] Justice Orr dissented from the Court's rejection of Plaintiff's argument regarding *equal* educational opportunities but concurred in the Court's recognition of Plaintiff's claim regarding educational adequacy. *Id.* at 358–64 (Orr, J., dissenting in part and concurring in part).

education; rather, "there is a qualitative standard inherent in the right to education guaranteed by this state's constitution." *Id.* at 346. More specifically, this Court

> conclude[d] that the right to education provided in the state constitution is a right to a sound basic education. An education that does not serve the purpose of preparing students to participate and compete in the society in which they live and work is devoid of substance and is constitutionally inadequate.

*Id.* at 345. Accordingly, the Court held that "[t]he trial court properly denied defendants' motion to dismiss this claim for relief[, and] [t]he Court of Appeals erred in concluding otherwise." *Id.* at 348.

¶ 22        After recognizing the right to a sound basic education, this Court then set out to broadly define its contours. "For purposes of our Constitution," the Court held,

> a "sound basic education" is one that will provide the student with at least: (1) sufficient ability to read, write, and speak the English language and a sufficient knowledge of fundamental mathematics and physical science to enable the student to function in a complex and rapidly changing society; (2) sufficient fundamental knowledge of geography, history, and basic economic and political systems to enable to student to make informed choices with regard to issues that affect the student personally or affect the student's community, state, and nation; (3) sufficient academic and vocational skills to enable the student to successfully engage in post-secondary education or vocational training; and (4) sufficient academic and vocational skills to enable to student to compete on an equal basis with others in further formal education or gainful employment in contemporary society.

*Id.* at 347.

¶ 23        The *Leandro I* Court then noted certain factors that the trial court could consider on remand in assessing whether Plaintiff-parties were being afforded their constitutional right to a sound basic education. *Id.* at 355. These factors included, but were expressly not limited to, "[e]ducational goals and standards adopted by the legislature," " 'input' [measurements] such as per-pupil funding or general educational funding provided by the state," and " 'output' measurements" such as "the level of performance of the children of the state and its various districts on standard achievement tests." *Id.* at 355, 357.

¶ 24        Finally, the *Leandro I* Court noted the powers and duties of each branch of our government in protecting the constitutional right to a sound basic education. Because "the administration of the public schools of the state is best left to the legislative and executive branches," the Court clarified that "the courts of this state must grant every reasonable deference to [those] branches when considering whether they have established and are administering a system that provides the children of the various school districts of the state a sound basic education." *Id.* at 357. "[A] clear showing to the contrary must be made before the courts may conclude that they have not." *Id.* "Only such a clear showing," the Court counseled, "will justify a judicial intrusion into an area so clearly the province, *initially at least*, of the legislative and executive branches as the determination of what course of action will lead to a sound basic education." *Id.* (emphasis added).

¶ 25     After noting the importance of this initial deference, though, this Court made clear its own constitutional obligation:

> [L]ike the other branches of government, the judicial branch has its duty under the North Carolina Constitution. If on remand this case to the trial court, that court makes findings and conclusions from competent evidence to the effect that defendants in this case are denying children of the state a sound basic education, a denial of a fundamental right will have been established. It will then become incumbent upon defendants to establish that their actions denying this fundamental right are necessary to promote a compelling governmental interest. If defendants are unable to do so, *it will then be the duty of the court to enter a judgment granting declaratory relief and such other relief as needed to correct the wrong* while minimizing the encroachment upon the other branches of government.

*Id.* (emphasis added).

¶ 26     With these principles as a guide, this Court then remanded the case back to the trial court to determine whether the State was upholding its constitutional duty to provide all children with a sound basic education. *Id.* at 358.

## B. *Leandro II*: Establishing a Violation

¶ 27     Upon remand, then-Chief Justice Mitchell designated the case as exceptional under Rule 2.1 of our General Rules of Practice and assigned it to Judge Howard Manning.[5] Thereafter, Judge Manning presided over several years of fact finding, research, and hearings culminating in a fourteen-month trial in which the court took

---

[5] We take a moment of privilege to express the Court's gratitude to Judge Manning for his many years of diligent service to the State presiding over this case.

evidence from over forty witnesses and thousands of pages of exhibits to answer one foundational question: whether the State was complying with or violating *Leandro I*'s constitutional mandate to provide all children with the opportunity to receive a sound basic education. At the conclusion of this process, the trial court issued its factual findings and legal conclusions via four "Memoranda of Decision" published between October 2000 and April 2002.

¶ 28 In its first Memorandum of Decision, issued 12 October 2000, the trial court considered the constitutionality of the major components of North Carolina's Statewide Education Delivery system. As a preliminary matter, the trial court explained that "[b]ecause of the sheer size and complexity of dealing with evidence relating to five (5) low wealth districts," the court "made the initial decision to take evidence on one system" that would serve as a representative district. "The [c]ourt suggested that the low wealth district be Hoke County and the parties agreed with that decision[.]"Upon selecting this representative district, the court noted that "[i]t is clear that the same issues affecting each small district are similar[.]" Thereafter, the trial court focused its inquiry primarily—though not exclusively—on this representative county, and "plaintiff-intervenors were permitted to participate fully in discovery and in the trial of the case centered on Hoke County." Likewise, the State repeatedly made clear that despite the parties' selection of Hoke County as a representative district, its various remedial "efforts have been directed to

establishing and maintaining a *State-wide* system which provides adequate educational opportunities to *all* students," and that "[t]he State has never understood the Supreme Court or [the trial] [c]ourt to have ordered the defendants to provide students in Hoke County or any of the other plaintiff or plaintiff-intervenor school districts special treatment, services or resources which were not available to at-risk students in other LEAs across the State." (emphasis added).

¶ 29        After noting this procedure, the trial court's first Memorandum of Decision noted its preliminary conclusions of law. Most pertinently, the court determined that as a whole, North Carolina's Statewide Educational Delivery System—including its curriculum, teacher licensing and certification standards, funding delivery system, and school accountability program—was "sound, valid, and constitutional when measured against the sound basic education standard of *Leandro*." "However," the court noted, "the existence of a constitutionally sound and valid [educational delivery system], standing alone, does not constitute clear evidence that [that system] is being properly implemented . . . in such a manner as to provide each child with an equal opportunity to receive a sound basic education." The court made clear that these legal conclusions applied "to all school systems in North Carolina, including Hoke County."

¶ 30        In its second Memorandum of Decision, issued 26 October 2000, the trial court considered the implementation of the various facets of the statewide educational delivery system with respect to at-risk students. The court determined that in order

"for at-risk children to have an equal opportunity for a sound basic education, the State should provide quality pre-kindergarten programs for at-risk children." Again, the court emphasized that its findings and conclusions were directed at both Hoke County and "other counties in North Carolina."

¶ 31        In its third Memorandum of Decision, issued 26 March 2001, the trial court compared student achievement data from at-risk students in various counties across the state. The court considered several different measures of student achievement, including standardized test scores, high school retention rates, and vocational and college preparedness. "This comparison showed that there were at-risk students failing to achieve a sound basic education statewide, as well as in Hoke County, and that the low performance of at-risk students was similar regardless of the wealth and resources of the school system attended." "Taking all of the evidence into account, the [c]ourt determined that the at-risk children in North Carolina are not obtaining a sound basic education[.]" Again, the court emphasized that "[t]his problem is not limited to Hoke County." Indeed, the court expressly stated that the evidence

> show[ed] that HCSS is not alone or isolated in terms of the poor academic performance of great numbers of its at-risk students. Poor academic performance of at-risk populations of North Carolina public school students permeates throughout the State regardless of the "wealth" or local funding provided. Based on the data available and the enormity of the at-risk problems throughout the State, the [c]ourt cannot close its eyes to this fact and look only at HCSS. The poor academic performance of at-risk populations is too widespread to by-pass and put off for

another day.

"Reduced to essentials," the court concluded, "the plaintiffs and plaintiff-intervenors have produced clear and convincing evidence that there are at-risk children in Hoke County and throughout North Carolina who are, by virtue of the ABCs accountability system and other measures, not obtaining a sound basic education."

¶ 32      In its fourth and final Memorandum of Decision, issued 4 April 2002, the trial court issued its final judgments and orders. First, the trial court enumerated certain minimum requirements for statewide *Leandro* compliance including: (1) "that every classroom be staffed with a competent, certified, well-trained teacher who is teaching the standard course of study by implementing effective educational methods that provide differentiated, individualized instruction, assessment and remediation to the students in that classroom;" (2) "that every school be led by a well-trained, competent Principal with the leadership skills and the ability to retain competent, certified, and well-trained teachers;" and (3) "that every school be provided, in the most cost-effective manner, the resources necessary to support the effective instructional programs within that school so that the educational needs of all children, including at-risk children, to obtain a sound basic education, can be met." Second, the trial court concluded that "there are children at-risk of educational failure who are not being provided the equal opportunity to obtain a sound basic education because their particular LEA, such as the Hoke County Public Schools, is not providing them with

one or more of the educational services set out . . . above." Third, the trial court emphasized that "the State of North Carolina is ultimately responsible for providing each child with access to a sound basic education and that this ultimate responsibility cannot be abdicated by transferring responsibility to local boards of education." Fourth, the trial court declared that "the State of North Carolina is ORDERED to remedy the [c]onstitutional deficiency for those children who are not being provided the basic educational services set out [above], whether they are in Hoke County[ ] or another county within the State." Fifth, the court stated that "[t]he nuts and bolts of how this task should be accomplished is not for the [c]ourt to do," but rather "belongs to the executive and legislative branches of government." "By directing this to be done," the court noted, "the [c]ourt is showing proper deference to the executive and legislative branches by allowing them, initially at least, to use their informed judgment as to how best to remedy the identified constitutional deficiencies." Finally, the court clarified that its prior three Memoranda of Decision were incorporated into its final judgment and "constitute the Decision and Judgment of th[e] [c]ourt," ordered the State to keep the plaintiff-parties and the court advised of its remedial actions, and retained jurisdiction over the case to resolve issues of enforcement.

¶ 33          On 6 May 2002, the State appealed. Thereafter, both the plaintiff-parties and the State sought discretionary review by this Court prior to a determination by the

Court of Appeals. On 18 March 2003, this Court allowed the parties' motions for discretionary review. The appeal was heard in this Court on 10 September 2003.

¶ 34        On 30 July 2004, in *Leandro II*, this Court unanimously affirmed the trial court's central conclusion: "the State had failed in its constitutional duty to provide certain students with the opportunity to attain a sound basic education, as defined by this Court's holding in [*Leandro I*]. 358 N.C. at 608.

¶ 35        As an initial matter, the Court in *Leandro II* noted the unique procedural history of this case. Because the trial court designated Hoke County "as the representative plaintiff district," this Court noted that "our consideration of the case is properly limited to the issues relating solely to Hoke County as raised at trial." *Id.* at 613. The Court recognized, however, that "plaintiffs from the four other rural districts . . . were not eliminated as parties as a result of the trial court's decision to confine evidence to its effect on Hoke County Schools." *Id.* at 613 n.5. Accordingly, "[w]ith regard to the claims of named plaintiffs from the other four rural districts, [this Court] remanded [the case] to the trial court for further proceedings that include, but are not necessarily limited to, presentation of relevant evidence by the parties, and findings and conclusions of law by the trial court." *Id.* More generally, though, the Court emphasized that

> the unique procedural posture and substantive importance
> of the instant case compel us to adopt and apply the
> broadened parameters of a declaratory judgment action
> that is premised on issues of great public interest. The

> children of North Carolina are our state's most valuable
> renewable resource. If inordinate numbers of them are
> wrongfully being denied their constitutional right to the
> opportunity for a sound basic education, our state courts
> cannot risk further and continued damage because the
> perfect civil action has proved elusive.

*Id.* at 616. Likewise, the Court noted that while declaratory judgment actions

> require that there be a genuine controversy to be decided,
> they do not require that the participating parties be strictly
> designated as having adverse interests in relation to each
> other. In fact, declaratory judgment actions, by definition,
> are premised on providing parties with a means for courts
> of record to declare such rights, status, and other legal
> relations among such parties.

*Id.* at 617 (cleaned up). This procedural flexibility is necessary, the Court concluded,

because

> *Leandro* and our state Constitution . . . accord[ ] the right
> at issue to all children of North Carolina, regardless of
> their respective ages or needs. Whether it be the infant Zoe,
> the toddler Riley, the preschooler Nathaniel, the "at-risk"
> middle-schooler Jerome, or the not "at-risk" seventh-
> grader Louise, the constitutional right articulated in
> *Leandro* is vested in them all.

*Id.* at 620.

¶ 36      With these procedural issues addressed, the *Leandro II* Court then assessed the merits of the trial court's ruling. First, the Court considered "whether there was a clear showing of evidence supporting the trial court's conclusion that 'the constitutional mandate of *Leandro* has been violated [in the Hoke County School System] and action must be taken by both the LEA [Local Educational Area] and the

State to remedy the violation.' " *Id.* at 623 (alterations in original). After reviewing the evidence documented by the trial court regarding educational "inputs," academic "outputs," post-secondary and vocational opportunities, and the State's educational delivery system and funding mechanisms, the Court agreed with the trial court's foundational determination: "the State's method of funding and providing for individual school districts such as Hoke County was such that it did not comply with *Leandro*'s mandate of ensuring that all children of the state be provided with the opportunity for a sound basic education." *Id.* at 637. The Court concluded that "the trial court's approach to the issue was sound and its order reflects both findings of fact that were supported by the evidence and conclusions that were supported by ample and adequate findings of fact." *Id.* at 638. Therefore, the Court "affirmed those portions of the trial court's order that conclude that there has been a clear showing of a denial of the established right of Hoke County students to gain their opportunity for a sound basic education and those portions of the order that require the State to assess its education-related allocations to the county's schools so as to correct any deficiencies that presently prevent the county from offering its students the opportunity to obtain a *Leandro*-conforming education." *Id.*

¶ 37 Second, the *Leandro II* Court addressed the trial court's Pre-K ruling. On the questions of rights and violations, the Court agreed with the trial court: the evidence presented at trial clearly supported the conclusion "that there was an inordinate

number of 'at-risk' children who were entering the Hoke County school district . . .

behind their non 'at-risk' counterparts[,]" that such 'at-risk children were likely to

stay behind, or fall further behind, their non 'at-risk' counterparts as they continued

their education[,]" "that the State was providing inadequate resources for such 'at-

risk' prospective enrollees, and that the State's failings were contributing to the 'at-

risk' prospective enrollees' subsequent failure to avail themselves of the opportunity

to obtain a sound basic education." *Id.* at 641. Accordingly, the Court agreed with the

trial court's conclusion "that State efforts towards providing remedial aid to 'at-risk'

prospective enrollees were inadequate." *Id.* at 642.

On the question of remedy, though, this Court disagreed. "[T]here is a marked

difference," the Court noted, "between the State's recognizing a need to assist 'at-risk'

students prior to enrollment in the public schools and a court order compelling the

legislative and executive branches to address that need in a singular fashion." *Id.*

> In our view, while the trial court's findings and conclusions concerning the problem of 'at-risk' prospective enrollees are well supported by the evidence, a similar foundational support cannot be ascertained for the trial court's order requiring the State to provide pre-kindergarten classes for either all of the State's 'at-risk' prospective enrollees or all of Hoke County's 'at-risk' prospective enrollees.

*Id.* While the Court

> assuredly recognize[d] the gravity of the situation for "at-risk" prospective enrollees in Hoke County and elsewhere, and acknowledge[d] the imperative need for a solution that will prevent existing circumstances from remaining static

> or spiraling further, we [were] equally convinced that the evidence indicates that the State shares our concerns and, more importantly, that the State has already begun to assume its responsibilities for implementing corrective measures.

*Id.* at 643. Accordingly, the Court held that the trial court's Pre-K remedy was "premature" and "reverse[d] those portions of the trial court order that . . . require[d] the State to provide pre-kindergarten services as the remedy for [the aforementioned] constitutional violations." *Id.* at 645.

¶ 39        Simultaneously, though, the *Leandro II* Court emphasized that if push came to shove, it would not shy away from its duty to address constitutional violations.

> Certainly, when the State fails to live up to its constitutional duties, a court is empowered to order the deficiency remedied, and if the offending branch of government or its agents either fail to do so or have consistently shown an inability to do so, a court is empowered to provide relief by imposing a specific remedy and instructing recalcitrant state actors to implement it.

*Id.* at 642.

¶ 40        Finally, the *Leandro II* Court addressed the question of federal funds. Plaintiffs contended that the trial court had erred by considering educational services provided by federal funds within its statewide assessment for *Leandro* compliance. *Id.* at 645–46. The Court disagreed and concluded that the trial court's consideration of federal funds was permissible because "the relevant provisions of the North Carolina Constitution do not forbid the State from including federal funds in its

formula for providing the state's children with the opportunity to obtain a sound basic education." *Id.* at 646. "While the State has a duty to provide the means for such educational opportunity," the Court clarified, "no statutory or constitutional provisions require that it is concomitantly obliged to be the exclusive source of the opportunity's funding." *Id.*

¶ 41    The *Leandro II* Court concluded by emphasizing the "paramount" importance of education toward "[a]ssuring that our children are afforded the chance to become contributing, constructive members of society." *Id.* at 649. "Whether the State meets this challenge[,]" the Court noted, "remains to be determined." *Id.* Accordingly, the Court remanded "to the lower court[,] and ultimately into the hands of the legislative and executive branches, one more installment in the 200-plus year effort to provide an education to the children of North Carolina." *Id.* "As for the pending cases involving either other rural school districts or urban school districts," the Court "order[ed] that they should proceed, as necessary, in a fashion that is consistent with the tenets outlined in this opinion." *Id.* at 648.

## C. Remedial Phase: 2004–2018

¶ 42    Following *Leandro II*, the trial court diligently undertook its responsibilities on remand and initiated the remedial phase of the *Leandro* litigation. For over a decade, through more than a dozen hearings, the trial court took evidence and heard arguments from the parties regarding the State's various efforts to achieve

constitutional compliance. In alignment with its 2002 Judgment and *Leandro II*, the trial court took evidence and rendered factual finding and legal conclusions regarding the constitutional adequacy of educational opportunities not just in Hoke County, but statewide. For instance, at different points during this period, the trial court reviewed evidence regarding the State's Disadvantaged Student Supplemental Funding (DSSF) program, county-specific student achievement data from Hoke and other counties, statewide grade-specific achievement data, and statewide subject-specific achievement data, among many other categories. The trial court primarily issued its factual findings and legal conclusions based on this evidence in periodic "Notice of Hearing and Order[s]" or "Report[s] from the Court," in which the trial court memorialized past proceedings, made factual findings and legal conclusions, and requested particular information from the parties in upcoming hearings.

¶ 43    Reviewing a few of these orders is illustrative. First, on 9 September 2004, the trial court's order focused in part on the State's response to statewide teacher recruitment and retention issues through the DSSF program. After reviewing the submissions of the parties, the trial court concluded that "[t]here is no dispute that there exists a serious problem in hiring, training[,] and retaining certified teachers in North Carolina, especially in the low wealth plaintiff LEAs and other low wealth LEAs." The court observed that the Department of Public Instruction and the State Board of Education

> acknowledged the constitutional deficiency and the lack of compliance under *Leandro* in the classroom teacher area and sought $22,000,000 from the General Assembly to fund the DSSF pilot program for sixteen (16) LEAs in which there was demonstrated need to remedy the constitutional deficiency of the presence of a competent, certified[,] and well trained teacher in individual classrooms.

"Despite knowing of this deficiency and being repeatedly advised of [the] demonstrated need for assistance in these low-wealth school districts and despite being advised of the constitutional requirements in *Leandro*," the court noted, "the General Assembly of North Carolina passed its budget and adjourned without funding the DSSF program for any LEA, including HCSS." As such, the trial court "direct[ed] counsel for the State . . . to be prepared [at the next hearing] to report to the [c]ourt on behalf of the legislative branch of government (the General Assembly) what action the General Assembly has taken[ ] to address its failure to fund the pilot $22,000,000 DSSF program."

¶ 44        Second, on 15 March 2009, the trial court's order focused primarily on Halifax County Public Schools. After an extensive review of student achievement data broken down by individual schools and grade-levels throughout the district, the trial court concluded that

> [t]he majority of these children in the Halifax County Public Schools from elementary school through high school are not receiving the equal opportunity to obtain a sound basic education and the State of North Carolina must take action to remedy this deprivation of constitutional rights since the State of North Carolina is responsible to see that

> these schools become *Leandro* compliant in the classroom
> and in the principal's office and in the general
> administration and leadership of the system.

"Accordingly," the trial court concluded, "it is time for the State to exert itself and exercise command and control over the Halifax County Public Schools beginning in the school year 2009–2010, nothing more and nothing less." More broadly, based on the extensive evidence presented, the trial court reiterated its conclusion regarding a statewide *Leandro* violation:

> poor academic performance remains a problem in a host of
> elementary, middle[,] and high schools throughout North
> Carolina and as a result, the children of those schools who
> are blessed with the right to the equal opportunity to
> obtain a sound basic education as guaranteed by the
> Constitution and as set out in *Leandro* are being deprived
> of their constitutional right to that opportunity on a daily
> basis.

Indeed, this legal conclusion was repeated verbatim in the trial court's subsequent orders on 3 August 2009, 26 March 2010, and 20 May 2011, among many others.[6]

---

[6] On 15 August 2011, Legislative Defendants filed a Motion to Intervene and For Clarification from the trial court order issued 18 July 2011 regarding "Pre-K services for at-risk four year[-]olds." On 2 September 2011, the trial court denied Legislative Defendants' motion, reasoning that the defendant in this case was the State as a whole, "not the legislative branch—nor the executive branch" individually. In 2013, the General Assembly enacted N.C.G.S. § 1-72.2, which established that legislative leaders "have standing to intervene on behalf of the General Assembly as a party in any judicial proceeding challenging a North Carolina statute or provision of the North Carolina Constitution." N.C.G.S. § 1-72.2(b). In 2017, N.C.G.S. § 1-72.2 was amended by adding: "[i]ntervention pursuant to this section shall be effected upon the filing of a notice of intervention of right in the trial or appellate court in which the matter is pending regardless of the stage of the proceeding." Here, the record reflects no attempt by Legislative Defendants to intervene in this litigation between the 2011 motion and their 2021 intervention.

¶ 45 Third, on 5 May 2014, the trial court's order focused on "the reading problem."[7] The trial court summarized its factual findings regarding various reading programs and assessments from Halifax County, Forsyth County, Durham County, Guilford County, Johnston County, Union County, and Charlotte-Mecklenburg County, among several others. Based on these statewide factual findings, the trial court concluded "that there are way too many thousands of school children from kindergarten through . . . high school who have not obtained the sound basic education mandated and defined above and reaffirmed by the North Carolina Supreme Court in November 2013."

¶ 46 Fourth, on 17 March 2015, the trial court's order addressed the State's recent "redefin[ing] and relabeling [of] the standards for academic achievement." The court expressed its concern that

> [n]o matter how many times the [c]ourt has issued Notices of Hearings and Orders regarding unacceptable academic performance, and even after the North Carolina Supreme Court plainly stated that the mandates of *Leandro* remain "in full force and effect[,]" many adults involved in education . . . still seem unable to understand that **the constitutional right to have an equal opportunity to**

---

[7] On 8 November 2013, this Court considered a third appeal within this litigation. *Hoke Cnty. Bd. of Educ. v. State*, 367 N.C. 156 (2013) (*Leandro III*). There, plaintiffs challenged the General Assembly's 2011 statutory changes to its "More at Four" Pre-K program. *Id.* at 156. However, before this Court could consider the case, the General Assembly substantively amended the statute with the apparent intent of ridding the law of its dubious constitutionality. *Id.* at 159. Accordingly, this Court "conclude[d] that the questions originally in controversy between the parties [were] no longer at issue and that th[e] appeal [was] moot." *Id.* Nevertheless, the Court took the opportunity to emphasize that "[o]ur mandates in [*Leandro I* and *II*] remain in full force and effect." *Id.* at 160.

**obtain a sound basic education is a right vested in
<u>each and every child</u> in North Carolina regardless of
their respective age or educational needs**.

Based on these findings, trial court again concluded "that the valid assessments of student achievement in North Carolina show that many thousands of children in K–12 . . . are not obtaining a sound basic education. This is an ongoing problem that needs to be dealt with and corrected." Accordingly, the trial court ordered the State to "propose a definite plan of action as to how the State of North Carolina intends to correct the educational deficiencies in the student population."

¶ 47     These orders illustrate several key themes within the record. First, the trial court made extensive factual findings over the course of about twelve years regarding many educational "inputs" and "outputs" including school funding, teacher retention, instructional methods, and academic performance. In reviewing this data, the trial court's findings of fact consider the efficacy of the State's various piecemeal proposals to achieve *Leandro* compliance, such as the DSSF and the redefining of academic standards. Second, these factual findings did not focus solely on Hoke County, but expressly drew upon testimony and evidence regarding rural, urban, and suburban counties across the state. Third, based upon this clear and convincing evidence, the trial court repeatedly documented its ultimate legal conclusion that "in way too many school districts across the state, thousands of children in the public schools have failed to obtain, and are not now obtaining[,] a sound basic education as defined by

and required by the *Leandro* decisions." Put differently, the trial court repeatedly concluded based on clear and convincing evidence that, despite its piecemeal compliance efforts, the State remained in an ongoing and statewide violation of its constitutional duty. Fourth, despite its growing impatience with the State's failure to remedy its statewide violation, the trial court continued—for well over a decade—to defer to the executive and legislative branches to craft a remedy. Fifth and finally, in response to the repeated failure of various piecemeal remedial attempts, the trial court ultimately ordered the State to propose and implement a comprehensive "definite plan of action" to remedy its statewide *Leandro* violation.

**D. WestEd Report and the Comprehensive Remedial Plan: 2018–2021**

¶ 48 On 7 October 2016, upon Judge Manning's retirement, then-Chief Justice Mark Martin reassigned this case to Judge W. David Lee.[8] On 10 July 2017, the State Board of Education filed a Motion for Relief Pursuant to Rule 60 and Rule 12 requesting that the trial court relinquish jurisdiction over the case. The SBE contended that "[b]ecause the factual and legal landscapes have significantly changed [since the beginning of the case], the original claims, as well as the resultant trial court findings and conclusions, are divorced from the current law and circumstances

---

[8] We take a moment of privilege to express the Court's gratitude to Judge Lee's family (Judge Lee himself recently passed away on 4 October 2022) for his many years of diligent service to the State presiding over this case.

[and] are stale." As such, the SBE argued, "[c]ontinued status hearings on the present system . . . exceed the jurisdiction established by the original pleadings in this action."

¶ 49 On 7 March 2018, the trial court denied the SBE's motion to relinquish jurisdiction. First, the court stated its factual findings, including expressly finding that "[t]he court record is replete with evidence that the *Leandro* right continues to be denied to hundreds of thousands of North Carolina schoolchildren" and that "a definite plan of action is still necessary to meet the requirements and duties of the State of North Carolina with regard to its children having equal opportunity to obtain a sound basic education." While the court noted that it "indeed indulges in the presumption of constitutionality with respect to each and every one of the legislative enactments cited by the SBE," that "is not the issue before the court." Rather, the court found, "the evidence before this court upon the SBE motion is wholly inadequate to demonstrate that these enactments translate into substantial compliance with the constitutional mandate of *Leandro* measured by applicable educational standards."

¶ 50 Based on these factual findings, the trial court concluded that "[t]he changes in the factual landscape that have occurred during the pendency of this litigation do not serve to divest the court of its jurisdiction to address the constitutional right at issue in this case." Further, the court concluded that "there is an ongoing constitutional violation of every child's right to receive the opportunity for a sound basic education[,]" and that "[t]his court not only has the *power* to hear and enter

appropriate orders declaratory and remedial in nature, but also has a *duty* to address this violation." The trial court concluded that "state defendants have the burden of proving that remedial efforts have afforded substantial compliance with the constitutional directives of our Supreme Court," and that "[t]o date, neither defendant has met this burden." "Both law and equity demand the prospective application of the constitutional guarantee of *Leandro* to every child in this State."

¶ 51        In closing, the trial court emphasized its own constitutional duty and growing impatience with the legislative and executive branches:

> This [c]ourt notes that both branches have had more than a decade since the Supreme Court remand in *Leandro II* to chart a course that would adequately address this continuing constitutional violation. The clear import of the *Leandro* decisions is that if the defendants are unable to do so, it will be the duty . . . of the court to enter a judgment "granting declaratory relief and such other relief as needed to correct the wrong while minimizing the encroachment upon the other branches of government." (*Leandro I*).

> This trial court has held status conference after status conference and continues to exercise tremendous judicial restraint. This court is encouraged by Governor Cooper's creation of the Governor's Commission on Access to a Sound Basic Education. . . . The time is drawing nigh, however, when due deference to both the legislative and executive branches must yield to the court's duty to adequately safeguard and actively enforce the constitutional mandate on which this case is premised. It is the sincere desire of this court that the legislative and executive branches heed the call.

¶ 52     That same day, the trial court also issued a Consent Order Appointing Consultant. In January 2018, the State and plaintiffs filed a joint motion in which they proposed to nominate, for the court's consideration and appointment, an independent, non-party consultant to assess the current state of *Leandro* compliance in North Carolina and to make subsequent comprehensive recommendations for specific actions necessary to achieve sustained constitutional compliance. In its subsequent Order, the court agreed to the parties' request and stated that the appointed consultant would be charged with recommending specific actions the State should take to meet the core requirements of *Leandro*, including providing a competent and well-trained teacher in every classroom, providing a competent and well-trained principal in every school, and identifying resources necessary to ensure that all students have an equal opportunity to obtain a sound basic education. In its Consent Order, the trial court consented to the parties' joint nomination of WestEd, a nationally acclaimed nonpartisan education research and development nonprofit, to serve as the independent non-party consultant. As such, WestEd was instructed to submit its final recommendation to the parties and the court within one year, and the parties were required to submit a subsequent "proposed consent order . . . of specific actions to achieve compliance with the constitutional mandates establish forth above."

¶ 53 Thus began the WestEd chapter of this litigation. For the next year, in collaboration with the Friday Institute for Educational Innovation at North Carolina State University and the Learning Policy Institute, WestEd conducted thirteen distinct studies to better identify, define, and understand key issues and challenges to North Carolina's education system and to offer a comprehensive framework of change for the State. The researchers developed and carried out an extensive research agenda to investigate the current state and major needs of North Carolina public education in four overarching areas: (1) access to effective educators, (2) access to effective school leaders, (3) adequate and equitable school funding and resources, and (4) adequate accountability and assessment systems.

¶ 54 WestEd's methodology was comprehensive. Each of its thirteen studies was designed to address specific research questions and used mixed-method designs such as data analysis, school visits, focus group interviews with key stakeholders, statewide surveys, reviews of prior studies, and cost function analysis. "Site visits, interviews, and focus groups were designed to maximize engagement with education stakeholders representing the diversity of the state in terms of geography, school level, and school type as well as the characteristics of the student and educator populations." Researchers collected new data from schools in forty-four counties, engaged with over 1,200 educators, and examined existing data from Duke

University's North Carolina Education Research Data Center and UNC's Education

Policy Initiative at Carolina.

¶ 55          On 4 October 2019, WestEd submitted its final report to the trial court. In

short, the WestEd Report concluded that as North Carolina educators "prepare for

the 2019–20 school year, the state is *further away* from meeting its constitutional

obligation to provide every child with the opportunity for a sound basic education

than it was when the Supreme Court of North Carolina issued the *Leandro* decision

more than 20 years ago." (emphasis added). "Although there have been many efforts

on the part of the state and districts to improve students' achievement, the challenges

of providing every student with a sound basic education have increased, along with

the number of at-risk students." Specifically, the WestEd Report found systemic

deficiencies in teacher and principal quality and supply (especially in low-wealth

districts) and programmatic funding and resources (especially those necessary to

support disadvantaged students), among other statewide shortcomings. While the

WestEd Report noted that many promising initiatives had been put in place, they

"have neither been sustained nor been brought to scale and are insufficient to

adequately address the *Leandro* requirements."

¶ 56          Accordingly, the WestEd Report issued eight primary findings and

recommendations. These recommendations included revising the state funding model

to provide adequate and equitable resources, providing all at-risk students with the

opportunity to attend high-quality early childhood programs, directing resources and opportunities to economically disadvantaged students, revising the student assessment and school accountability systems, and building an effective regional and statewide system of support for the improvement of low-performing and high-poverty schools, among others. For each of these recommendations, the WestEd Report provided a detailed "investment overview and sequenced action plan" which described the timeline, stakeholders, and resources necessary for proper implementation. Likewise, the action plan itemized the necessary statewide investments for each recommendation for each fiscal year from 2020–2021 to 2027–2028.

On 21 January 2020, the trial court issued its subsequent Consent Order. First, the trial court noted that "[t]he State of North Carolina, North Carolina State Board of Education, and other actors have taken significant steps over time in an effort to improve student achievement and students' opportunity to access a sound basic education." "However," the trial court continued,

> historic and current data before the [c]ourt show that considerable, systemic work is necessary to deliver fully the *Leandro* right to all children in the State. In short, North Carolina's PreK-12 public education system leaves too many students behind—especially students of color and economically disadvantaged students. As a result, thousands of students are not being prepared for full participation in the global, interconnected economy and the society in which they will live, work, and engage as citizens. The costs to those students, individually, and to the State are considerable and if left unattended will result in a North Carolina that does not meet its vast potential.

¶ 58    Next, the trial court addressed the WestEd Report. The court concluded that "[t]he WestEd Report confirms what this [c]ourt has previously made clear: that the State Defendants have not yet ensured the provision of education that meets the required constitutional standard to all school children in North Carolina." The court observed that the WestEd Report's "findings and recommendations are rooted in an unprecedented body of research and analysis, which will inform decision-making and th[e] [c]ourt's approach to this case."

¶ 59    Based on the WestEd Report, the trial court made two primary conclusions of law. First, the trial court concluded that "North Carolina has substantial assets to draw upon to develop a successful PreK-12 education system that meets the *Leandro* tenets." These assets "includ[e] a strong state economy, a deep and long-standing commitment to public education to support the social and economic welfare of its citizens, and an engaged business community that sees the value and economic benefits of the public education system."

¶ 60    Second, the trial court concluded that "despite numerous initiatives, many children are not receiving a *Leandro*-conforming education; systemic changes and investments are required to deliver the constitutional right to all children." On this point, the court acknowledged that "the State Defendants face greater challenges than ever" in achieving *Leandro* compliance, and that "systemic, synchronous action and investments are necessary to successfully deliver the *Leandro* tenets," including

in teacher quality and supply, principal quality and supply, resources and school funding, assessment and accountability systems, low-performing and high-poverty schools, early childhood learning and Pre-K, and alignment and preparation for post-secondary opportunities. Throughout its order, the trial court repeatedly emphasized that "[t]he Defendants have not yet met their constitutional duty to provide all North Carolina students with the opportunity to obtain a sound basic education."

Based on these legal conclusions, the trial court ordered "the State Defendants to work expeditiously and without delay to take all necessary actions to create and fully implement" a comprehensive remedial plan to address each of the seven *Leandro* compliance issues noted above. The trial court further ordered the parties

> [t]o keep the [c]ourt fully informed as to the remedial progress . . . [by] submit[ting] a status report to the [c]ourt . . . setting out . . . :
>
> 1. Specific actions that the State Defendants must implement in 2020 to begin to address the issues identified by WestEd and described herein and the seven components set forth above;
>
> 2. A date by which the State Defendants, in consultation with each other and the Plaintiffs, will submit to the [c]ourt additional, mid-range actions that should be implemented, including specific actions that must be taken, a timeframe for implementation, and an estimate of the resources in addition to current funding, if any, necessary to complete those actions[; and]
>
> 3. A date by which the State Defendants, in consultation with each other and the Plaintiffs, will submit to the [c]ourt a comprehensive remedial plan . . . to provide all

> public school children the opportunity for a sound basic education, including specific long-term actions that must be taken, a timeframe for implementation, an estimate of resources in addition to current funding, if any, necessary to complete those actions, and a proposal for monitoring implementation and assessing the outcomes of the plan.

The trial court likewise ordered State Defendants to "identify the State actors and institutions responsible for implementing specific actions and components of the proposed Plan," and retained jurisdiction over the case and parties.

¶ 62 On 15 June 2020, the parties submitted their initial "Fiscal Year 2021 Remedial Plan and Action Steps" to the trial court. As instructed, the joint report stated the parties' shared goals and commitments for each of the seven issue areas identified in the trial court's January 2020 Order for fiscal year 2021. These commitments addressed both broad issues, such as "[s]ignificantly increas[ing] the racial and ethnic diversity of North Carolina's qualified and well-prepared teacher workforce," and more specific steps, such as "[r]emov[ing] [the] 12.75 percent funding cap for students with disabilities to provide supplemental funding for all students with disabilities at the current formula rate."

¶ 63 On 1 September 2020, the trial court issued a "Consent Order on *Leandro* Remedial Action Plan for Fiscal Year 2021" in response to the parties' joint report. The trial court approved the report and ordered Defendants to implement its remedial actions by 30 June 2021. Further, the trial court ordered Defendants, "in consultation with Plaintiff parties, [to] develop and present to the [c]ourt[ ] a *Leandro*

Comprehensive Remedial Plan to be fully implemented by the end of 2028 with the objective of fully satisfying the Defendant's *Leandro* obligations by the end of 2030." The court likewise ordered Defendants to submit quarterly status reports "to assist the [c]ourt's efforts to enter a final, enforceable judgment in this case, while promoting transparency in these proceedings."

On 15 March 2021, State Defendants submitted their Comprehensive Remedial Plan (CRP) to the trial court. As mandated by the trial court's prior orders, the CRP laid out "both broad programs and discrete, individual action steps to be taken [between 2021 and 2028] to achieve the overarching constitutional obligation to provide[ ] all children the opportunity to obtain a sound basic education in a public school [by 2030]." "The Parties agree[d] that the actions outlined in [the CRP] are the necessary and appropriate actions needed to address the constitutional violations in providing the opportunity for a sound basic education to all children in North Carolina."

As its title indicates, the CRP is comprehensive. For each of the seven pillar issues, the CRP enumerates specific action steps to be initiated in various fiscal years between 2021 and 2028. Each action step lists the various state actors responsible for its implementation and itemizes the specific funding required in each year. Some of the steps, such as "[u]pdat[ing] the State's school administrator preparation standards and principal licensure requirements to align with the National Education

Leadership Preparation (NELP) standards," require administrative effort, but no additional funding. Others, such as "[p]rovid[ing] funding to cover the reduced-price lunch co-pays for all students who qualify for reduced-price meals so that those students would receive free lunches," require a static amount of funding ($3.9 million) each fiscal year. Still others, like "[i]ncreas[ing] low wealth funding to provide eligible counties supplemental funding equal to 110% of the statewide local revenue per student," require increasing funding in each fiscal year (growing from $20 million in 2022 to $182.7 million by 2028). The CRP is the only remedial plan submitted to the trial court by any party in this case.

¶ 66      On 11 June 2021, the trial court issued its "Order on Comprehensive Remedial Plan." After reviewing and approving the CRP, the trial court noted that "[t]he urgency of implementing the [CRP] on the timeline currently set forth by State Defendants cannot be overstated . . . . Time is of the essence." The trial court further emphasized that "[i]f the State fails to implement the actions described in the [CRP,] . . . 'it will then be the duty of this [c]ourt to enter a judgment granting declaratory relief and such other relief as needed to correct the wrong.' [*Leandro I*,] 346 N.C. at 357." Finally, the trial court ordered that "the [CRP] shall be implemented in full and in accordance with the timelines set forth therein," and that

> [t]he State shall inform and engage its actors, agencies, divisions, and/or departments as necessary to ensure the State's compliance with this Order, including without limitation seeking and securing such funding and

resources as are needed and required to implement in a sustainable manner the programs and policies set forth in the [CRP].

**E. November 2021 Order, April 2022 Order, and Present Appeal**

¶ 67        On 6 August 2021, State Defendants submitted their first progress report regarding implementation of the CRP. Plaintiff parties submitted responses on 25 August 2021. On 8 September 2021, the trial court held a subsequent hearing to review the State's progress toward the CRP. In short, State Defendants made clear to the trial court that they had not made progress toward substantially implementing the action steps within the CRP due to inadequate existing allocations of the necessary funding.

¶ 68        On 22 September 2021, the trial court issued its subsequent "Order on First Progress Reports for Implementation of Comprehensive Remedial Plan." Therein, the trial court made the following "findings of fact, each of which was stipulated to by Counsel on the record at the [8 September 2021] hearing:"

> 1. The [CRP], developed by State Defendants in consultation with Plaintiffs, is a fair and reasonable plan that is based upon the extensive evidence developed in this action . . . . The parties to this action agree that this fair and reasonable plan is the necessary step to provide the children of our State the opportunity to obtain a sound basic education.
>
> . . . .
>
> 3. The [CRP] represents the only robust and all-embracing plan to secure the opportunity for a sound basic education that has been presented to the [c]ourt over the course of

this decades-long litigation . . . .

. . . .

5. The State of North Carolina presently has available the fiscal resources needed to implement Years 2 and 3 of the [CRP], which in total is approximately $1.7 billion. According to the First Progress Report from the State, as of the time the Report was filed a collection of funding sources could be utilized to support the policies, programs, and procedures in the [CRP]. To wit, an unappropriated cash balance of $8 billion, projected revenues for the current fiscal year of 2021–22 exceeding the current budgetary allocations by about $5 billion, and additional funding from the federal government amounting to over $5 billion.

Following these findings, the trial court noted that

[i]mproved educational policies, programs, and procedures alone do not ensure that the children of our State have the opportunity to obtain a sound basic education unless those policies, programs, and procedures are in fact supported by the resources and funds necessary for implementation. Accordingly, should all necessary steps to fully fund the [CRP] not be taken by the State—that is, our legislative and executive branches—as of [18 October 2021], this [c]ourt is prepared to implement the judicial remedies at its disposal to ensure that our State's children are finally guaranteed their constitutionally-mandated opportunity to obtain a sound basic education.

Therefore, the trial court ordered the parties to appear before it on 18 October 2021 "to inform the court of the State's progress in securing the full funds necessary to implement the [CRP]." "In the event the full funds necessary to implement the [CRP] are not secured by that date," the trial court ordered, "the [c]ourt will hear and

consider any proposals for how the [c]ourt may use its remedial powers to secure such funding."

¶ 71 On 18 October 2021, the trial court conducted this compliance hearing. That same day, the trial court issued an Order in which it noted that it had been "informed by counsel that an appropriations bill in which the [CRP] is fully funded has not, as of that date, been finalized and enacted." "Because the full funds necessary to implement the [CRP] were not secured by [that day], the [c]ourt heard proposals for how [it] may use its remedial powers to secure such funding." The trial court further ordered that Plaintiffs would have until 1 November 2021 to submit "any additional authorities, memoranda of law, or proposed orders for the [c]ourt's consideration on the use of its remedial powers, which include, but are not necessarily limited to, a writ of mandamus, a legislative injunction, sanctions, or a combination thereof," and that State Defendants would have until 8 November 2021 to subsequently respond.

¶ 72 On 10 November 2021, the trial court issued the subsequent Order (November 2021 Order) now before us for review. First, the November 2021 Order made findings of fact summarizing the history of the litigation to that point. The court repeated its prior conclusion that "the evidence before this court is wholly inadequate to demonstrate substantial compliance with the constitutional mandate of *Leandro* measured by applicable educational standards." (cleaned up). The court "noted many shortcomings in the State's accomplishments and the State admitted that [its

Progress] Report showed that it had failed to implement the Year One Plan as ordered." The court found that "more than sufficient funds are available to execute the current needs of the [CRP]." "As of the date of this Order," the trial court declared, "the State's implementation of the [CRP] is already behind the contemplated timeline, and the State has failed yet another class of students. Time is of the essence."

¶ 73          Next, the trial court noted its years and years of deference. The court found that, in compliance with this Court's 1997 instructions in *Leandro I,* it had "granted every reasonable deference to the legislative and executive branches to establish and administer a [*Leandro*-compliant education] system . . . , including, most recently, deferring to State Defendants' leadership in the collaborative development of the [CRP] over the past three years." The court noted its

> extraordinary lengths in granting these co-equal branches of government time, deference, and opportunity to use their informed judgment as to the 'nuts and bolts' of the remedy, including the identification of the specific remedial actions that required implementation, the time frame for such implementation, the resources necessary for the implementation, and the manner in which to obtain those resources.

The trial court further found that "[t]he failure of the State to provide the funding necessary to effectuate North Carolina's constitutional right to a sound basic education is consistent with the antagonism demonstrated by legislative leaders towards these proceedings, the constitutional rights of North Carolina children, and

this [c]ourt's authority." The court found that it had "provided the State with ample time and every opportunity to make meaningful progress towards remedying the ongoing constitutional violations that persist within our public education system." Nevertheless, "[t]he State has repeatedly failed to act to fulfill its constitutional obligations."

Finally, the court found that "[i]n the seventeen years since the *Leandro II* decision, a new generation of school children, especially those at-risk and socioeconomically disadvantaged, were denied their constitutional right to a sound basic education. Further and continued damage is happening now, especially to at-risk children from impoverished backgrounds, and that cannot continue."

Accordingly, the trial court made the following conclusions of law. First, regarding its own constitutional duties and powers, the trial court concluded:

> 11. Because the State has failed for more than seventeen years to remedy the constitutional violation as the Supreme Court ordered, this [c]ourt must provide a remedy through the exercise of its constitutional role. Otherwise, the State's repeated failure to meet the minimum standards for effectuating the constitutional right to a sound basic education will threaten the integrity and viability of the North Carolina Constitution by:
>
> > a. nullifying the Constitution's language without the people's consent, making the right to a sound basic education merely aspirational and not enforceable;
> >
> > b. ignoring rulings of the Supreme Court of North Carolina setting forth authoritative and binding interpretations of our Constitution; and

c. violating separation of powers by preventing the judiciary from performing its core duty of interpreting our Constitution.

. . . .

13. . . . This [c]ourt concludes that Article I Section 15 of the North Carolina Constitution represents an ongoing constitutional appropriation of funds sufficient to create and maintain a school system that provides each of our State's students with the constitutional minimum of a sound basic education. This constitutional provision may therefore be deemed an appropriation "made by law" [under Article V Section 7].

14. . . . [S]uch an appropriation may be considered to have been made by the people themselves, through the Constitution, thereby allowing fiscal resources to be drawn from the State Treasury to meet that requirement. The Constitution reflects the direct will of the people; an order effectuating Article I, § 15's constitutional appropriation is fully consistent with the framers['] desire to give the people ultimate control over the state's expenditures.

. . . .

20. Accordingly, this [c]ourt recognizes, as a matter of constitutional law, a continuing appropriation from the State Treasury to effectuate the people's right to a sound basic education. . . . When the General Assembly fulfills its constitutional role through the normal (statutory) budget process, there is no need for judicial intervention to effectuate the constitutional right. As the foregoing findings of fact make plain, however, this [c]ourt must fulfill its constitutional duty to effect a remedy at this time.

. . . .

22. The [c]ourt further concludes that . . . [it] has inherent and equitable powers that allow it to enter this Order. . . .

. . . .

23. . . . [T]he [c]ourt's inherent powers are derived from being one of three separate, coordinate branches of the government. . . .

24. In fact, it is the separation of powers doctrine itself which undergirds the judicial branch's authority to enforce its order here. "Inherent powers are critical to the court's autonomy and to its functional existence: 'If the courts could be deprived by the Legislature of these powers, which are essential in the direct administration of justice, they would be destroyed for all efficient and useful purposes.'" *Matter of Alamance Cty. Ct. Facilities*, 329 N.C. 84, 93–94 (1991) . . . (citing *Ex Parte Scheneck*, 65 N.C. 353, 355 (1871).

Second, regarding its duty to limit its encroachment upon its coequal branches, the trial court concluded:

25. . . . The relief proposed here carefully balances these interests with the [c]ourt's constitutional obligation of affording relief to injured parties. First, there is no alternative or adequate remedy available to the children of North Carolina that affords them the relief to which they are so entitled. State Defendants have conceded that the [CRP]'s full implementation is necessary to provide a sound basic education to students and there is nothing else on the table. . . .

26. Second, this [c]ourt will have minimized its encroachment on legislative authority through the least intrusive remedy. Evidence of the [c]ourt's deference over the last seventeen years and its careful balancing of the interests at stake includes but is not limited to:

a. The [c]ourt has given the State seventeen years to arrive at a proper remedy and numerous opportunities proposed by the State have failed to live up to their promise. Seventeen classes of students have since gone through schooling without a sound basic education;

b. The [c]ourt deferred to State Defendants and the other parties to recommend to the [c]ourt an independent, outside consultant to provide comprehensive, specific recommendations to remedy the existing constitutional violations;

c. The [c]ourt deferred to State Defendants and the other parties to recommend a remedial plan and the proposed duration of the plan . . . .

d. The [c]ourt deferred to State Defendants to propose an action plan and remedy for the first year and then allowed the State Defendants additional latitude in implementing its actions in light of the pandemic's effect on education;

e. The [c]ourt deferred to State Defendants to propose a long-term comprehensive remedial plan, and to determine the resources necessary for full implementation . . . .

f. The [c]ourt also gave the State discretion to seek and secure the resources identified to fully implement the [CRP]. . . .

g. The [c]ourt has further allowed for extended deliberations between the executive and legislative branches over several months to give the State an additional opportunity to implement the [CRP];

h. The status conferences, including more recent ones held in September and October 2021, have

> provided the State with additional notice and opportunities to implement the [CRP], to no avail. The [c]ourt has further put [the] State on notice of forthcoming consequences if it continued to violate students' fundamental rights to a sound basic education.

¶ 77 Based on these findings of fact and conclusions of law, the trial court ordered the following:

> 1. The Office of State Budget and Management and the current State Budget Director ("OSBM"), the Office of the State Controller and the current State Comptroller ("Controller"), and the Office of the State Treasurer and the current State Treasurer ("Treasurer") shall take the necessary actions to transfer the total amount of funds necessary to effectuate years 2 & 3 of the [CRP], from the unappropriated balance within the General Fund to the state agencies and state actors with fiscal responsibility for implementing the [CRP] as follows:
>
> > (a) Department of Health and Human Services ("DHHS"): $189,800,000.00;
> >
> > (b) Department of Public Instruction ("DPI"): $1,522,058,000.00; and
> >
> > (c) University of North Carolina System: $41,300,000.00
>
> 2. OSBM, the Controller, and the Treasurer are directed to treat the foregoing funds as an appropriation from the General Fund as contemplated within [N.C.G.S.] § 143C-6-4(b)(2)(a) and to carry out all actions necessary to effectuate those transfers;
>
> . . . .

4. DHHS, the University of North Carolina System, and the State Superintendent of Public Instruction, and all other State agents or State actors receiving funds under the [CRP] are directed to administer those funds to guarantee and maintain the opportunity of a sound basic education consistent with, and under the time frames set out in, the [CRP], including the Appendix thereto;

5. In accordance with its constitutional obligations, the State Board of Education is directed to allocate the funds transferred to DPI to the programs and objectives specified in the Action Steps in the [CRP] and the Superintendent of Public Instruction is directed to administer the funds so allocated in accordance with the policies, rules, . . . and regulations of the State Board of Education so that all funds are allocated and administered to guard and maintain the opportunity of a sound basic education consistent with, and under the time frames set out in, the [CRP], including the appendix thereto[;]

6. OSBM, the Controller, and the Treasurer are directed to take all actions necessary to facilitate and authorize those expenditures;

7. To the extent any other actions are necessary to effectuate the year 2 & 3 actions in the [CRP], any and all other State actors and their officers, agents, servants, and employees are authorized and directed to do what is necessary to fully effectuate years 2 and 3 of the [CRP];

8. The funds transferred under this Order are for maximum amounts necessary to provide the services and accomplish the purposes described in years 2 and 3 of the [CRP]. Savings shall be effected where the total amounts appropriated are not required to perform these services and accomplish these purposes and the savings shall revert to the General Fund at the end of fiscal year 2023, unless the General Assembly extends their availability[.]

Finally, the trial court declared that its Order would be "stayed for a period of thirty (30) days to preserve the *status quo* . . . to permit the other branches of government to take further action consistent with the findings and conclusions of this Order."

¶ 78     One week later, on 18 November 2021, the State enacted An Act to Make Budget Appropriations for Current Operations of State Agencies, Departments, and Institutions, and for Other Purposes, S.L. 2021-180, https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2021-2022/SL2021-180.pdf (Budget Act).

¶ 79     On 24 November 2021, the Controller of the State of North Carolina petitioned the Court of Appeals for a Writ of Prohibition. The Controller sought an order preventing her from being required to comply with the trial court's November 2021. Specifically, the Controller asserted that the transfer directive within the trial court' November 2021 was legally erroneous and required her to act in a manner which would defeat a legal right.

¶ 80     On 30 November 2021, the trial court issued a "Notice of Hearing and Order Continuing Stay of Court's November 10, 2021 Order." After reviewing the Budget Act, the trial court concluded that the Act "appear[ed] to provide for some—but not all—the resources and funds required to implement years 2 & 3 of the [CRP], which may necessitate a modification in the November 10 Order." Therefore, the court announced that it would hold a hearing on 13 December 2021 for the State "to inform

the [c]ourt of the specific components of the [CRP] plan for years 2 & 3 that are funded by the [Budget] Act and those that are not." The court further stayed its 10 November 2021 Order until ten days after the conclusion of its December hearing.

¶ 81        But the trial court's planned 13 December hearing never came to pass. Instead, also on 30 November 2021, the Court of Appeals issued a writ of prohibition restraining the trial court from proceeding in the matter. In its writ, the Court of Appeals concluded that the trial court's November Order erred for two reasons. First, the Court of Appeals reasoned that the trial court's interpretation of a constitutional appropriation within Article I, § 15 would render the subsequent Educational Provisions in Article IX "unnecessary and meaningless." Second, the Court of Appeals stated that the trial court's reasoning "would result in a host of ongoing constitutional appropriations . . . that would devastate the clear separation of powers between the legislative and judicial branches and threaten to wreck the carefully crafted checks and balances that are the genius of our system of government." The Court of Appeals therefore restrain[ed] the trial court from enforcing its direct transfer order. Judge Arrowood dissented from the Court of Appeals' Order.[9]

---

[9] The dissent reasoned that the majority's *ex meru motu* shortening of the time for Plaintiff parties to file a response to the petition to one day when there were no immediate consequences in the case "was arbitrary, capricious and lacked good cause and instead designed to allow this panel to rule on this petition during the month of November" before a new panel was assigned.

¶ 82    On 7 December 2021, the State appealed the November 2021 Order to the Court of Appeals. The next day, 8 December 2021, for the first time since their August 2011 Motion to Intervene regarding Pre-K, Legislative Defendants intervened as a matter of right pursuant to N.C.G.S. § 1-72.2(b) and likewise appealed the trial court's November Order to the Court of Appeals.

¶ 83    On 14 February 2022, the State filed with this Court a Petition for Discretionary Review Prior to Determination by the Court of Appeals of the trial court's November 2021 Order. On 24 and 28 February 2022, Plaintiffs and Plaintiff Intervenors likewise requested this Court's discretionary review prior to determination by the Court of Appeals. On 28 February 2022, Legislative Defendants filed a response requesting that this Court deny the State's petition.

¶ 84    On 21 March 2022, this Court issued an order allowing the State's petition. Before appellate review, however, this Court remanded the case to the trial court "for a period of no more than thirty days for the purpose of allowing the trial court to determine what effect, if any, the enactment of the [2021] State Budget has upon the nature and extent of the relief that the trial court granted in its 11 November 2021 order." This Court instructed the trial court to "make any necessary findings of fact and conclusions of law and to certify any amended order that it chooses to enter with this Court on or before the thirtieth day following the entry of this order." That same

day, Chief Justice Newby reassigned this case from Judge Lee to Judge Michael L. Robinson.[10]

¶ 85        On 24 March, 13 April, and 22 April 2022, the trial court conducted hearings with the parties to determine the effect of the 2021 Budget Act on the relief granted in the trial court's November 2021 Order. At these hearings, the parties took contrasting views on the scope of this Court's 21 March 2022 Remand Order. Legislative Defendants contended that the remand order allowed the trial court "to make a de novo legal determination on the legality and enforceability of the 10 November Order—claiming that, as concluded by the panel of the Court of Appeals, the trial court lacked legal authority to order funds transferred from the North Carolina treasury to fund specific educational programs." Alternatively, Legislative Defendants argued "that the Budget Act as passed fully satisfies the State's obligation to provide K–12 students with a sound basic education as established by the Supreme Court in [*Leandro I*]."

¶ 86        "By comparison, Plaintiffs and the State Defendants contend[ed] that the trial court's task [was] simply to examine the Budget Act as passed and determine the amount of funding provided therein for each of the CRP programs during years 2 and 3 of the CRP." The State's evidence, based on the affidavit of the Chief Deputy

---

[10] We take a moment of privilege to express the Court's gratitude to Judge Robinson for his diligent service to the State presiding over this case.

Director of State Budget for the North Carolina Office of State Budget and Management, indicated that "the Budget Act funded approximately 60 percent of year 2 CRP programs and 49 percent of year three programs."

¶ 87 On 26 April 2022, the trial court issued its subsequent order (April 2022 Order), also now before us for review. As an initial matter, the trial court addressed the parties' arguments regarding its own authority in light of the Court of Appeals' Writ of Prohibition. Because that order "has not been overruled or modified[,]" the court "conclude[d] that it is binding on the trial court." "Accordingly," the trial court determined that it "cannot and shall not consider the legal issue of the trial court's authority to order State officers to transfer funds from the State treasury to the CRP."

¶ 88 The trial court then addressed the effect of the Budget Act on the CRP. "Based on [its] review of analyses provided to it by [OSBM] and the General Assembly's Fiscal Research Division . . . , and the arguments and submissions of the parties," the trial court found that "significant necessary services for students, as identified in the CRP, remain unfunded and/or underfunded by the Budget Act." The court found that "the Budget Act fail[ed] to provide nearly one-half of the[ ] total necessary funds." Specifically, the court found that "the Budget Act fund[ed] approximately 63% of the total cost of the programs to be conducted during year 2 and approximately 50% of the total cost of the programs to be conducted during year 3." Regarding the State's unappropriated savings, the trial court found that "[t]he Budget Act reserves during

each year of the two-year budget cycle $1.134 billion to the State's Saving Reserve, which brings the total of unappropriated funds in the State's Savings Reserve to $4.25 billion after the fiscal year 2022–23 legislatively-mandated transfer." Therefore, "[a]s a matter of mathematical calculation," the trial court found that "the funds transferred on a discretionary basis to the State's Savings Reserve and the State's Capital and Infrastructure Reserve during the two-year budget cycle is substantially in excess of the amount necessary to fully fund the CRP during years 2 and 3 of the CRP."

¶ 89        Based on these findings of fact, the trial court concluded that the Budget Act "partially but not totally fund[ed] years 2 and 3 of the CRP." Specifically, the court concluded that "the total underfunding of CRP programs during years 2 and 3 . . . is $785,106,248 in the aggregate." Regarding the State's potentially available funds, the court concluded that "the General Fund does contain sufficient unappropriated monies to make the transfer anticipated by the 10 November Order and the lesser amount of underfunding identified above." However, based on the Court of Appeals' Writ of Prohibition, the trial court "conclude[d] that the 10 November Order should be amended to remove a directive that State officers or employees transfer funds from the State treasury to fully fund the CRP." Instead, the trial court concluded that its Order must simply "determine that the State of North Carolina has failed to comply with the trial court's prior order to fully fund years 2 and 3 of the CRP" without

specifically directing the State officials to make the transfers necessary to do so.

¶ 90     Accordingly, the trial court ordered:

> The Department of Health and Human Services[,] the Department of Public Instruction, and the University of North Carolina System have and recover from the State of North Carolina to properly fund years 2 and 3 of the [CRP] the following sums in addition to those sums otherwise provided for the [CRP] by the Budget Act and federal or other funds made available:
>
> a. The [DHHS] recover from the State of North Carolina the sum of $142,900,000;
>
> b. The [DPI] recover from the State of North Carolina the sum of $608,006,248; and
>
> c. The [UNC] System recover from the State of North Carolina the sum of $34,200,000.

¶ 91     In alignment with the November 2021 Order, the trial court further ordered that "DHHS, DPI, UNC System, and all other State agents or State actors receiving funds under the [CRP] are directed to administer those funds consistent with, and under the time frames set out in the [CRP], including the Appendix thereto." Likewise, the court ordered that upon administering these funds, any "savings shall revert to the General Fund at the end of fiscal year 2023, unless the General Assembly extends their availability."

¶ 92     In July 2022, the State enacted the 2022 Appropriations Act. An Act to Modify the Current Operations Appropriations Act of 2021 and to Make Other Changes in the Budget Operations of the State, S.L. 2022-74,

https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2021-2022/SL2022-74.pdf.

¶ 93     Following the trial court's April 2022 Order, this case returned to the jurisdiction of this Court. On appeal, Plaintiffs, Plaintiff-Intervenors, and the State argued that, contrary to the order of the Court of Appeals, under the extraordinary circumstances summarized here, the trial court had the proper authority to direct State actors to transfer the available funds necessary to fulfill years two and three of the Comprehensive Remedial Plan in its November 2021 Order.[11] The State Board of Education emphasized that the CRP is the product of the State's efforts to fulfill its constitutional commitment and that the CRP's action steps are necessary to avoid judicial encroachment on the Board's constitutional authority.

¶ 94     Contrastingly, Legislative Defendants argued that the trial court's November 2021 Order's transfer provisions violated the Separation of Powers Clause of our State's Constitution.[12] Legislative Defendants further argued that both the November 2021 and April 2022 Orders were improper because the case is narrowly confined to Hoke County and not the state as a whole, the trial court engaged with

---

[11] Plaintiffs and Plaintiff-Intervenors' position was supported by amici curiae professors and longtime practitioners of constitutional and educational law, the North Carolina Justice Center, the Duke Law Children's Law Clinic, the Center for Educational Equity, the Southern Poverty Law Center, and over fifty North Carolina business leaders.

[12] Legislative Defendants' position was supported by amici curiae North Carolina Institute for Constitutional Law and the John Locke Foundation.

non-justiciable political questions, the trial court failed to presume that the Budget Act was constitutionally compliant, and the suit was friendly and lacked genuine controversy.

¶ 95 Finally, the State Controller argued that the trial court's November 2021 Order lacked constitutional authority to order the Controller and other state officials to transfer available State funds, and therefore that this Court should affirm the trial court's April 2022 Order removing those transfer directives.

¶ 96 This case came before this Court once more for oral arguments on 31 August 2022.

## II.    Analysis

¶ 97 Now, this Court must assess the constitutionality of the trial court's 10 November 2021 and 26 April 2022 Orders. This Court reviews constitutional questions de novo. *Cooper v. Berger*, 370 N.C. 392, 413 (2018). Under the extraordinary circumstances of this case, we hold that the trial court's November 2021 Order properly directed certain State officials to transfer State funds in compliance with the CRP. We thus affirm the constitutional analysis and transfer directives within the November 2021 Order and vacate in part and reverse in part the April 2022 Order with further instructions on remand. To enable the trial court to comply with these instructions, we stay the Court of Appeals' Writ prohibiting the trial court from issuing the November 2021 transfer directive.

¶ 98    First, we review the meaning and scope of the constitutional right at the heart of this case: the right of all North Carolina schoolchildren to the opportunity to receive a sound basic education. Second, we consider the duties and powers of the legislative and judicial branches as they relate to guarding and maintaining that constitutional right. Third, we apply this constitutional analysis to the trial court's November 2021 and April 2022 Orders. Fourth, we address Legislative Defendants' various assertions of trial court error.

### A. The Constitutional Right to a Sound Basic Education

¶ 99    Our Constitution and statutes recognize certain rights. In particular, our Constitution's Declaration of Rights vests within all people of our State rights that we deem fundamental, such as the right to free elections, equal protection under law, and freedom of speech and assembly. N.C. Const. Art. I, §§ 10, 12, 14, 19; *see also Harper v. Hall*, 380 N.C. 317, 2022-NCSC-17, ¶ 159 (discussing these rights).

¶ 100    Since its inception in 1994, this case has revolved around the rights enshrined within our Constitution's "Education Provisions:" namely Article I, § 15 and Article IX, § 2, but also Article IX, §§ 6 and 7. Accordingly, we begin our analysis by reviewing the text, structure, and history of the right to a sound basic education as established in these Education Provisions. *See Harper*, 2022-NCSC-17, ¶ 121 (considering the text, history, and structure of constitutional rights to ascertain their meaning).

¶ 101         Constitutional analysis begins with the text. *State ex rel. Martin v. Preston*, 325 N.C. 438, 449 (1989). "We look to the plain meaning of [each] phrase to ascertain its intent." *Town of Boone v. State*, 369 N.C. 126, 132 (2016). To understand the meaning of the fundamental right at issue in this case, we must consider the plain text of our Constitution's Education Provisions.

¶ 102         First, Article I, § 15 of our Constitution's Declaration of Rights declares that "[t]he people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." The plain text of this provision is not suggestive, but obligatory. It does not declare that the State *may* guard and maintain the people's right to the privilege of education, but that it is the *duty* of the State to do so. Further, the plain text of this provision places this affirmative duty on the shoulders of one entity: the State. While subsequent constitutional provisions note that the State *may* involve local units of government in school operation, Article I, § 15 makes clear that the ultimate responsibility lies with the State. Finally, the word "maintain" within this provision begins to establish that the State's affirmative duty here is not merely administrative, but financial. One definition of maintain is "[t]o support . . . financially," *Maintain, Black's Law Dictionary* (11th ed. 2019), or "to support the expense of." *Maintain, Webster's American Dictionary of the English Language* (1865). *See also Maintain, A Dictionary of the English Language* (1865) ("To bear the expense of; to support; to keep up; to supply with what is needed."). This meaning

aligns with the Constitution's plain emphasis on education funding within subsequent provisions noted below.

¶ 103         Second, Article IX, § 2(1) establishes that "[t]he General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students." Like Article I, § 15, the plain language of this section is obligatory; it does not declare that the General Assembly *may* provide for a system of free public schools, but that it *shall* do so. *See Mebane Graded Sch. Dist. v. Alamance Cnty.*, 211 N.C. 213, 223 (1937) (*Mebane*) ("The duty imposed on the State, under Art. IX of the Constitution of North Carolina, is mandatory."). This contrasts with the subsequent permissive language in Article IX, § 2(2), which states that "[t]he General Assembly *may* assign to units of local government such responsibility for the financial support of the free public schools as it may deem appropriate[,]" and that "units of local government with financial responsibility for public education *may* use local revenues to add or to supplement any public school or post-secondary school program." (emphasis added). Here again, the plain constitutional text makes clear that the ultimate responsibility for securing the people's right to education lies with the State. And in declaring the governmental entity that is obligated to *fund* public education, the plain language of Article IX, § 2 is even more specific: "[t]he General Assembly."

¶ 104        Third, two subsequent provisions within Article IX further specify methods for

funding the state's system of free public schools.  Article IX, § 6 states that

> The proceeds of all lands that have been or hereafter may
> be granted by the United States to this State, and not
> otherwise appropriated by this State or the United States;
> all moneys, stocks, bonds, and other property belonging to
> the State for purposes of public education; the net proceeds
> of all sales of the swamp lands belonging to the State; and
> all other grants, gifts, and devises that have been or
> hereafter may be made to the State, and not otherwise
> appropriated by the State or by the terms of the grant, gift,
> or devise, shall be paid into the State Treasury and,
> together with so much of the revenue of the State as may
> be set apart for that purpose, shall be faithfully
> appropriated and used exclusively for establishing and
> maintaining a uniform system of free public schools.

Next, Article IX, § 7(a) states that

> [e]xcept as provided in subsection (b) of this section, all
> moneys, stocks, bonds, and other property belonging to a
> county school fund, and the clear proceeds of all penalties
> and forfeitures and of all fines collected in the several
> counties for any breach of the penal laws of the State, shall
> belong and remain in the several counties, and shall be
> faithfully appropriated and used exclusively for
> maintaining free public schools.

Building from Article IX, § 2, the plain text of these provisions further clarifies the

Constitution's repeated emphasis on adequately funding the State's system of free

public schools. Indeed, these provisions establish specific requirements for the

manner in which the General Assembly may exercise its appropriation powers by

declaring that such funds "*shall* be faithfully appropriated and used *exclusively* for

establishing and maintaining a uniform system of free public schools." More broadly, the plain text of these provisions emphasizes the distinctive prominence of public education within our Constitution: it is first established as a positive right of the people within the Declaration of Rights, then mandated to be guarded and maintained by the State, then specifically required to be funded through taxation and otherwise by the General Assembly. This renders the fundamental right established within these provisions highly exceptional, even among other rights enumerated within the Declaration of Rights.

¶ 105        The structure of our Constitution likewise supports this prominence. As an initial matter, the location of the right to education (N.C. Const. art. I, § 15) within the Constitution's Declaration of Rights indicates its significance. "The Declaration of Rights was passed by the Constitutional Convention on 17 December 1776, the day before the [state] Constitution itself was adopted, manifesting the primacy of the Declaration in the minds of the framers." *Corum*, 330 N.C. at 782. That original "logical and chronological primacy is preserved in our present constitution, with the Declaration of Rights now incorporated in the text of the [C]onstitution itself as article I." *Harper*, 2022-NCSC-17, ¶ 122. The fundamental purpose for the adoption of the Declaration of Rights "was to provide citizens with protection from the State's encroachment upon these rights." *Corum*, 330 N.C. at 782. It is no wonder, then, that the Framers chose to enshrine the fundamental right to education within the

Declaration; like the right to free elections, N.C. Const. art. I, § 10, the right to religious liberty, N.C. Const. art. I, § 13, and the right to freedom of speech and press, N.C. Const. art. I, § 14, the right to education inherently strengthens the ability of a person and a community to safeguard their personal liberty and popular sovereignty from infringement. *See* N.C. Const. art. IX, § 1 ("Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, libraries, and the means of education shall forever be encouraged"); *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954) (*Brown I*) (describing education as "the very foundation of good citizenship.").

¶ 106 Beyond the location of Article I, § 15, the structure of the North Carolina Constitution further emphasizes the paramount importance of the right to education by devoting an *entire article* to it: Article IX. For context, there are only fourteen articles in our entire Constitution, including the Declaration of Rights and those establishing our three branches of government. Within Article IX, the Constitution contains ten sections enumerating certain principles and requirements for our state's system of public education, such as those establishing the State Board of Education, N.C. Const. art. IX, § 4, and describing methods of education funding, N.C. Const. art. IX, §§ 2, 6, 7. By comparison, the articles addressing local governments and corporations contain three and two sections, respectively. *See* N.C. Const. art. VII;

N.C. Const. art. VIII. In short, the Constitution's structure makes clear that the right to education is regarded with foremost significance.

¶ 107 Finally, constitutional history likewise supports this significance. *See Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 2021-NCSC-6, ¶ 15 ("Constitutional provisions should be construed in consonance with the objects and purposes in contemplation at the time of their adoption."). North Carolina constitutional history illustrates both that our citizens have long valued public education and that experience taught them the necessity of safeguarding it through our Constitution, particularly to secure the fundamental rights of marginalized communities.

¶ 108 "Throughout the colonial period, the provincial government accepted no responsibility for education." N.C. Dep't of Public Instruction, The History of Education in North Carolina, 5 (1993) (hereinafter DPI Report). Because of the absence of State funding, what few educational opportunities that did exist were largely private, religious, and limited to affluent white families. *Id*.

¶ 109 In 1776, North Carolina's original Constitution provided "[t]hat a school or schools shall be established by the Legislature, for the convenient instruction of youth, with such salaries to the masters, paid by the public." N.C. Const. of 1776 art. XLI. Nevertheless, educational opportunities remained underfunded and exclusive,

and "[m]any North Carolina citizens were dissatisfied with the deplorable state of affairs and efforts were begun to remedy the situation." DPI Report at 7.

¶ 110        The 1825 enactment of the Literary Fund was one such effort. *Id.* at 8. Over time, the fund grew and, in conjunction with further legislative support, "ushered in a period of expansion and progress for North Carolina public schools." *Id.* at 9. "By the time the Civil War erupted in 1861, it was generally recognized that North Carolina had one of the best school systems in the South." *Id.* Notably, though, this system still expressly excluded Black children, who could only access educational opportunities—if at all—at freedmen schools established and funded by private groups such as the American Missionary Association. *See* John L. Bell*, Samuel Stanford Ashley, Carpetbagger and Educator*, 72 N.C. Hist. Rev. 456, 459, 461 (1995) (hereinafter Bell).

¶ 111        The Civil War "brought this progressive period in education to an abrupt halt." DPI Report at 10. First, the Literary Fund was depleted due to wartime economic instability. Bell at 476. Then, in 1866, due to this economic fallout and "fear[ ] that the federal government would force integration of [B]lack pupils into the statewide school system," the General Assembly abolished North Carolina's public school system entirely, instead leaving county governments to establish schools "at their discretion." *Id.*

¶ 112        Against this historical backdrop, North Carolina's first ever multiracial cohort of state leaders "met in the winter of 1868 to draft a new state constitution." *Id.* at 473; *see also* Leonard Bernstein, *The Participation of Negro Delegates in the Constitutional Convention of 1868 in North Carolina*, The Journal of Negro History, Vol. 34, No. 4, 391, 394 (Oct. 1949) (describing the composition of the Constitutional Convention of 1868) (hereinafter Bernstein); John V. Orth, The North Carolina State Constitution 12 (1993) (same) (hereinafter Orth). The resulting 1868 Constitution was markedly more progressive than its predecessor, including, for instance, the expansion of property rights to women and elimination of property qualifications from political participation. *See* Orth at 15; DPI Report at 10.

¶ 113        The 1868 Constitution likewise expanded educational rights. "Seeing that the legislature could abolish the school system by law in 1866, [delegates] insisted that the guarantee of a public school education for all children of North Carolina be embedded in the [C]onstitution beyond the reach of legislative majorities." Bell at 482–83. Thus, Article I, § 27 of the 1868 Constitution established the express positive right of the people to the privilege of education and corresponding duty of the State to guard and maintain that right. *See* Orth at 52 ("[T]he right to education was intended to mark a new and more positive role for state government."). The 1868 Constitution likewise established the General Assembly's duty to fund the state's public education system, declaring that [t]he General Assembly shall provide by

taxation and otherwise for a general and uniform system of Public Schools," and specified that certain funds "shall be faithfully appropriated for establishing and perfecting in this State a system of Free Public Schools, and for no other purposes or uses whatsoever." N.C. Const. of 1868 art. IX, §§ 2, 4. Although conservative legislators attempted "to add segregation amendments to the [Education Provisions,]" these were rejected. Bernstein at 398. Instead, these constitutional guarantees "made no mention of race."[13] Bell at 473. As noted above, our current State Constitution, ratified in 1971, includes substantially similar or identical language within its Education Provisions as its 1868 predecessor. *See* N.C. Const. art. I, § 15; N.C. Const. art. IX, §§ 2, 6, 7. Cumulatively, this historical context emphatically supports the paramount importance of the right to the opportunity to a sound basic education within our Constitution and of the will of the people to safeguard this right from legislative diminishment or abandonment.

¶ 114        These historical origins confirm what the text and structure make plain: that our Constitution expressly establishes the fundamental right of the people to the privilege of education, that it is the "sacred duty" of the State to safeguard that right, and that the General Assembly is constitutionally obligated to provide for our system

---

[13] However, "a post-Reconstruction amendment in 1876 required segregated schooling ('separate but equal') . . . [until] [o]utlawed in 1954 by the U.S. Supreme Court's ruling in *Brown v. Board of Education* [and subsequently] forbidden by the 1971 Constitution." Orth at 145.

of free public schools by taxation and otherwise. *Mebane*, 221 N.C. at 223. More specifically, the Education Provisions express a clear desire by the people to hold the executive and legislative branches accountable for ensuring that our public school system is properly maintained, financially and otherwise. Finally, "[w]e give our Constitution a liberal interpretation in favor of its citizens with respect to those provisions which were designed to safeguard the liberty and security of the citizens." *Corum*, 330 N.C. at 783.

¶ 115     In accordance with these principles, this Court has held that the Education Provisions "combine to guarantee every child of this state an opportunity to receive a sound basic education in our public schools." *Leandro I*, 346 N.C. at 345. This Court has further concluded that this right is substantive, robust, and paramount. *Id.*; *Leandro II*, 358 N.C. at 649. Today, we expressly and emphatically reaffirm the inherent substance, broad scope, and paramount importance of the fundamental right to the opportunity to a sound basic education enshrined in our Constitution as first recognized by this Court in *Leandro I* and *II*.

**B. Legislative and Judicial Duties and Powers**

¶ 116     When rights are violated, justice requires a remedy. N.C. Const. art. I, § 18 ("[E]very person for an injury done him . . . shall have remedy by due course of law."); *see also Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("[E]very right, when withheld, must have a remedy, and every injury its proper redress."). The nature of the right

and the extent of the violation dictate the appropriate nature and extent of the corresponding remedy. *Corum*, 330 N.C. at 784. Accordingly, a longstanding violation of a fundamental constitutional right demands a remedy of equivalent magnitude.

¶ 117      Here, as summarized above, the trial court repeatedly concluded based on an abundance of clear and convincing evidence that the State—for many years—has continued to violate the fundamental constitutional rights of North Carolina schoolchildren across the state by failing to guard and maintain their right to the opportunity of a sound basic education. The trial court likewise repeatedly concluded that this violation disproportionately impacts historically marginalized students such as students from economically disadvantaged families, English language learners, students with learning differences, and students of color. The trial court emphasized these conclusions most recently within the November 2021 Order before us on this appeal.

¶ 118      Now, this Court must consider the scope of its authority to appropriately remedy this violation. To do so, we first analyze the constitutional duties and powers of the legislative branch as they relate to guarding and maintaining the fundamental right to a sound basic education. Second, we analyze the constitutional duties and powers of the judicial branch relating to that right. Third, we harmonize these constitutional duties and powers in light of the principles of separation of powers and checks and balances within our tripartite system of democratic governance.

### 1. *Legislative Duties and Powers*

¶ 119      Because this case primarily involves the boundaries between the legislative and judicial branches, we begin by considering the constitutional duties and powers of the legislative branch.

¶ 120      Our Constitution assigns certain positive and negative duties to the legislative branch. Positive duties are those the Constitution mandates that the legislative branch fulfill. For instance, Article II, §§ 3 and 5 respectively mandate that "[t]he General Assembly, at the first regular session convening after the return of every decennial census of population taken by order of Congress, *shall* revise the senate [and representative] districts and the apportionment of Senators [and Representatives] among those districts." (emphasis added). Likewise, Article II, § 20 establishes that each house of the General Assembly "*shall* prepare bills to be enacted into laws." (emphasis added). Contrastingly, negative duties prohibit certain legislative action. For instance, Article II, § 24 dictates that "[t]he General Assembly *shall not* enact any local private, or special act or resolution" relating to certain subjects, such as "changing the names of cities, towns, and townships." N.C. Const. art. II, § 24(b) (emphasis added).

¶ 121      This case considers the legislature's duties under the Education Provisions. As summarized above, these provisions create a positive duty for the legislature to fulfill its role (as part of "the State") in maintaining the people's right to education by

providing by taxation and otherwise for a general and uniform system of free public schools. N.C. Const. art. I, § 15; N.C. Const. art. IX, §§ 2, 6. As established by *Leandro I*, this constitutional guarantee is not one of mere education *access*, but of education *adequacy*. 346 N.C. at 345–46. Put differently, the General Assembly is not merely responsible for ensuring that there is an operational school building in each district that lets students in its front doors, but for ensuring that once a student enters those doors, she has the opportunity to receive—at minimum—a sound basic education. *See id.* at 345 ("An education that does not serve the purpose of preparing students to participate and compete in the society in which they live and work is devoid of substance and is constitutionally inadequate."). The history of this case has established that this duty is both substantive (for instance, ensuring through education statutes and policies that there is a competent, well-trained teacher in every classroom) and financial (ensuring that state funding is distributed in a manner that allows every school district to provide all students with the opportunity to receive a sound basic education).

¶ 122      To fulfill these constitutional duties, the legislature is granted broad powers. For instance, Article II, § 1 provides that "[t]he legislative power of the State shall be vested in the General Assembly[.]" As such, the General Assembly is broadly empowered to enact legislation to advance its policy goals, including in the realm of

education. Other constitutional provisions, such as Article II, § 22, describe the procedures that the General Assembly must follow in exercising its legislative power.

¶ 123 More specifically, our Constitution grants the General Assembly extensive financial authority. For instance, Article II, § 23 provides for the General Assembly's power to enact revenue bills. Likewise, Article III, § 5(3) "defines the manner in which th[e] three-branch governmental structure should operate in the budgetary context by providing that . . . '[t]he budget as enacted by the General Assembly shall be administered by the Governor.' " *Cooper v. Berger*, 376 N.C. 22, 37 (2020). Article V § 2 delineates the General Assembly's taxation power. Finally, Article V, § 7 notes that "[n]o money shall be drawn from the State treasury but in consequence of appropriations made by law[.]" The Appropriations Clause is further operationalized by statute in N.C.G.S. § 143C-1-2 of the State Budget Act, which states that "[a] law enacted by the General Assembly that expressly appropriates funds from the State treasury is an appropriation."

¶ 124 Here, the trial court's November 2021 Order concluded that Article I, § 15 "represents an ongoing constitutional appropriation of funds sufficient to create and maintain a school system that provides each of our State's students with the constitutional minimum of a sound basic education[,] . . . [and] may therefore be deemed an appropriation 'made by law.' " By contrast, Legislative Defendants and

the State Controller contend that the Appropriations Clause and the Separation of Powers Clause indicate that the trial court's subsequent transfer order is prohibited.

### 2. *Judicial Duties and Powers*

¶ 125    Next, we must likewise consider the duties and powers of the judicial branch in addressing the violation of constitutional rights.

¶ 126    Article I, § 18 of our Constitution establishes that "every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial, or delay." In accordance with this constitutional promise, this Court has expressed a "longstanding emphasis on ensuring redress for every constitutional injury." *Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 342 (2009).

¶ 127    The duty to ensure such redress belongs to the courts. Because the judicial branch "is the ultimate interpreter of our State Constitution[,] [i]t is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens; this obligation to protect the fundamental rights of individuals is as old as the State." *Corum*, 330 N.C. at 783.

¶ 128    With this constitutional duty comes constitutional powers. Generally, judicial power arises from Article IV, § 1 of our Constitution, which establishes that "[t]he judicial power of the State shall . . . be vested in a Court for the Trial of Impeachments and in a General Court of Justice." The Constitution further establishes that "[t]he

General Assembly shall have no power to deprive the judicial department of any power or jurisdiction that rightfully pertains to it as a co-ordinate department of government." N.C. Const. art. IV, § 1.

¶ 129     More specifically, the judiciary is endowed with certain inherent power. In 1991, Chief Justice Exum, writing unanimously on behalf of this Court, observed that

> [a] court's inherent power is that belonging to it by virtue of its being one of three separate, coordinate branches of government. For over a century this Court has recognized such powers as being plenary within the judicial branch— neither limited by our [C]onstitution nor subject to abridgment by the legislature. In fact, the inherent power of the judicial department is expressly protected by the constitution: "The General Assembly shall have no power to deprive the judicial department of any power or jurisdiction that rightfully pertains to it as a co-ordinate department of the government . . . . " N.C. Const. art. IV, § 1. Inherent powers are critical to the court's autonomy and to its functional existence: if the courts could be deprived by the legislature of these powers, which are essential to the direct administration of justice, they would be destroyed for all efficient and useful purposes.
>
> Generally speaking, the scope of a court's inherent power is its authority to do all things that are reasonably necessary for the proper administration of justice. . . . This Court has upheld the application of the inherent powers doctrine to a wide range of circumstances, from dealing with its attorneys[ ] to punishing a party for contempt.

*Alamance*, 329 N.C. at 93–94 (1991) (cleaned up).

¶ 130        "Typically, . . . [due to the Separation of Powers,] the exercise of inherent power by courts of this state has been limited to matters discretely within the judicial branch." *Id.* at 94. However,

> [t]he scope of the inherent power of a court does not, in reality, always stop neatly short of explicit, exclusive powers granted to the legislature, but occasionally must be exercised in the area of overlap between branches. The North Carolina Constitution provides: "The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. I. art. I, § 4. The perception of the separation of the three branches of government as inviolable, however, is an ideal not only unattainable but undesirable. An overlap of powers constitutes a check and preserves the tripartite balance, as two hundred years of constitutional commentary note. "Unless these [three branches of government] be so far connected and blended as to give each a constitutional control over the others, the degree of separation which the maxim requires, as essential to a free government, can never in practice be duly maintained." The Federalist No. 48, at 308 (J. Madison) (Arlington House ed. 1966). This "constant check . . . preserving the mutual relations of one branch with the other . . . can best be accomplished, if not solely accomplished, by an occasional mixture of the powers of each department with that of the others, while the separate existence, and constitutional independence of each are fully provided for." 2 J. Story, Commentaries on the Constitution of the United States 22 (1833). A contemporary view notes that this area of overlap is occupied not only by the doctrine of checks and its basis in maintaining the province of each power, but also by a functional component of pragmatic necessity—termed by some commentators "incidental powers"—whereby one branch exercises some activities usually belonging to one of the other two branches in order to fully and properly discharge its duties.

> Like the jealous checks by one branch upon the encroachments of another, which the Framers viewed positively as the basis for government's critical balance, a functional overlap of powers should facilitate the tasks of each branch. . . . No less important to a functional balance of power is the notion of a working reciprocity and cooperativeness amongst the branches: "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 96 L. Ed. 1153, 1199 (1952) (Jackson, J., concurring).

*Id.* at 96–97 (cleaned up).

"In the realm of appropriations," this Court has noted, "some overlap of power between the legislative and the judicial branches is inevitable." *Id.* at 97. Accordingly, this Court has "[held] that when inaction by those exercising legislative authority threatens fiscally to undermine the integrity of the judiciary, a court may invoke its inherent power to do what is reasonably necessary for the orderly and efficient administration of justice." *Id.* at 99. Although "Article V prohibits the judiciary from taking public monies without statutory authorization[,]" when the exercise of remedial power "necessarily includes safeguarding the constitutional rights of the parties[,] . . . the court has the inherent authority to direct local authorities to perform that duty." *Id.*

However, even inherent power is not without limitation. For instance,

> doing what is reasonably necessary for the proper

administration of justice means doing *no more* than is reasonably necessary. The court's exercise of its inherent power must be responsible—even cautious—and in the spirit of mutual cooperation among the three branches. The very genius of our tripartite Government is based upon the proper exercise of their respective powers together with harmonious cooperation between the three independent branches. However, if this cooperation breaks down, the Judiciary must exercise its inherent power to preserve the efficient and expeditious administration of Justice and protect it from being impaired or destroyed.

The inherent power of the court must be exercised with as much concern for its potential to usurp the powers of another branch as for the usurpation it is intended to correct. It is a tool to be utilized only where other means to rectify the threat . . . are unavailable or ineffectual, and its wielding must be no more forceful or invasive than the exigency of the circumstances requires.

The very conception of inherent power carries with it the implication that its use is for occasions not provided for by established methods. Only when established methods fail and the court shall determine that by observing them the assistance necessary . . . cannot be had, or when an emergency arises which the established methods cannot or do not instantly meet, then and not till then does occasion arise for the exercise of the inherent power.

*Id.* at 99–100 (cleaned up).

¶ 133   More specifically,

the court's judicious use of its inherent power to reach towards the public purse must recognize two [further] critical limitations: first, it must bow to established procedural methods where these provide an alternative to the extraordinary exercise of its inherent power. Second, in the interests of the future harmony of the branches, the court in exercising that power must minimize the

> encroachment upon those with legislative authority in appearance and in fact. This includes not only recognizing any explicit, constitutional rights and duties belonging uniquely to the other branch, but also seeking the least intrusive remedy.

*Id.* at 100–101.

¶ 134    Here, the trial court concluded that given the extraordinary circumstance of this case, it was required to "provide a remedy [for the ongoing constitutional violation] through the exercise of its constitutional role." "Otherwise," the trial court concluded, "the State's repeated failure to meet the minimum standards for effectuating the constitutional right to obtain a sound basic education will threaten the integrity and viability of the North Carolina Constitution." By contrast, Legislative Defendants contend that the trial court's remedy violated the doctrine of separation of powers because the power to appropriate state funds is vested exclusively with the legislative branch.

### 3. *Harmonizing Judicial and Legislative Duties and Powers*

¶ 135    Now, we must address the intersection of these legislative and judicial powers and duties. When considering the meaning of multiple constitutional provisions, this Court seeks to read the provisions in harmony. "It is axiomatic that the terms or requirements of a constitution cannot be in violation of the same constitution—a constitution cannot violate itself." *Leandro I*, 346 N.C. at 352. Specifically, this case requires the interpretation of the General Assembly's powers under the

Appropriations Clause in light of its duties under the Education Provisions. It likewise requires the interpretation of the judiciary's inherent power in light of the Education Provisions, the Appropriations Clause, and the Separation of Powers Clause. We address each of these constitutional crossroads in turn.

¶ 136    First, this case requires this Court to harmonize the General Assembly's powers under the Appropriations Clause in light of its duties under the Education Provisions. On the one hand, the General Assembly enjoys broad discretion over all legislative matters, including the appropriation of state funds. In conjunction with the Separation of Powers Clause, this Court has observed that "[i]n drafting the appropriations clause, the framers sought to ensure that the people, through their elected representatives in the General Assembly, had full and exclusive control over the allocation of the state's expenditures." *Cooper*, 376 N.C. at 37. On the other hand, this Court has repeatedly held that the General Assembly, as part of "the State," has a constitutional duty to "guard and maintain" the fundamental right of North Carolina schoolchildren to the opportunity to a sound basic education, including adequately funding our system of free public schools such that this right is maintained. *See generally Leandro I*, 346 N.C. 33; *Leandro II*, 358 N.C. 605.

¶ 137    In order to harmonize these principles, we hold that our Constitution requires the General Assembly to exercise its power under the Appropriations Clause in contemporaneous compliance with its duties under the Education Provisions. Under

*Leandro I*, this means that the General Assembly must exercise its appropriations powers such that every student receives the opportunity to obtain a sound basic education. In other words, the General Assembly is constitutionally required to appropriate at least enough funding to public education such that every child in every school in every district is provided with the opportunity to receive at least a sound basic education. When it does not, it violates both its own constitutional duties and the constitutional rights of North Carolina schoolchildren under the Education Provisions. To hold otherwise would allow the General Assembly to ignore these duties and rights, rendering them—and, in other contexts, other constitutional duties or fundamental rights—meaningless and not subject to judicial enforcement. This our Constitution does not allow. *See Leandro I*, 346 N.C. at 345 (concluding that plaintiffs' educational adequacy claims are not nonjusticiable political questions and that "it is the duty of this Court to address [their] constitutional challenge to the state's public education system.").

This principle is not novel. Since 1787, the highest Court of our state has held that because our Constitution is "the fundamental law of the land," the General Assembly may not exercise its legislative power in a manner that violates constitutional rights. *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 7 (1787). Accordingly, in *Bayard*, the Court rejected a statute that abrogated the constitutional right to a trial by jury. *Id.*

¶ 139      We have applied this same principle to voting rights. In *Stephenson v. Bartlett*, for instance, this Court stated that the principle of constitutional harmony "require[d] us to construe [the legislature's power under] Article II, Sections 3(1) and 5(1) in conjunction with [the right to equal protection of the laws under] Article I, Section 19 in such a manner as to avoid internal textual conflict." 355 N.C. 354, 378 (2002). Accordingly, the Court held that

> [t]he General Assembly may consider partisan advantage and incumbency protection in the application of its discretionary redistricting decisions, but it must do so in conformity with the State Constitution. To hold otherwise would abrogate the constitutional limitations or "objective constraints" that the people of North Carolina have imposed on legislative redistricting and reapportionment in the State Constitution.

*Id.* at 371–72.

¶ 140      More recently, this Court reaffirmed this principle in *Harper*, 2022-NCSC-17. There we again noted that "[a]lthough the task of redistricting is primarily delegated to the legislature, it must be performed in conformity with the State Constitution." *Id.* at ¶ 6 (cleaned up). Thus, we held that the General Assembly's "redistricting authority is subject to limitations contained in the North Carolina Constitution, including both in the provisions allocating the initial redistricting responsibility to the General Assembly and in other provisions [in our Declaration of Rights]." *Id.* at ¶ 12. In these cases and others, this Court has made clear that the General Assembly

may not exercise its broad legislative power in a manner that violates fundamental constitutional rights.

¶ 141     So too here. The Education Provisions obligate the General Assembly to fund a uniform system of free public schools in which every child has the opportunity to receive a sound basic education. N.C. Const. art. I, § 15; N.C. Const. art. IX, § 2; *Leandro I*, 346 N.C. at 345. The Appropriations Clause, among other provisions, establishes the General Assembly's power to appropriate State funds. Therefore, in exercising its broad discretion within appropriations and other legislative powers, the General Assembly must fulfill its constitutional duty to maintain every child's right to the opportunity to receive a sound basic education.

¶ 142     Below, the dissent focuses exclusively on the legislature's powers while ignoring its constitutional duties. Such an approach would allow the legislature to exercise its broad powers under the Appropriations Clause (or others) in a manner that indefinitely violates the fundamental constitutional rights of the people. This interpretation would approve both constitutional dissonance and constitutional disregard in direct violation of this Court's own constitutional duties.

¶ 143     Second and accordingly, this case requires the interpretation of the judiciary's inherent power to remedy constitutional violations in light of the Education Provisions, the Appropriations Clause, and the Separation of Powers Clause. On the one hand, the Appropriations Clause states that "[n]o money shall be drawn from the

State treasury but in consequence of appropriations made by law." N.C. Const. art. V, § 7. The Separation of Powers Clause states that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. As applied to the Appropriations Clause, this Court has noted that the principle of separation of powers indicates "that the legislative power is supreme over the public purse." *State v. Davis*, 270 N.C. 1, 14 (1967). More recently, this Court has stated that "[i]n light of [the Appropriations Clause], the power of the purse is the exclusive prerogative of the General Assembly." *Cooper*, 376 N.C. at 37.

¶ 144        On the other hand, the judicial branch derives inherent and inalienable authority to address the violation of constitutional rights from its very status as one of three separate and coordinate branches of our state government. *See Ex Parte McCown*, 139 N.C. 95, 105–06 (1905) (citing N.C. Const. art. I, § 4); *Corum*, 330 N.C. at 783 ("It is the state judiciary that has the responsibility to protect the state constitutional right of the citizens."). As a coequal part of "the State," the judiciary—like the legislative and executive branches—is constitutionally bound by Article I, § 15 to fulfill its own unique role in guarding and maintaining the right to a sound basic education. This role requires the judiciary to assess the constitutional compliance of the other branches and—if an offending branch proves unwilling or unable to remedy the deficiency—after showing due deference, invoke its inherent power to do what is

reasonably necessary to restore constitutional rights "by imposing a specific remedy and instructing the recalcitrant state actors to implement it." *Leandro II*, 358 N.C. at 642.

¶ 145        In order to harmonize these principles, we hold that because the Constitution itself requires the General Assembly to adequately fund the state's system of public education, in exceedingly rare and extraordinary circumstances, a court may remedy an ongoing violation of the constitutional right to the opportunity to a sound basic education by ordering the transfer of adequate available state funds.

¶ 146        This holding is consistent with foundational constitutional principles. First, it upholds the will of the people. Above any statute or legislative prerogative, our Constitution "expresses the will of the people in this State and is, therefore, the supreme law of the land." *In re Martin*, 295 N.C. 291, 299 (1978). Accordingly, just as the General Assembly's authority over appropriations is grounded in its function as the elected voice of the people, *see Cooper*, 376 N.C. at 37, the requirement for adequate education funding embedded within the Education Provisions is fully consistent with the Framers' intent to give the people ultimate control over the state's expenditures.

¶ 147        Second, this holding upholds constitutional integrity. Allowing the legislature to indefinitely violate the constitutional right of North Carolina schoolchildren to a sound basic education would threaten the integrity and viability of the Constitution

itself by nullifying its language without the people's consent, thus rendering this right—and therefore, perhaps others—meaningless and unenforceable. This Court has already forsworn this possibility: in *Leandro I*, the Court squarely rejected the State's contention that claims of education adequacy were judicially unenforceable. 346 N.C. at 344–45.

Third, this holding upholds constitutional checks and balances and the separation of powers. The North Carolina Constitution "incorporates a system of checks and balances that gives each branch some control over the others." *State ex rel. McCroy v. Berger*, 368 N.C. 633, 635 (2016). Simultaneously, "the separation of powers clause requires that, as the three branches of government carry out their duties, one branch will not prevent another branch from performing its core functions." *Id.* at 636. Although at first glance these principles may appear to be in tension—one indicating flexibility and the other rigidity—a deeper look reveals that they both support a common democratic purpose: ensuring that no single person or branch may accumulate excessive power, and thus threaten the liberty and sovereignty of the people. *See The Federalist* No. 47 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny."). As cases arise that probe the contours of these foundational constitutional principles, this Court "must look freshly at the separation of powers provision in the North Carolina Constitution, with

an eye to the actual constitutional, pragmatic, and philosophical limitations on the power granted therein." *Alamance*, 329 N.C. at 96.

¶ 149        Our fresh look is informed by old sources. In *The Federalist Papers*, James Madison stated that the separation of powers between the three branches does "not mean that these departments ought to have no *partial agency* in, or no *control* over, the action of each other." *Federalist* No. 47. Rather, the separation of powers properly dictates "that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free Constitution are subverted." *Id.*[14] Indeed, Madison observed that "[i]f we look into the constitutions of the several states we find that, notwithstanding the emphasis and, in some instances, the unqualified terms in which [the separation of powers] has been laid down, there is not a single instance in which the several departments of power have been kept absolutely separate and distinct." *Id*. This marginal intersection of certain powers is necessary because "unless these departments be so far connected and blended as to give each a constitutional control over the others, the degree of separation which the maxim requires, as essential to a free government, can never in practice be duly maintained." *Federalist* No. 48 (James

---

[14] *See also* 2 J. Story, *Commentaries on the Constitution of the United States* 22 (1833) (observing that that the "constant check . . . preserv[ing] the mutual relations of one [branch] with the other . . . can be best accomplished, if not solely accomplished, by an occasional mixture of the powers of each department with that of the others, which the separate existence, and constitutional independence are each fully provided for").

Madison). In short, "the lesson the Founding Fathers drew was that separation of powers needed to be qualified by checks and balances lest one branch become overpowerful." Orth at 4.

¶ 150          Specifically, the founders expressed concern about an overpowerful legislature. In *The Federalist* No. 48, Madison warned that because the constitutional powers of the legislative branch are "at once more extensive, and less susceptible of precise limits, it can, with greater facility, mask, under complicated and indirect measures, the encroachment which it makes on the co-ordinate departments." *Federalist* No. 48. Accordingly, Alexander Hamilton observed in *The Federalist* No. 78 that "the courts were designed to be an intermediate body between the people and the legislature in order, among other things, to keep the latter within the [constitutional] limits assigned to their authority." This role does not

> suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both, and that where the will of the legislature . . . stands in opposition to that of the people, declared in the Constitution, the judges ought to be governed by the later rather than the former. They ought to regulate their decisions by the fundamental laws rather than by those which are not fundamental.

*Id.*

¶ 151          Precedents from this Court align with these foundational authorities. This Court has long made clear that "[o]bedience to the Constitution on the part of the Legislature is no more necessary to orderly government than the exercise of the power

of the Court in requiring it when the Legislature inadvertently exceeds its limitations." *State v. Harris*, 216 N.C. 746, 764 (1940). As such, for over two centuries our courts have faithfully checked legislative actions for constitutional compliance. *See Bayard*, 1 N.C. 5. "Like the jealous checks by one branch upon the encroachments of another, which the Framers viewed positively as the basis for government's critical balance, a functional overlap of powers should facilitate the tasks of each branch." *Alamance*, 329 N.C. at 97.

¶ 152     In extraordinary circumstances, this Court has held that this "functional overlap of powers" may include directing the transfer of State funds. In *Alamance*, this Court held that even within "the realm of appropriations, some overlap of power between the legislative and the judicial branches is inevitable." 329 N.C. at 97. There, the Court held "that when inaction by those exercising legislative authority threatens fiscally to undermine the integrity of the judiciary, a court may invoke its inherent power to do what is reasonably necessary for the orderly and efficient exercise of the administration of justice." *Id.* at 99. Here, we invoke our inherent authority to protect against an equally grave threat of legislative inaction: the indefinite violation of the constitutional right to the opportunity to a sound basic education.

¶ 153     Even standing apart from checks and balances, separation of power principles likewise support this holding. "[T]he separation of powers clause requires that, as the three branches of government carry out their duties, one branch will not prevent

another branch from performing its core functions." *McCrory*, 368 N.C. at 636. Here, to allow the State to indefinitely fail to meet the minimum standards for effectuating the constitutional right to obtain a sound basic education would violate this maxim by preventing the judiciary from performing its core duty of interpreting our Constitution and "protecting the state constitutional rights of the citizens." *Corum*, 330 N.C. 761.

¶ 154     Below, the dissent would abandon all notions of checks and balances in favor of an absolutely rigid interpretation of the separation of powers. Such an approach would empower the legislative or executive branch to indefinitely violate the fundamental constitutional rights of the people without consequence in direct contravention of the judiciary's own constitutional "responsibility to protect the state constitutional rights of the citizens." *Corum*, 330 N.C. at 783.

¶ 155     Finally, this holding aligns with precedent regarding equitable remedies. When extraordinary circumstances render it necessary and proper for a court to exercise its inherent authority, it is obligated and empowered to craft and order flexible equitable relief to remedy the violation of fundamental constitutional rights. "It is the unique role of the courts to fashion equitable remedies to protect and promote the principles of equity." *Lankford v. Wright*, 347 N.C. 115, 120 (1997) "It is a long-standing principle that 'when equitable relief is sought, courts claim the power to grant, deny, limit, or shape that relief as a matter of discretion.' " *Sara Lee Corp.*

*v. Carter*, 351 N.C. 27, 36 (1999) (quoting *Roberts v. Madison County Realtors Ass'n*, 344 N.C. 394, 399 (1996)). "A court of equity traditionally has discretion to shape the relief in accord with its view of the equities or hardships of the case." *Roberts*, 344 N.C. at 401. "It is a fundamental premise of equitable relief that equity regards as done that which in fairness and good conscience ought to be done." *Thompson v. Sole*, 299 N.C. 484, 489 (1980). Intuitively, "[v]arious rights that are protected by our Declaration of Rights may require greater or lesser relief to rectify the violation of such rights, depending on the right violated and the facts of the particular case." *Corum*, 330 N.C. at 784.

¶ 156        The equitable remedy considered within this case is extraordinary, but not unprecedented. Indeed, precedent for this broad and flexible equitable remedial power can be found within this very litigation, in other cases from this Court, and in related cases from federal courts and other state courts.

¶ 157        First, emphasis on this Court's equitable remedial power can be found within the history of this very case. In *Leandro I*, after recognizing the constitutional right to a sound basic education, this Court summarized the process and standards through which a violation of that right may be established and how the judiciary may address such a violation. 346 N.C. at 357. Because "the administration of the public schools of the state is best left to the legislative and executive branches of government," the Court emphasized that "the courts of the state must grant every reasonable deference

to [those] branches when considering whether they have established and are administering a system that provides the children of the various school districts of the state a sound basic education." *Id.*

> A clear showing to the contrary must be made before the courts may conclude that they have not. Only such a clear showing will justify a judicial intrusion into an area so clearly the province, initially at least, of the legislative and executive branches as the determination of what course of action will lead to a sound basic education.

*Id.*

¶ 158      However, immediately following the explanation of this procedure, this Court made expressly clear that

> [l]ike the other branches of government, the judicial branch has its duty under the North Carolina Constitution. If on remand of this case to the trial court, that court makes findings and conclusions from competent evidence to the effect that defendants in this case are denying children of the state a sound basic education, a denial of a fundamental right will have been established. It will then become incumbent upon defendants to establish that their actions denying this fundamental right are necessary to promote a compelling governmental interest. If defendants are unable to do so, *it will then be the duty of the court to enter a judgment granting declaratory relief and such other relief as necessary to correct the wrong while minimizing the encroachment upon the other branches of government.*

*Id.* (emphasis added).

¶ 159      In *Leandro II*, this Court was even more explicit. After holding that the trial

court's pre-kindergarten order was premature at that early stage of the remedial

process, this Court cautioned:

> [c]ertainly, when the State fails to live up to its
> constitutional duties, a court is empowered to order the
> deficiency remedied, and *if the offending branch of
> government or its agents either fail to do so or have
> consistently shown an inability to do so, a court is
> empowered to provide relief by imposing a specific remedy
> and instructing the recalcitrant state actors to implement
> it*.

*Leandro II*, 358 N.C. at 642 (emphasis added). Today, we confirm that we meant what

we said in *Leandro I* and *II*.

¶ 160      Second, prior cases likewise affirm this Court's broad equitable powers to

remedy the violation of rights in a wide variety of substantive and procedural

contexts. In *Alamance*, for instance, this Court addressed the inaction of county

officials to adequately fund the county's court facilities. 329 N.C. at 884. This Court

held that "[a]lthough the statutes do not expressly pass the duty of providing

adequate judicial facilities to the court in cases of default by local authorities, the

court has the inherent authority [to remedy the violation by] direct[ing] local

authorities to perform that duty."[15] 329 N.C. at 99. Ultimately, the Court vacated the

---

[15] Here, by contrast, the General Assembly *does* have an express constitutional duty to "guard and maintain" the right to a sound basic education and to fund that right "by taxation and otherwise." N.C. Const. art. I, § 15; N.C. Const. art. IX, § 2; *see generally Leandro I*, 346 N.C. 336; *Leandro II*, 358 N.C. 605.

trial court's order because "in form and in substance the order's attempted remedy went beyond requiring the Alamance County Commissioners to do their constitutional and statutory duty" and therefore "exceeded what was reasonably necessary to the administration of justice under the circumstances of th[at] case, and in so doing strained at the rational limits of the court's inherent power." *Id.* at 106–07. A more reasonable remedy, the Court explained, would be to "call attention to [the official's] statutory duty and their apparent failure to perform that duty," and "[i]f after a hearing it was determined that the commissioners had indeed failed to perform their duty, . . . the court could order the commissioners to respond with a [remedial] plan . . . to submit to the court within a reasonable time."[16] *Id.* at 107. If at *that* point the violation persisted, the Court implied, the trial court's more invasive remedy would have been more appropriate. *See id.* at 106–07.

¶ 161 Similarly, this Court has long recognized the judiciary's broad equitable powers to remedy constitutional violations through ordering the transfer of State funds by mandamus. In *Wilson v. Jenkins*, this Court declared that

> the [c]ourts have no power to compel, by mandamus, the Public Treasurer to pay a debt which the General Assembly has directed him not to pay, the Auditor to give a warrant upon the Treasurer which the General Assembly has directed him not to give, *unless the act of the General Assembly be void as violating the Constitution of the United States of or this State.*

---

[16] Notably, this is *exactly* what the trial court has already done in this case.

72 N.C. 5, 6 (1875) (emphasis added).

¶ 162      So too in the context of ordering certain education funding. In *Hickory v. Catawba County*, this Court affirmed the trial court's use of mandamus to compel the County and the Board of County Commissioners to assume payment of school buildings and the debt of the school district. 206 N.C. 165, 170–74 (1934). Because "[t]he defendants are public agencies charged with the performance of duties imposed by the Constitution and by statutes[,]" the Court held that "upon their failure or refusal to discharge the required duties resort may be had to the courts to compel performance by the writ of mandamus." *Id.* at 173. In *Mebane Graded School District v. Alamance County*, this Court held the same. 211 N.C. 213 (1937). There, the Court stated that

> [u]nder legal authority, the county of Alamance has assumed almost every school debt of every school district except the Mebane District. Having assumed part, it is the duty, under the facts in this case, to assume the indebtedness of the Mebane District, and from the findings of the jury mandamus will lie to compel them to do so. Technicalities and refinements should not be seriously considered in a case like this involving a constitutional mandate, but the record should be so interpreted that substantial justice should be done. Under the facts in this case and the findings of the jury, it would be inequitable and unconscionable for defendants to assume part and not all of the indebtedness of the school districts of Alamance and not assume the plaintiffs' indebtedness and give them the relief demanded.

*Id.* at 226–27.

¶ 163        So too in a variety of other substantive and procedural contexts. In *Lankford v. Wright*, this Court concluded that in the adoption context, "a decree of equitable adoption should be granted where justice, equity, and good faith require it." 347 N.C. 115, 121 (1997). In *Sara Lee Corp.*, this Court relied on flexible equitable remedial power to conclude that "the trial court properly exercised its discretion in ordering that defendant's workers' compensation benefits be placed in a constructive trust." 351 N.C. at 37. In *White v. Worth*, this Court affirmed the trial court's mandamus ordering the State auditor and State treasurer to transfer state funds to pay the state's chief inspector in order to uphold the inspector's statutory right to such payment. 126 N.C. 570, 547–78 (1900). While the substantive and procedural context of these cases (and many others) are diverse, their foundational principle is unified: when addressing the violation of rights, our courts enjoy broad and flexible equitable power to ensure that the violation is justly remedied.

¶ 164        Third, federal precedents provide persuasive authority. Indeed, the Supreme Court of the United States has previously addressed the broad scope of judicial equitable remedial power in protecting the constitutional rights of marginalized students from executive and legislative violation and recalcitrance.

¶ 165        In 1954, the U.S. Supreme Court in *Brown I* declared that "in the field of public education, the doctrine of 'separate but equal' has no place." 347 U.S. at 494. In ruling that racial segregation in public schools violated the equal protection rights of Black

students, the Court struck down perhaps the most visible and consequential pillar of

white supremacy and racial subordination in American society. In its second ruling

in the case, the Court expressly directed the federal district courts responsible for

overseeing the enforcement of desegregation to engage in equitable principles:

> In fashioning and effectuating the decrees, the courts will
> be guided by equitable principles. Traditionally, equity has
> been characterized by a practical flexibility in shaping its
> remedies and by a facility for adjusting and reconciling
> public and private needs. These cases call for the exercise
> of these traditional attributes of equity power. At stake is
> the personal interests of the plaintiffs in admission to
> public schools as soon as practicable on a
> nondiscriminatory basis. To effectuate this interest may
> call for elimination of a variety of obstacles in making the
> transition to school systems operated in accordance with
> the constitutional principles set forth in [*Brown I*]. Courts
> of equity may properly take into account the public interest
> in the elimination of such obstacles in a systemic and
> effective manner. But it should go without saying that the
> vitality of these constitutional principles cannot be allowed
> to yield simply because of disagreement with them.

*Brown v. Bd. of Educ.*, 349 U.S. 294, 300 (1955) (footnotes omitted) (*Brown II*).

¶ 166 Yet disagreement there was. Immediately following *Brown I* and *Brown II*,

many white state officials vigorously resisted and defied the Court's order to

desegregate their public schools.[17] For several years, the federal judiciary largely

deferred to these state officials. But as resistance to *Brown* continued and intensified,

---

[17] *See generally* Mark Tushnet, Making Civil Rights Law 247–56 (1994) (documenting the "massive resistance" against *Brown*).

the U.S. Supreme Court in a series of rulings exercised its inherent authority to protect the constitutional rights of marginalized students by ordering broad and flexible equitable remedies.

¶ 167 In 1958 in *Cooper v. Aaron*, the Court addressed resistance to desegregation by executive and legislative officials in Arkansas. 358 U.S. 1 (1958). "The constitutional rights of respondents[,]" the Court declared, "are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and the Legislature." *Id.* at 16. While it is "quite true that the responsibility for public education is primarily the concern" of state officials, the Court noted that "it is equally true that such responsibilities, like all other state activity, must be exercised consistently with federal constitutional requirements." *Id.* at 19. Only through compliance with these principles, the Court concluded, "[is] [o]ur constitutional ideal of equal justice under law . . . made a living truth." *Id.* at 20.

¶ 168 In 1964 in *Griffin v. County School Board*, the Court spoke more forcefully. 377 U.S. 218. There, the Court addressed resistance to desegregation by state and local officials in Virginia, where "[t]he General Assembly . . . enacted legislation to close any public schools where white and colored children were enrolled together, to cut off state funds to such schools, [and] to pay tuition grants to children in nonsectarian private schools." *Id.* at 221. In addressing "the question of the kind of decree necessary and appropriate to put an end to the racial discrimination practiced against

these petitioners under authority of the Virginia laws[,]" the Court noted that "all of [the state official defendants] have duties which relate directly or indirectly to the financing, supervision, or operation of the schools." *Id.* at 232. Accordingly, the Court declared that "the District Court may, if necessary to prevent further racial discrimination, *require the [applicable officials] to exercise the power that is theirs to levy taxes to raise funds adequate to reopen, operate, and maintain without racial discrimination a public school system*." *Id.* at 233 (emphasis added). "An order of this kind is within the court's power if required to assure these petitioners that their constitutional rights will no longer be denied them." *Id.* at 233–34.

¶ 169        Finally, in 1971 in *Swann v. Charlotte-Mecklenburg Board of Education*, the Court further emphasized its broad and flexible power to order equitable remedies. 402 U.S. 1. There, after the district court deemed the school board's initial desegregation plan unacceptable, it "appointed an expert in education administration, Dr. John Finger, to prepare a desegregation plan." *Id.* at 8. When the district court ordered the school district to implement this plan, the school board challenged the district court's equitable remedial powers, arguing that the court had gone too far in ordering the implementation of the plan. *Id.* at 16–17.

¶ 170        On appeal, the U.S. Supreme Court unanimously affirmed the district court's expansive and adaptable authority to enact equitable remedies in the face of an ongoing constitutional violation. *Id.* at 32. "Once a right and a violation have been

shown," the Court declared, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Id.* at 15. Indeed, it was only "because of th[e] total failure of the school board that the District Court was obligated to turn to other qualified sources, and Dr. Finger *was designated to assist the District Court to do what the board should have done.*" *Id.* at 25 (emphasis added). "Thus the remedial techniques used in the District Court's order were within that court's power to provide equitable relief; implementation of the decree is well within the capacity of the school authority." *Id.* at 30.

¶ 171    Of course, notable differences exist between the circumstance of the U.S. Supreme Court enforcing *Brown* and the circumstances here. Where the rights in *Brown* originate in the federal Constitution, the rights in this case originate in the North Carolina Constitution. Where *Brown* and its progeny remedied a denial of education *access*, this case remedies a denial of education *adequacy*. Where *Brown* and its progeny considered issues of federalism, this case considers those of the separation of powers and checks and balances between coequal branches of state government.

¶ 172    Nevertheless, the broader applicability of *Brown* and its progeny to our inquiry today arises from the fundamental alignment of the question at the heart of each case: what is the proper role of the judiciary in guarding and maintaining the constitutional rights of marginalized schoolchildren in the face of ongoing violations

by state legislative and executive powers? Because of the alignment of this fundamental question, the U.S. Supreme Court's answer in the wake of *Brown* informs our answer here.

¶ 173        Fourth, rulings from other state supreme courts lend support. Many other state supreme courts have exercised broad and flexible equitable remedial powers to address ongoing violations of state constitutional education rights. In 1989, the Supreme Court of Kentucky affirmed the trial court's determination that the state's school finance system was unconstitutional and ordered the state to completely redesign it to ensure adequate funding to meet the needs of marginalized students. *See Rose v. Council for Better Educ.*, 790 S.W.2d 186, 215 (1989) ("Lest there be any doubt, the result of our decision is that Kentucky's *entire system* of common schools is unconstitutional."). In 2003, the Court of Appeals of New York (that state's highest appellate court) ordered the state to reform its school finance system to provide for a comprehensive package of foundational educational resources identified by the court. *See Campaign for Fiscal Equity, Inc. v. State*, 100 N.Y.2d 893, 930 (2003) (ordering that the State "ascertain the actual cost of providing a sound basic education in New York City" and implement subsequent reforms to "address the shortcomings of the current system by ensuring . . . that every school in New York City would have the resources necessary for providing the opportunity for a sound basic education").

¶ 174    Other supreme courts have likewise ordered the reallocation of state funds. In 2011, the Supreme Court of New Jersey ordered the state to provide approximately $500 million in additional education funding after violating its constitutional duty. *See Abbott v. Burke*, 206 N.J. 332, 376 (2011) ("We order that funding to the Abbott districts in FY 2012 must be calculated and provided in accordance with the SFRA formula."). In 2017, the Supreme Court of Kansas determined the state's education finance system was constitutionally noncompliant and ordered the legislature to enact legislation remedying the deficiency in "both adequacy and equity." *Gannon v. State*, 306 Kan. 1170, 1173 (2017). The court emphasized that continued judicial deference to the legislature's constitutional violation would "make[ ] the courts vulnerable to becoming complicit actors in the deprivation of those rights." *Id*. at 1174. Finally, the Supreme Court of Washington in 2017 affirmed the trial court's order finding the state's education funding system to be constitutionally deficient and imposing a $100,000 daily contempt sanction on the state until compliance was achieved. *See McCleary v. State*, 2017 Wash. 2017 WL 11680212, *1 (2017) ("The court will retain jurisdiction, continue to impose daily sanctions, and reserve all enforcement options to compel compliance with its decision and orders.").

¶ 175    Of course, these cases are not binding precedent upon this Court. They arise in different jurisdictions under different facts and different constitutional language.

Nevertheless, as with the federal cases noted above, they provide important national context and persuasive authority for this Court's similar ruling today.

¶ 176        Legislative Defendants and the Controller contend that declaratory relief constitutes the farthest reach of judicial power on this issue. Based on the intersection of the Appropriations Clause and the Separation of Powers Clause noted above, they argue that once a court issues such a decree, the matter is then exclusively in the hands of the voters to elect new legislators if they so choose. But compliance with our Constitution is not a mere policy choice in which legislators may align with one side or another. Indeed, the people of North Carolina have already spoken on this issue through the Constitution itself, which constitutes the supreme will of the people. There, they mandated that the State must guard and maintain the right to the opportunity to a sound basic education. *See Leandro I*, 346 N.C. 336.

\* \* \* \* \*

¶ 177        In summary, constitutional violations demand a just remedy. N.C. Const. art. I, § 18. As the ultimate interpreter of our State Constitution, this Court "has the responsibility to protect the state constitutional rights of the citizens." *Corum*, 330 N.C. at 783. Correspondingly, the judiciary is empowered with "inherent constitutional power to fashion a common law remedy for a violation of a particular constitutional right." *Id.* at 784. When necessary for the proper administration of justice based on the inaction of another branch, and within important limitations,

that inherent judicial power may include the authority to craft a remedy "whereby one branch exercises some activities usually belonging to one of the other two branches in order to fully and properly discharge its duties." *Alamance*, 329 N.C. at 97.

¶ 178          Here, our Constitution requires the General Assembly to exercise its power under the Appropriations Clause in contemporaneous compliance with its constitutional duties under the Education Provisions. Accordingly, in exceedingly rare and extraordinary circumstances, a court may remedy an ongoing violation of the constitutional right to a sound basic education by directing the transfer of adequate available state funds. However, a court may reach for such an extraordinary remedy "only when established methods fail," and even then must "minimize the encroachment upon those with legislative authority in appearance and in fact." *Id.* This holding maintains the integrity of our Constitution, honors the principles of checks and balances and separation of powers, aligns with this Court's precedent on equitable remedial power, and is supported by federal and state rulings in similar contexts.

**C. Application**

¶ 179          Now, we must apply the constitutional analysis above to the two trial court orders in question on this appeal: the November 2021 Order and the April 2022 Order. We address each in turn. This Court reviews constitutional issues de novo.

### 1. *November 2021 Order*

We first review the trial court's 10 November 2021 Order (November 2021 Order). The November 2021 Order begins with thorough findings of fact regarding the long and extraordinary history of this case. These factual findings document the trial court's previous repeated findings of a statewide constitutional violation, the State's repeated failure to adequately remedy that violation, and the trial court's repeated deference to the executive and legislative branches to do so. The Order finds that the CRP "is the *only* remedial plan that the State Defendants have presented to the [c]ourt," and that "more than sufficient funds are available to execute the current need of the [CRP]." The Order's factual findings conclude by observing: "[i]n the seventeen years since the *Leandro II* decision, a new generation of school children, especially those at-risk and socio-economically disadvantaged, were denied their constitutional right to a sound basic education. Further and continued damage is happening now, especially to at-risk children from impoverished backgrounds, and that cannot continue."

The November 2021 Order subsequently makes several conclusions of law. The Order concludes that "[b]ecause the State has failed for more than seventeen years to remedy the constitutional violation as the Supreme Court ordered, this [c]ourt must provide a remedy through the exercise of its constitutional role." To continue to defer, the Order concludes, "will threaten the integrity and viability of the North Carolina

Constitution by . . . nullifying [its] language without the people's consent, . . . ignoring rulings of the Supreme Court of North Carolina[,] . . . and . . . violating separation of powers." The Order further concludes that the Education Provisions constitute "an ongoing constitutional appropriation of funds sufficient to create and maintain a school system that provides each of our State's students with the constitutional minimum of a sound basic education. This constitutional provision may therefore be deemed an appropriation 'made by law.' " Finally, the Order concludes that the trial court has "minimized its encroachment on legislative authority through the least intrusive remedy" through its seventeen years of unfettered deference in every aspect of the case, including allowing the State itself to create and implement the CRP.

¶ 182    Based on these factual findings and legal conclusions, the November 2021 Order orders the OSMB and the State Budget Director, the Office of the State Controller and the State Controller, and the Office of the State Treasurer and the State Treasurer to "take the necessary actions to transfer the total amount of funds necessary to effectuate years 2 & 3 of the [CRP] from the unappropriated balance within the General Funds to the state agents and state actors with fiscal responsibility for implementing the [CRP]." The Order then specifies the dollar amounts of three transfers to DHHS, DPI, and the UNC System. The Order directs these recipients, their agents, and all other involved State actors to administer those funds and take any other actions necessary "to guarantee the opportunity of a sound

basic education consistent with, and under the times frames set out in, the [CRP], including the Appendix thereto."

¶ 183 Today, this Court affirms the constitutionality of the November 2021 Order's transfer directives. We reach this holding because, given the extraordinary circumstances of this case, the trial court acted within its inherent power to address ongoing constitutional violations through equitable remedies while minimizing its encroachment upon the legislative branch.

¶ 184 In *Leandro I*, this Court established the procedure through which a court may identify and remedy a violation of the fundamental right to a sound basic education. The Court stated that

> [T]he courts of this state must grant every reasonable deference to the legislative and executive branches when considering whether they have established and are administering a system that provides the children of the various school districts of the state a sound basic education. A clear showing to the contrary must be made before the courts may conclude that they have not. . . .
>
> . . . . [If a] court makes findings and conclusions from competent evidence to the effect that defendants in this case are denying children of the state a sound basic education, a denial of a fundamental right will have been established. It will then become incumbent upon defendants to establish that their actions denying this fundamental right are "necessary to promote a compelling governmental interest." If defendants are unable to do so, it will then be the duty of the court to enter a judgment granting declaratory relief and such other relief as necessary to correct the wrong while minimizing the encroachment upon the other branches of government.

346 N.C. at 357 (citations omitted).

¶ 185        In *Leandro II*, this Court further noted that

> when the State fails to live up to its constitutional duties,
> a court is empowered to order the deficiency remedied, and
> if the offending branch of government or its agents either
> fail to do so or have consistently shown an inability to do
> so, a court is empowered to provide relief by imposing a
> specific remedy and instructing the recalcitrant state
> actors to implement it.

358 N.C. at 642.

¶ 186        As noted above, when the action or inaction of a coequal branch of government indefinitely violates the fundamental constitutional rights of the people, a court—after showing appropriate deference—may invoke its inherent power to do what is reasonably necessary to remedy the violation. Under extraordinary circumstances, this may include directing state actors to transfer available state funds in order to guard and maintain the right of every child to the opportunity to a sound basic education.

¶ 187        Even then, important limitations apply.

> [A] court's judicious use of its inherent power to reach
> towards the public purse must recognize two critical
> limitations: first, it must bow to established procedural
> methods where these provide an alternative to the
> extraordinary exercise of its inherent power. Second, in the
> interests of the future harmony of the branches, the court
> in exercising that power must minimize the encroachment
> upon those branches with legislative authority in
> appearance and in fact . . . [by] seeking the least intrusive
> remedy.

*Alamance*, 329 N.C. at 100–01.

¶ 188 Here, the trial court faithfully complied with these procedures, powers, and limitations. First, after an extensive trial in which it granted every reasonable deference to the executive and legislative branches, it determined based on an abundance of clear and convincing evidence that the State was violating its constitutional obligation to guard and maintain the right of all North Carolina schoolchildren to the opportunity to a sound basic education as defined by *Leandro I.* While the trial court focused primarily on Hoke County as a representative district, it expressly and repeatedly made findings of fact and conclusions of law regarding a statewide violation that was not isolated to Hoke County.[18] The State has never and does not contend that this statewide violation is necessary to promote a compelling governmental interest.

¶ 189 In *Leandro II*, this Court affirmed the trial court's conclusion. 358 N.C. 605. This Court's opinion limited itself to Hoke County as a representative district but directed the trial court on remand to conduct "further proceedings that include, but are not necessarily limited to, presentations of relevant evidence by the parties, and findings and conclusions of law by the trial court" regarding other districts. *Id*. at 613

---

[18] The State itself likewise emphasized that any remedial efforts must be directed statewide because "[t]he State . . . never understood the Supreme Court or [the trial] [c]ourt to have ordered the defendants to provide students in Hoke County or any of the other plaintiff or plaintiff-intervenor school districts special treatment, services or resources which were not available to at-risk students in other LEAs across the State."

n.5. Within these further proceedings, the Court emphasized, "a broader mandate may ultimately be required." *Id.* at 633 n.15. Upon remand, this Court instructed the trial court to "proceed, as necessary, in a fashion that is consistent with the tenets outlined in this opinion." *Id.* at 648.[19]

¶ 190 So the trial court did. For about fourteen years, the trial court presided over presentations of relevant evidence by the parties in open court and made volumes upon volumes of factual findings and conclusions of law. These repeatedly affirmed the same ultimate legal conclusion: that despite its piecemeal remedial efforts, the State remained in statewide violation of its constitutional duty to provide all students with the opportunity to receive a sound basic education.

¶ 191 True, these factual findings and legal conclusions were typically issued within documents titled "Notice of Hearing and Order" rather than just "Order." But it is well within this Court's ability and authority to properly identify factual findings and legal conclusions as such, regardless of how they are labeled by a trial court. *See, e.g., In re J.O.D.*, 374 N.C. 797, 807 (2020) (identifying findings of fact and conclusions of law as such despite trial court labels). Further, this Court already articulated in *Leandro II* that

> [i]n our view, the unique procedural posture and

---

[19] Contrary to the claim of the dissent below, this Court in *Leandro II* did not expressly direct the trial court to conduct additional trials. Rather, it instructed the trial court to "proceed, as necessary, in a fashion that is consistent with the tenets outlined in this opinion." *Id.*

> substantive importance of this case compel us to adopt and
> apply the broadened parameters of a declaratory judgment
> action that is premised on issues of great public interest.
> The children of North Carolina are our state's most
> valuable renewable resource. If inordinate numbers of
> them are wrongfully being denied their constitutional right
> to the opportunity for a sound basic education, our state
> courts cannot risk further and continued damage because
> the perfect civil action has proved elusive.

358 N.C. at 616. So too here regarding the perfectly formatted court paper.[20]

"Technicalities and refinements should not be seriously considered in a case like this

involving a constitutional mandate, but the record should be so interpreted that

substantial justice should be done." *Mebane*, 211 N.C. at 227. Indeed, "[f]or well over

a century, North Carolina courts have abided by the foundational principles that

administering equity and justice prohibits the elevation of form over substance." *M.E.*

*v. T.J.*, 380 N.C. 539, 2022-NCSC-23, ¶ 1. To cover our eyes and plug our ears to the

trial court's express and repeated findings and conclusions of a statewide *Leandro*

violation because of procedural imperfections would squarely violate that prohibition.

Accordingly, this Court holds that the trial court, in alignment with this Court's

instructions in *Leandro II*, properly concluded based on an abundance of clear and

convincing evidence that the State's *Leandro* violation was statewide.[21]

---

[20] In fact, this Court has already recognized and proven itself able to handle the "free-wheeling nature" of the trial court's various and voluminous orders in *Leandro II*. 358 N.C. at 621.

[21] For a summary of this evidence, see the Factual and Procedural History above.

¶ 192        Next, the November 2021 Order properly concluded that the trial court showed

sufficient deference to the executive and legislative branches to remedy this violation.

As summarized above, this conclusion is grounded in eighteen years of clear and

convincing evidence. Year after year, hearing after hearing, attempt after attempt,

the trial court continued to provide the executive and legislative branches more time

and space to fix the violation on their own terms. Yet year after year, hearing after

hearing, attempt after attempt, they did not.

¶ 193        Over these years, the trial court made clear its increasing frustration and

decreasing patience with the State's failure to remedy the violation despite its

constitutional and court-ordered obligation to do so. In 2015, for instance, the trial

court lamented that

> [n]o matter how many times the [c]ourt has issued Notices
> of Hearings and Orders regarding unacceptable academic
> performance, and even after the North Carolina Supreme
> Court plainly stated that the mandates of *Leandro* remain
> "in full force and effect[,]" many adults involved in
> education . . . still seem unable to understand that **the
> constitutional right to have an equal opportunity to
> obtain a sound basic education is a right vested in
> <u>each and every child</u> in North Carolina regardless of
> their respective age or educational needs**.

The court subsequently ordered the State to "propose a definite plan of action as to

how the State of North Carolina intends to correct the educational deficiencies in the

student population." Three years later, the trial court expressly warned the State

that

> [the] trial court has held status conference after status conference and continues to exercise tremendous judicial restraint. . . . *The time is drawing nigh, however, when due deference to both the legislative and executive branches must yield to the court's duty to adequately safeguard and actively enforce the constitutional mandate on which this case is premised.* It is the sincere desire of this court that the legislative and executive branches heed the call.

(Emphasis added.) Three years after that, the trial court cautioned the State that "in the event the full funds necessary to implement the [CRP] are not secured . . . , the [c]ourt will hear and consider any proposals for how the [c]ourt may use its remedial powers to secure such funding." Even in the November 2021 Order itself, the trial court showed continued deference by staying its order for thirty days "to permit the other branches of government to take further action consistent with the findings and conclusions of this Order."

¶ 194        In short, the trial court demonstrated an abundance of restraint and deference to its coequal branches in compliance with this Court's instructions in *Leandro I* and *II*. Accordingly, this Court holds that the trial court's November 2021 Order properly concluded based on an abundance of clear and convincing evidence that the trial court had shown sufficient deference to the executive and legislative branches.

¶ 195        When a constitutional violation persists after extended judicial deference, "a court is empowered to provide relief by imposing a specific remedy and instructing the recalcitrant state actors to implement it." *Leandro II*, 358 N.C. at 642. As explained above, in exceedingly rare and extraordinary circumstances, a court's

inherent power to remedy an ongoing violation of the constitutional right to a sound basic education includes the authority to direct the transfer of adequate available state funds to address that violation. Before doing so, however, the court must first exhaust all established alternative procedural methods. *Alamance*, 329 N.C. at 100–01. Further, a court exercising such extraordinary authority must minimize its encroachment by seeking the least intrusive remedy. *Id.*

¶ 196         Here, we hold that the trial court properly exercised its remedial authority within these limitations. First, the circumstances of this case are exceedingly rare and extraordinary. For eighteen years, the executive and legislative branches have repeatedly failed to remedy an established statewide violation of the constitutional right to the opportunity to a sound basic education. As noted by the trial court, since *Leandro II*, an entire "new generation of school children, especially those at-risk and socio-economically disadvantaged, were denied their constitutional right to a sound basic education." The court has repeatedly deferred. The State has repeatedly failed. All the while, North Carolina's schoolchildren, their families, their communities, and the state itself have suffered the incalculable negative consequences. These extraordinary circumstances demand swift and decisive remedy.

¶ 197         Second, the trial court properly exhausted all established alternative methods before directing the transfer of available State funds. For the past eighteen years, the trial court allowed the State to craft and implement its own remedies, pass new

budgets, consult and engage with independent experts, establish commissions, and create its own comprehensive remedial plan. During this time, the court has stuck to more traditional judicial procedures: issuing declaratory judgments and ordering the parties to remedy the violation on their own terms. They have not. Only after exhausting these more ordinary alternatives did the trial court reach for the extraordinary measure of ordering the transfer of available State funds.

¶ 198        Third, in doing so, the trial court minimized its encroachment by seeking the least intrusive remedy that would still adequately address the constitutional violation. On its face, the November 2021 Order does not involve the legislative branch at all; it does not order the General Assembly to pass certain legislation, raise additional state funds through taxation, conduct certain legislative proceedings, or pay a daily contempt sanction, as other state courts have ordered under similar circumstances. Such remedies would have directly forced the General Assembly's hand to take certain actions, thereby exerting a higher degree of judicial influence over legislative powers.

¶ 199        Instead, the November 2021 Order opted for a less intrusive measure: directing certain executive officials responsible for transferring State funds to make certain transfers as if the General Assembly had directed the same. This remedy minimizes encroachment by implicating legislative *duties* without directing any order toward the legislature itself. To be sure, it is safe to say that everyone involved in this

litigation—including this Court—would have preferred if the *legislature* had fulfilled these legislative duties. But it has not. That leaves the judiciary with the constitutional obligation to fulfill its own role in guarding and maintaining the right to a sound basic education by directing the transfer of remedial funds.[22]

¶ 200        The invasiveness of the November 2021 Order is further minimized because these funds are readily available. The trial court found based on clear, convincing, and undisputed evidence "that more than sufficient funds are available to execute the current needs of the [CRP]." Accordingly, the November 2021 Order did not require the State to raise additional funds or to reallocate funds that had previously been allocated for other uses, which could implicate policy choices. Rather, it directs the State actors to transfer the necessary funds "from the unappropriated balance with the General Fund."[23]

¶ 201        Finally, the invasiveness of the November 2021 Order must be assessed within the broader history and context of the litigation that necessitated it. For instance, it is true that yet another declaratory judgment order—as later issued in the April 2022 Order—would have been less invasive than the November 2021 Order's transfer

---

[22] *See Swann*, 402 U.S. at 25 ("It was because of this total failure of the school board that the District Court was obligated to turn to other qualified sources, and Dr. Finger was designated to assist the District Court to do what the board should have done.").

[23] This is not to minimize the effort required by these State officials in properly executing the transfer of these funds, which the Court recognizes as a challenging administrative task. However, it does not implicate the same policy choices that would be involved in reallocating funds between different agencies or initiatives.

directive. However, given the history of this case in which the trial court issued such declaratory judgments again and again and again to no avail, issuing the same judgment one more time with crossed fingers and bated breath cannot reasonably be considered a remedy at all. Instead, the State's repeated and ongoing failure to remedy the constitutional violation after many prior such declaratory judgments required the trial court to this time do more.

¶ 202        Below, the dissent insists that affirming the November 2021 Order would allow this Court to invoke similar inherent authority in a wide variety of dissimilar contexts. This parade of horribles is—in a word—overstated. To be clear, today's ruling creates precedent for the exercise of this type of judicial remedial power in exactly one circumstance: when the recalcitrant inaction of the legislative or executive branch indefinitely violates the fundamental constitutional rights of the people after years of judicial deference.[24]

¶ 203        Finally, the dissent contends that affirming the November 2021 Order would violate the rights of the Controller. But as an executive branch official, the Controller's interests have been adequately represented throughout this litigation. A court cannot reasonably add as a party to a case every state official who may be

---

[24] *See Leandro II*, 358 N.C. at 642 ("[W]hen the State fails to live up to its constitutional duties, a court is empowered to order deficiency remedied, and if the offending branch of government or its agents either fail to do so or have consistently shown an inability to do so, a court is empowered to provide relief by imposing a specific remedy and instructing the recalcitrant state actors to implement it.").

involved in implementing a remedy; instead, the interests of those officials are represented by that agency, branch, or the State as a whole.

¶ 204 In summary, the trial court's November 2021 Order complied with its constitutional authority and limitations. We therefore affirm and reinstate the trial court's order directing certain State officials to transfer the funds required to implement years two and three of the CRP. To enable the trial court to comply with this ruling, we stay the Court of Appeals' Writ prohibiting this transfer.

### 2. *April 2022 Order*

¶ 205 We next review the trial court's 26 April 2022 Order (April 2022 Order). The April 2022 Order recalculated the State's CRP funding shortcomings in light of the 2021 Budget Act but removed the transfer directive in favor of a declaratory judgment.

¶ 206 First, April 2022 Order confirmed the State's continued failure to fully fund the CRP. The trial court found "that significant necessary services for students, as identified in the CRP, remain unfunded and/or underfunded by the [2021] Budget Act." Specifically, the court found "the Budget Act funds approximately 63% of the total cost of the programs to be conducted during year 2 and approximately 50% of the total cost of the programs to be conducted during year three." Because the CRP remains the only comprehensive remedial plan submitted to and ordered by the trial court, this finding further confirms the present continuance of the State's statewide

*Leandro* violation.

¶ 207        Next, the April 2022 Order confirmed that adequate State funds are available. The trial court found that "the total of unappropriated funds in the State's Savings Reserve [will be] $4.25 billion after the fiscal year 2022-23 legislative-mandated transfer." Accordingly, the trial court found that "the funds transferred on a discretionary basis to the State's Saving Reserve and the State's Capital and Infrastructure Reserve during the two-year budget cycle is substantially in excess of the amount necessary to fully fund the CRP during years 2 and 3 of the CRP."

¶ 208        Based on these factual findings, the trial court concluded that "the total underfunding of CRP programs during years 2 and 3 of the CRP is $785,106,248 in the aggregate." The court concluded that "[t]aking the two-year budget as a whole, the General Fund does contain sufficient unappropriated monies to make the transfer anticipated by the 10 November Order and the lesser amount of underfunding identified above."

¶ 209        However, because the Court of Appeals' writ of prohibition "determined that the trial court had no proper basis in law to direct the transfer by state officers or departments of funds to DHHS, DPI, and the UNC System," the trial court removed those direct transfer provisions from its order. Instead, it issued a declaratory judgment by decreeing that DHHS, DPI, and the UNC System "have and recover from the State of North Carolina" the specified funds and that the funds are "owed by the

State to DHHS, DPI, and the UNC system."

¶ 210        Since the trial court's April 2022 Order, the State has presented no argument that it has complied with this declaratory judgment by transferring these funds.

¶ 211        Today, we vacate in part and reverse in part the trial court's April 2022 Order. First, we vacate the trial court's calculation of the amount of funds by which each portion of the CRP is underfunded. This is not because the trial court erred in its calculations, which were diligent and precise. Rather, those calculations have been functionally mooted by the State's subsequent enactment of the 2022 Budget Act. Accordingly, on remand, we direct the trial court to recalculate the appropriate transfer amounts required for compliance with years two and three of the CRP in light of the 2022 Budget Act.

¶ 212        Second, we reverse the trial court's conclusion that it lacked the legal authority to order certain State actors to transfer the available State funds to comply with years two and three of the CRP. In accordance with the principles described above, we hold that under the extraordinary circumstances of this case, the trial court was properly empowered to do so. As such, the trial court's contrary conclusion in its April 2022 Order was grounded in an error of law and is therefore reversed.

¶ 213        Accordingly, our order to the trial court on remand is threefold. First, we order the trial court to recalculate the funding required for full compliance with years two and three of the CRP in light of the 2022 Budget Act. Second, we order the trial court

to reinstate its November 2021 Order transfer directive instructing certain State actors to transfer those recalculated amounts from available State funds as an appropriation under law. To enable the trial court to do so, we stay the Court of Appeals' 30 November 2021 Writ of Prohibition. Third, we order the trial court to retain jurisdiction over the case in order to monitor compliance with its order and with future years of the CRP. In future years, the General Assembly may—and is encouraged to—choose to moot the necessity for further transfer directives from the court by substantially complying with the terms of the CRP on its own accord.

¶ 214    We recognize that the remedy decreed by the trial court's November 2021 Order and reinstated by this Court today is extraordinary. It exercises powers at the outer bounds of the reach of the judiciary and encroaches into the traditional responsibilities of our coequal branches of government. We do not do so lightly. Nevertheless, years of continued judicial deference and legislative non-compliance render it our solemn constitutional duty to do so. For our Constitution to retain its integrity and legitimacy, the fundamental rights enshrined therein must be "guarded and maintained." When other branches indefinitely abdicate this constitutional obligation, the judiciary must fill the void.

**D. Legislative Defendants' Assertions of Error**

¶ 215    Finally, we address Legislative Defendants' various assertions of error. On appeal, Legislative Defendants raise four primary claims of error in addition to the

foundational constitutional issues addressed above, most of which are also echoed by the dissent below. First, they argue that the trial court exceeded its jurisdiction and authority by imposing a statewide remedy because this case is properly "limited to just at-risk students in Hoke County." Second, they argue that the trial court erroneously failed to presume that the 2021 Budget Act satisfied the State's constitutional obligations under *Leandro*. Third, they argue that the trial court's order engaged in a non-justiciable political question by deciding the amount of State funds to be transferred to certain State agencies. Fourth, they argue that "the trial court erred in making a constitutional determination in a friendly suit."

¶ 216        These claims unequivocally fail. As an initial matter, they are untimely. Since 2004, and especially since the enactment of N.C.G.S. § 1-72.2 in 2013, Legislative Defendants have had any number of opportunities to intervene in this litigation and thereby earnestly engage with these important issues from within the arena where the parties and the trial court sought to solve the formidable problems facing our state. Besides their single Motion to Intervene regarding Pre-K issues in 2011, they have not. Instead, Legislative Defendants have largely opted to comment upon the proceedings from the sidelines, including by publicly disparaging the trial court itself. In doing so, Legislative Defendants functionally abdicated their constitutional duties and accordingly undermined their own credibility to raise these arguments at this eleventh hour.

¶ 217        In any event, these arguments are meritless. At best, they reveal a fundamental misunderstanding of the history and present reality of this litigation. At worst, they suggest a desire for further obfuscation and recalcitrance in lieu of remedying this decades-old constitutional violation. Regardless, they will not prevent this Court from exercising its inherent authority to protect the constitutional right of North Carolina children to the opportunity to a sound basic education.

### 1. *Scope of Violation*

¶ 218        First, and most enthusiastically, Legislative Defendants assert this case is properly "limited to just at-risk students in Hoke County." As such, they argue that the trial court erred by exceeding its jurisdiction and authority by imposing a statewide remedy. Legislative Defendants contend that because this Court's ruling in *Leandro II* was expressly restricted to Hoke County, "there has never been a judgment finding a statewide violation of the right to a sound basic education." The dissent below echoes this claim.

¶ 219        To be sure, it is true that this Court's ruling in *Leandro II* was expressly limited to Hoke County as a representative district. *See* 358 N.C. at 613 n.5. However, on remand, this Court instructed the trial court to address other districts by conducting "further proceedings that include, but are not necessarily limited to, presentations of relevant evidence by the parties, and findings and conclusions of law by the trial court." *Id*. This Court further instructed the trial court to "proceed[ ] as necessary[ ]

in a fashion that is consistent with the tenets outlined in this opinion." *Id.* at 648.[25]

¶ 220          On remand, the trial court did just that: it conducted further proceedings that included, but were not limited to, presentations of relevant evidence by the parties and findings and conclusions of law by the trial court regarding other districts in a fashion consistent with the tenets outlined in *Leandro I* and *II*. Based on an abundance of clear and convincing evidence, the trial court repeatedly concluded that the State's *Leandro* violation was not limited to Hoke County but was pervasive statewide. Time and time again, the trial court observed that the evidence "indicate[d] that in way too many school districts across the state, thousands of children in the public schools have failed to obtain, and are not now obtaining a sound basic education as defined by and required by the *Leandro* decisions."

¶ 221          As addressed above, the fact that the trial court's filings were often titled "Notice of Hearing and Order" instead of just "Order" does not render this Court suddenly incapable of understanding the trial court's express findings and conclusions. In any event, the trial court's factual finding and legal conclusion of a continued statewide *Leandro* violation were most recently repeated in its November 2021 Order, which was formally titled "Order" and formally enumerated "Findings of Fact" and "Conclusions of Law." These findings and conclusions were neither

---

[25] As noted above, at no point did this Court instruct the trial court to formally conduct separate trials for all of the other school districts involved in this litigation and in the state. *See id.*

amended nor revoked—and indeed were functionally confirmed *again*—in the trial court's subsequent April 2022 Order.

¶ 222     Further, the State itself has consistently proposed and advocated for a statewide remedy. This is because its constitutional obligation applies not just toward marginalized students in Hoke County, but to every student in every district in the state. As such, it strains both reason and judicial economy to contend that separate cases with identical facts and constitutional claims must be brought by plaintiffs in all 114 of North Carolina's other school districts in order for the State to implement a remedy that applies to each of those districts. The paramount public interest of the constitutional rights at stake in this case demand a more reasonable and efficient resolution.[26]

¶ 223     Accordingly, to contend that there has never been a finding or conclusion of a *Leandro* violation beyond Hoke County reflects, at best, a fundamental misunderstanding of the history of this case and the State's constitutional obligations. Legislative Defendants' argument is unequivocally rejected.

### 2. *Impact of the Budget Act*

---

[26] "In declaratory actions involving issues of significant public interest, such as those addressing alleged violations of education rights under a state constitution, courts have often broadened both standing and evidentiary parameters to the extent that plaintiffs are permitted to proceed so long as the interest sought to be protected by the complainant is arguably within the 'zone of interest' to be protected by the constitutional guaranty in question." *Leandro II*, 358 N.C. at 615.

¶ 224    Second, Legislative Defendants assert that the trial court erroneously failed to presume that the 2021 Budget Act satisfied the State's constitutional obligations under *Leandro*. They argue that "in reducing its assessment of the Budget to a mathematical exercise and assuming that the CRP was the only means to provide a *Leandro*-compliant education, the trial court got the analysis backwards" by "start[ing] with the assumption that the Budget was insufficient, and then skipp[ing] straight to asking whether the General Assembly had provided Plaintiffs with their chosen remedy." The dissent below likewise echoes this claim.

¶ 225    This is wrong on several fronts. First, it is true that the CRP is by no means the only path toward constitutional compliance under *Leandro*. The executive and legislative branches are—and have been—granted broad deference in crafting a remedy on their own terms. However, as the trial court repeatedly observed, the CRP is currently the *only* remedial plan that the State has presented to the court in response to its January 2020, September 2020, and June 2021 Orders. Indeed, no party in this litigation, including Legislative Defendants, have presented any alternative remedial plan. As such, the trial court did not erroneously "assum[e] that the CRP was the only means to provide a *Leandro*-compliant education." Rather, it assessed the constitutional compliance of the Budget Act against the only comprehensive remedial plan that it has been presented with in the eighteen-year long remedial phase of this case.

¶ 226        Second, the trial court did not erroneously fail to presume the constitutionality

of the Budget Act. The constitutionality of the Budget Act was not the question before

the trial court. Rather, the trial court's task was to assess the constitutional

compliance of the Budget Act against the only comprehensive remedial plan that had

been presented to it by the State.

¶ 227        In fact, a review of the record reveals that the trial court has already addressed

and rejected this argument. In 2018, the State argued in a motion to dismiss "that

legislation enacted by . . . [the] General Assembly now adequately addresses those

criteria that our Supreme Court has decreed constitute a 'sound basic education' . . .

[and] that these enactments must be presumed by this court to be constitutional." In

rejecting this argument, the trial court explained that

> [t]his court indeed indulges in the presumption of
> constitutionality with respect to each and every one of the
> legislative enactments cited by the [State]. That these
> enactments are constitutional and seek to make available
> to children in this State better educational opportunities is
> not the issue before this court. The issue is whether the
> court should continue to exercise such remedial jurisdiction
> as may be necessary to safeguard and enforce the much
> more fundamental *constitutional right* of every child to
> have the opportunity to receive a sound basic education.
> Again, the evidence before this court upon the [State's]
> motion is wholly inadequate to demonstrate that these
> enactments translate into substantial compliance with the
> constitutional mandate of *Leandro* measured by applicable
> educational standards.

¶ 228        So too here. Neither the Plaintiff-parties nor the State dispute the presumed

constitutionality of the passage of the 2021 Budget Act as a general procedural matter. But that was not the issue before the trial court and is not the issue before this Court. The more specific question in the context of this case is the extent to which the 2021 Budget Act remedies the State's longstanding statewide *Leandro* violation. As such, the Budget Act must be assessed against the terms of the only comprehensive remedial plan thus far presented by the parties to the court. The mere passage of a state budget—even one that enjoys a general presumption of constitutionality—is insufficient to meet that more specific burden. Accordingly, the trial court did not err in its evaluation of the 2021 Budget Act.[27]

¶ 229       Finally, it bears emphasizing that the CRP is not the "Plaintiffs['] . . . chosen remedy." The CRP was created by neither Plaintiff-parties nor the trial court, but by the State itself. It is therefore the *State's* chosen remedy, and thus far the only viable remedy presented by any party in this litigation.

### 3. *Political Question*

¶ 230       Third, Legislative Defendants argue that the trial court's November 2021 and

---

[27] Relatedly, the dissent contends that the CRP—and thus the November 2021 Order enforcing it—unduly focuses on education funding when the real problem is implementation. To be sure, this case is not just about money; it is also about competent and qualified teachers and principals, support for high-poverty school districts, effective state assessment and accountability systems, and adequate and accessible early education opportunities, among many other programs outlined at length in the CRP. Of course, just as no one would reasonably expect the Department of Public Safety or Department of Transportation to implement their various programs and responsibilities without adequate funding, none of these educational priorities can be implemented and sustained with fidelity without adequate education funding. Minimally adequate funding is a necessary means to that end.

April 2022 Orders impermissibly engaged in a non-justiciable political question by deciding the amount of State funds to be transferred to certain State agencies. Doing so, Legislative Defendants contend, requires the trial court to engage in policy-based prioritization that "is precisely the type of determination the people must make through their elected representatives."

¶ 231 This argument likewise ignores the history and prior rulings of this case. In *Leandro I*, this Court squarely rejected the State's threshold argument that courts may not assess issues of educational adequacy because they are non-justiciable political questions. 346 N.C. at 344–45. The Court held that "it is the duty of this Court to address plaintiff-parties' constitutional challenge to the state's public education system." *Id.* at 345.

¶ 232 More specifically, the trial court did not err by assessing the adequacy of the 2021 Budget Act. The court did not make its own policy determination. Rather, after concluding based on undisputed evidence that sufficient unappropriated State funds were available, it ordered that certain funds be transferred in order to comply with the terms of the only comprehensive plan for *Leandro* compliance presented to it by the State. Put differently, the court assessed the State's compliance with *the State's own determination* of constitutional educational adequacy, not the court's. Constitutional compliance is not a policy choice; it is a mandate that this Court is obligated to protect.

### 4. *Friendly Suit*

¶ 233    Finally, Legislative Defendants argue that "the trial court erred in making a constitutional determination in a friendly suit." They argue that there is no genuine controversy in this case because after the trial court's 2018 order requiring the parties to craft a comprehensive remedial plan, "Plaintiffs, Plaintiff-Intervenors, and [the State] have worked together to obtain judicial orders mandating their desired policies." The dissent below likewise echoes this claim.

¶ 234    Again, this is wrong on several fronts. First, this argument ignores the decades of history summarized above in which this case was hotly contested and the State repeatedly asserted either that it had achieved constitutional compliance or that the trial court no longer had jurisdiction over the case. While Legislative Defendants' Hoke County argument functionally disregards everything that occurred in this litigation after 2004, their friendly suit argument functionally disregards everything before 2018. Neither approach appreciates the complete past and present reality of this case, which provide vital context for the two trial court orders in question on this appeal.

¶ 235    Further, the State's efforts to achieve constitutional compliance after 2018 do not render this suit friendly. Rather, they reflect the State's commitment—at long last—to honor its constitutional duty to guard and maintain the right of North Carolina schoolchildren to a sound basic education. If the State's Comprehensive

Remedial Plan aligns with the interests of Plaintiff-parties, it is because during the remedial phase this litigation—in which parties are *encouraged* to create a collaborative solution that will settle their respective rights and duties—both the State and Plaintiff-parties seek to align with the requirements of the Constitution. A shared commitment to constitutional compliance does not render this suit friendly. Legislative Defendants' argument to the contrary is rejected.

### III.    Conclusion

The ultimate wisdom of *Leandro*, whispered through the ages from the Framers' vision in 1868 to the Plaintiffs' Complaint in 1994 to the untold and untapped potential of our schoolchildren today, is that public education is a public good. That is, when the State ensures that a child has the opportunity to receive a sound basic education, it is not only *that child* who benefits. It is not only that child's *family* that benefits. It is not only that child's *community* that benefits. Rather, when a child receives a sound basic education—one that prepares her "to participate fully in society as it exist[s] in . . . her lifetime"—*we all* benefit. *Leandro I*, 346 N.C. at 348.

Accordingly, our Constitution not only guarantees all children the right to the opportunity to a sound basic education, it establishes that "it is the duty of the *State* to guard and maintain that right." N.C. Const. art. I, § 15 (emphasis added). "[I]nitially, at least," it is the responsibility of the executive and legislative branches to fulfill that constitutional obligation. *Leandro I*, 346 N.C. at 357. But when those

branches indefinitely "fail[ ] to live up to [their] constitutional duties . . . or have consistently shown an inability to do so, a court is empowered to provide relief by imposing a specific remedy and instructing the recalcitrant state actors to implement it." *Leandro II*, 358 N.C. at 642.

¶ 238     For a quarter-century, the judiciary has deferred to the executive and legislative branches to remedy this statewide constitutional violation. Yet overwhelming evidence clearly demonstrates that it persists today. In 2004, the *Leandro II* Court lamented that "the instant case commenced ten years ago," and that "[i]f in the end it yields a clearly demonstrated constitutional violation, ten classes of students . . . will have already passed through our state's school system without benefit of relief. We cannot similarly imperil *one more class* unnecessarily." *Id.* at 616 (emphasis added). Today, that figure is twenty-eight years, and twenty-eight classes of students. The *children* of the original *Leandro* plaintiffs could well have entered or graduated from high school by now, all under a well-established constitutionally inadequate education system. As noted in Plaintiffs' original 1994 Complaint, this cycle "entails enormous losses, both in dollars and in human potential, to the State and its citizens." All the while, the judiciary has continued—patiently but with increasing concern—to defer.

¶ 239     Today, that deference expires. At this point, to continue to condone delay and evasion would render this Court complicit in the constitutional violation. Ultimately,

"[i]t is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens; this obligation to protect the fundamental rights of individuals is as old as the State." *Corum*, 330 N.C. at 783.

¶ 240        Today, we must fulfill that obligation. To do so, this Court exercises its power "to provide relief by imposing a specific remedy and instructing the recalcitrant state actors to implement it." *Leandro II*, 358 N.C. at 642. Specifically, we reinstate the trial court's November 2021 Order directing certain State officials to transfer available state funds to implement years two and three of the Comprehensive Remedial Plan. On remand, we narrowly direct the trial court to recalculate the appropriate distributions in light of the State's 2022 Budget. Once that calculation is complete, we instruct the trial court to order the applicable State officials to transfer these funds as an appropriation under law. Accordingly, we stay the Court of Appeals' 30 November 2021 Writ of Prohibition. Finally, we order the trial court to retain jurisdiction over this matter to ensure the implementation of this order and to monitor continued constitutional compliance.

¶ 241        Given these remand instructions, this ruling will not be the final page in the *Leandro* litigation. Nevertheless, it is the sincere hope of this Court that it will serve as the start of a new chapter—one in which the parties lay down old divisions and distrust to forge a spirit of collaboration in good faith toward a common goal: constitutional compliance. The same recalcitrant approach would only yield the same

inadequate outcomes. Instead, this Court calls upon the parties to imagine a future in which all North Carolina children receive the opportunity to a sound basic education, then honor their constitutional oaths by working together to make that future real. Indeed, our Constitution's Declarations of Rights is neither aspirational nor advisory; it is a mandate.

¶ 242 Until that mandate is fulfilled, the judiciary will stand ready to carry out its constitutional duties. We too comprise "the State," and we too must honor our constitutional obligations. While we recognize the primacy of the executive and legislative branches in creating and implementing our system of public education, we cannot and will not tolerate the ongoing violation of constitutional rights.

¶ 243 "Today, education is perhaps the most important function of state and local governments. . . . It is the very foundation of good citizenship." *Brown I*, 347 U.S. at 493. "Assuring that our children are afforded the chance to become contributing, constructive members of society is paramount. Whether the State meets this challenge remains to be determined." *Leandro II*, 358 N.C. at 649. Accordingly, this Court once more "remands to the lower court[,] and ultimately into the hands of the legislative and executive branches, one more installment in the 200-plus year effort to provide an education to the children of North Carolina." *Id.* We do so with hope that the parties will chart a new course, firmness in our resolve to uphold our

Constitution, and faith that the brightest days for our schoolchildren and our state lie still ahead.

IT IS SO ORDERED.

Justice BERGER dissenting.

"Frequently an issue of this sort will come before the Court clad, so to speak, in sheep's clothing: the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis.  But this wolf comes as a wolf."  *Morrison v. Olson*, 487 U.S. 654, 699, 108 S. Ct. 2597, 2623 (1988) (Scalia, J., dissenting).

"The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, selfappointed, or elective, may justly be pronounced the very definition of tyranny."  *The Federalist* No. 47 (James Madison).  "By tyranny, . . . [Madison] means arbitrary, capricious, and oppressive rule by those possessing any two of these powers."  George W. Carey & James McClellan, *Reader's Guide to The Federalist*, The Federalist, at lxx (George W. Carey & James McClellan, eds., Gideon ed. 2001).  We see in this opinion the arbitrary usurpation of purely legislative power by four justices.  The majority affirms the trial court order which strips the General Assembly of its constitutional power to make education policy and provide for its funding.  Indeed, this wolf comes as a wolf.

"The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other."  N.C. Const. art. I, § 6.  This clear and unambiguous principle "is the rock upon which rests the fabric of our government.  Indeed, the whole theory of constitutional government in this

State and in the United States is characterized by the care with which the separation of the departments has been preserved and by a marked jealousy [against] encroachment" by another branch. *Pers. v. Bd. of State Tax Comm'rs*, 184 N.C. 499, 502, 115 S.E. 336, 339 (1922).

¶ 247 Without question, the General Assembly, in which our constitution vests the legislative power of the State, N.C. Const. art. II, § 1, is "the policy making agency of our government[.]" *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169, 594 S.E.2d 1, 8 (2004). The General Assembly is the policymaking agency because "[a]ll political power is vested in and derived from the people," N.C. Const. art I, § 2, and the people act through the General Assembly, *State ex rel. Ewart v. Jones*, 116 N.C. 570, 570, 21 S.E. 787, 787 (1895); *see also Pope v. Easley*, 354 N.C. 544, 546, 556 S.E.2d 265, 267 (2001) (per curiam) ("[P]ower remains with the people and is exercised through the General Assembly, which functions as the arm of the electorate."). The General Assembly possesses both plenary and express lawmaking authority, and, as provided by the text of the state constitution, the legislative branch enacts policy through statutory directives and appropriations.

¶ 248 Relevant here, the Declaration of Rights in our constitution provides that "[t]he people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, § 15. This provision within the Declaration of Rights must be considered with the related, more specific provisions

in Article IX that outline the General Assembly's responsibilities with regard to public education. Placed in the working articles of the constitution, Article IX, entitled "Education," *see id.* art. IX, actually "implements the right to education as provided in Article I," *Demenski ex rel. C.E.D. v. State Bd. of Educ.*, 377 N.C. 406, 2021-NCSC-58, ¶ 14. This Court has explained that "these two provisions work in tandem," *id.*, to "guarantee every child in the state an *opportunity* to receive a sound basic education[.]" *Silver v. Halifax Cnty. Bd. of Comm'rs*, 371 N.C. 855, 862, 821 S.E.2d 755, 760 (2018) (emphasis added).

¶ 249        The state constitution explicitly recognizes that it is for the General Assembly to develop educational policy and to provide for its funding in keeping with its legislative authority. Article IX, section 2 requires that "[t]he General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students." N.C. Const. art. IX, § 2. The General Assembly creates the system through policy and funds it through taxation and appropriations. The text then tasks the State Board of Education with "supervis[ing] and administer[ing]" that system with "needed rules and regulations" that remain "subject to laws enacted by the General Assembly." N.C. Const. art. IX, § 5.

¶ 250    The "power of the purse," or the legislative authority to direct or deny appropriations, represents policy decisions made solely by the General Assembly. For that reason, our constitution provides that "[n]o money shall be drawn from the State treasury but in consequence of appropriations made by law[.]" N.C. Const. art. V, § 7(1).

¶ 251    As this Court unanimously noted just two years ago, "*the appropriations clause states in language no man can misunderstand that the legislative power is supreme over the public purse.*" *Cooper v. Berger*, 376 N.C. 22, 36–37, 852 S.E.2d 46, 58 (2020) (emphasis added); *see also Wilson v. Jenkins*, 72 N.C. 5, 6 (1875) ("The General Assembly has absolute control over the finances of the State."). By way of historical explanation, this Court stated:

> In light of this constitutional provision, the power of the purse is the exclusive prerogative of the General Assembly, with the origin of the appropriations clause dating back to the time that the original state constitution was ratified in 1776. In drafting the appropriations clause, the framers sought to ensure that the people, through their elected representatives in the General Assembly, had full and exclusive control over the allocation of the state's expenditures.

*Cooper*, 376 N.C. at 36–37, 852 S.E.2d at 58 (cleaned up). These constitutional principles remain true when the legislative branch enacts educational policy through appropriations.

¶ 252        If legislative power over appropriations is absolute, then the judicial branch has no role in this endeavor. Clear and unambiguous language that "no man can misunderstand," *id.*, should yield results that no reasonable person can question.

¶ 253        As set out in the constitutional text and this Court's precedent, the General Assembly determines and develops educational policy through statutes and appropriations. However, a review of this case's lengthy litigation reveals that the General Assembly was notably excluded. Due process requires notice and an opportunity to be heard—legislative defendants have been denied the protection of this fundamental fairness.

¶ 254        From the filing of the initial complaint until January 2011, the Attorney General represented the executive and legislative branches (the State). In 2011, the majority party of General Assembly, both House and Senate, changed. The Attorney General, then asserting a purported conflict of interest, ceased to represent the General Assembly at that time. The Attorney General noted that executive branch defendants refused to waive this conflict. The General Assembly attempted to intervene in the case, but the trial court rejected intervention because the issue in the case was not the legislature's education policy or funding, but the implementation of that policy by the executive branch.

¶ 255          Judge Howard Manning, perhaps the one individual most familiar with this

case, later stated in a memorandum that educational shortcomings did not result

from legislative failures:

> Our children that cannot read by the third grade are by and
> large doomed not to succeed by the time they get to high
> school.  As shown by the record in this case, that is a failure
> of classroom instruction.
>
> . . .
>
> Reduced to essentials, in my opinion the children are not
> being provided the opportunity because after all the
> millions spent, 90% of school costs are for adult salaries
> and benefits, and the data show as it did years ago and up
> to now the educational establishment has not produced
> results.

In other words, Judge Manning clearly understood that the problem is not with

education policy or funding; rather, the problem is with implementation and delivery

by the education establishment.

¶ 256          Moreover, the focus of this litigation post-*Leandro* has been the general

implementation and delivery of educational opportunities to the "at risk" children in

plaintiffs' counties.  *See Hoke Cnty. Bd. of Educ. v. State,* 358 N.C. 605, 612 n.1, 599

S.E.2d 365, 375 n.1 (2004) (the only issue which "faces scrutiny in the instant appeal

[is] whether the State has failed in its constitutional duty to provide Hoke County

school children with the opportunity to receive a sound basic education.").[1] Despite the express directive of this Court in Hoke County, the trial court failed to conduct any other trial. Furthermore, given that the education statutes and policy changed significantly through the years, the original *Leandro* claims and resulting decision have become stale.

When Judge Manning withdrew for health reasons in 2016, a new judge, in collaboration with executive branch defendants and plaintiffs, dramatically changed the direction of this litigation to focus on policy and funding statewide, rather than problems with implementation and delivery in plaintiffs' counties as originally pled. In November 2021, the new judge entered an order stripping the General Assembly of its constitutional authority, setting educational policy, and judicially appropriating taxpayer monies to fund his chosen policy. Only then did the legislative defendants receive the opportunity to intervene as they sought appellate review of this judicial invasion into their constitutional powers.

Because of the collusive nature of this litigation, the majority today now joins in denying legislative defendants due process, the fundamental fairness owed to any party, and usurps the legislative power by crafting policy and directly appropriating funds. Further, this Court approves the deprivation of due process to other non-

---

[1] Because the distinction is meaningful, we refer to *Hoke County Board of Education v. State* as *Hoke County*, not *Leandro II*. See discussion at *Hoke County Board of Education v State*, 367 N.C. 156, 158 n.2, 749 S.E.2d 451, 453 n.2 (2013).

parties by affirming the trial court order which required certain state officials to violate their oaths and circumvent the constitutionally and statutorily required lawful method of appropriating monies from the general fund.

¶ 259        In addition, the majority takes it upon itself to resolve issues in this case without notice and in the face of this Court's order to the contrary. In March 2022, this Court entered a special order holding "in abeyance [certain issues] with no other action, including the filing of briefs, to be taken until further order of the Court." Despite the fact that no notice has been provided to any party, and briefing has not been done, this Court exerts its will by summarily deciding the matter. In so doing, the majority ignores due process.

¶ 260        Fundamentally, and contrary to what plaintiffs, executive branch defendants, and the majority would have the public believe, this case is not about North Carolina's failure to afford its children with the opportunity to receive a sound basic education. The essence of this case is power—who has the power to craft educational policy and who has the authority to fund that policy.

¶ 261        While a properly restrained judiciary has "neither FORCE nor WILL, but merely judgment," *The Federalist* No. 78 (Alexander Hamilton), we once again address the pernicious extension of judicial power by this Court at the expense of the constitutionally prescribed power of the legislature. Once again, the subversion of constitutional order is engineered by a bare majority through unprecedented and

dangerous reasoning. Couched this time as its "inherent authority," the majority once again "unilaterally reassigns constitutional duties." *N.C. State Conf. of Nat'l Ass'n for the Advancement of Colored People v. Moore*, 2022-NCSC-99, ¶ 77 (Berger, J., dissenting).

¶ 262 Relying on a gross misapplication of our caselaw, the majority's Oppenheimer-esque reshaping of the appropriations clause and usurpation of legislative function has no apparent concern for constitutional strictures or the limits of this Court's power. The judicial branch now assumes boundless inherent authority to reach any desired result, ignoring the express boundaries set by the explicit language of our constitution and this Court's precedent. Because "[t]his power in the judicia[ry] will enable [judges] to mold the government into almost any shape they please," Brutus, Essay XI, The Essential Anti-Federalist 190 (W. B. Allen and Gordon Lloyd, eds., 2nd ed. 2002), I respectfully dissent.

## I. Factual and Procedural Background

¶ 263 The issues in this case are neither unprecedented nor extraordinary. Had the trial court below, and the majority here, understood precisely what this Court held in *Leandro* and *Hoke County*, much litigation would have been avoided. As this case is the latest chapter of a dispute this Court first considered more than twenty-four years ago, our prior decisions constitute the law of the case and are binding on the courts. *See Hayes v. City of Wilmington*, 243 N.C. 525, 536, 91 S.E.2d 673, 681–82 (1956)

("[W]hen an appellate court passes on a question and remands the cause for further proceedings, the questions there settled become the law of the case, both in subsequent proceedings in the trial court and on subsequent appeal[.]").

## A. *Leandro*

¶ 264          In *Leandro v. State of North Carolina*, 346 N.C. 336, 342, 488 S.E.2d 249, 252 (1997) (*Leandro*), plaintiffs brought an action against the State and the State Board of Education seeking declaratory and injunctive relief, alleging that children in their school districts were not "receiving a sufficient education to meet the minimal standard for a constitutionally adequate education." The original plaintiffs were "students and their parents or guardians from the relatively poor school systems in Cumberland, Halifax, Hoke, Robeson, and Vance Counties and the boards of educations for those counties." *Id.* at 342, 488 S.E.2d at 252. Those plaintiffs were joined by plaintiff-intervenors, "students and their parents or guardians from the relatively large and wealthy school systems of the City of Asheville and of Buncombe, Wake, Forsyth, Mecklenburg, and Durham counties and the boards of education for those systems." *Id.* at 342, 488 S.E.2d at 252.

¶ 265          Although plaintiffs' and plaintiff-intervenors' claims differed, they were similar in one significant respect:

> Both plaintiffs and plaintiff-intervenors (hereinafter "plaintiff-parties" when referred to collectively) allege in their complaints in the case resulting in this appeal that they have a right to adequate educational opportunities

> which is being denied them by defendants under the current school funding system. Plaintiff-parties also allege that the North Carolina Constitution not only creates a fundamental right to an education, but it also guarantees that every child, no matter where he or she resides, is entitled to equal educational opportunities.

*Id.* at 342, 488 S.E.2d at 252.

¶ 266 Defendants responded to plaintiff-parties' complaints by filing a motion to dismiss, contending in part that "plaintiff-parties had failed to state any claim upon which relief could be granted." *Id.* at 344, 488 S.E.2d at 253. The trial court denied defendants' motion, and defendants timely appealed. *Id.* at 344, 488 S.E.2d at 253. The Court of Appeals reversed the trial court and dismissed all of plaintiffs' claims. *Id.* at 344, 488 S.E.2d at 253. It concluded that "the right to education guaranteed by the North Carolina Constitution is limited to one of equal access to the existing system of education and does not embrace a qualitative standard." *Id.* at 344, 488 S.E.2d at 253 (citing *Leandro v. North Carolina*, 122 N.C. App. 1, 11, 468 S.E.2d 543, 550 (1996)).

¶ 267 Plaintiff-parties petitioned this Court for discretionary review. We granted the petition to address "whether the people's constitutional right to education has any qualitative content, that is, whether the state is required to provide children with an education that meets some minimum standard of quality." *Id.* at 345, 488 S.E.2d at 254. In answering that question in the affirmative, this Court stated:

> We conclude that Article I, Section 15, and Article IX,

> Section 2 of the North Carolina Constitution combine to guarantee every child of this state an *opportunity* to receive a sound basic education in our public schools. For purposes of our Constitution, a "sound basic education" is one that will provide the student with at least: (1) sufficient ability to read, write, and speak the English language and a sufficient knowledge of fundamental mathematics and physical science to enable the student to function in a complex and rapidly changing society; (2) sufficient fundamental knowledge of geography, history, and basic economic and political systems to enable the student to make informed choices with regard to issues that affect the student personally or affect the student's community, state, and nation; (3) sufficient academic and vocational skills to enable the student to successfully engage in post-secondary education or vocational training; and (4) sufficient academic and vocational skills to enable the student to compete on an equal basis with others in further formal education or gainful employment in contemporary society.

*Id*. at 347, 488 S.E.2d at 255 (emphasis added).

Plaintiff-parties also argued that "Article IX, Section 2(1), requiring a 'general and uniform system' in which 'equal opportunities shall be provided for all students,' mandates equality in the educational programs and resources offered the children in all school districts in North Carolina." *Id*. at 348, 488 S.E.2d at 255. This Court expressly rejected this argument, stating "we are convinced that the equal opportunities clause of Article IX, Section 2(1) does not require substantially equal funding or educational advantages in all school districts." *Id*. at 349, 488 S.E.2d at 256. Thus, we affirmed the Court of Appeals' decision to dismiss this claim.

As is especially relevant here, this Court made it clear that plaintiff-parties'

proposed constitutional requirement of "substantial equality of educational opportunities in every one of the various school districts of the state would almost certainly ensure that *no matter how much money was spent on the schools of the state*, at any given time some of those districts would be out of compliance." *Id.* at 350, 488 S.E.2d at 256–57 (emphasis added). Thus, this Court delineated between (1) a requirement for the state to provide all students with the *opportunity* to receive a sound basic education, and (2) a requirement for the state to provide the *same* opportunities to all students statewide.

¶ 270      Further, we drew a sharp distinction between the right *to* a sound basic education and the right to the *opportunity* to receive a sound basic education. This Court discussed at length the "[s]ubstantial problems [that] have been experienced in those states in which the courts have held that the state constitution guaranteed the right *to* a sound basic education." *Id.* at 350–51, 488 S.E.2d at 257 (emphasis added). We listed multiple cases from various jurisdictions involving, as is particularly relevant here, decisions of divided courts "striking down the most recent efforts of the [state] legislature and for the third time declaring a funding system for the schools of that state to be in violation of the state constitution." *Id.* (citing *Abbot v. Burke*, 149 N.J. 145, 693 A.2d 417 (1997)).[2] In addition to referencing the flood of

_____

[2] The majority cites to a continuation of *Abbott v. Burke* as an example to justify its "extraordinary" remedy. It is extraordinary that the majority cites to cases and theories that have been *expressly* disavowed by this Court. Further, the citations to cases from Kansas and

litigation brought forth in states that guarantee a right *to* a sound basic education, this Court also noted law review articles which described "the difficulty in understanding and implementing the mandates of the courts" and "the lack of an adequate remedy" in these states. *Id*. (citing William E. Thro, *The Third Wave: The Impact of the Montana, Kentucky, and Texas Decisions on the Future of Public School Finance Reform Litigation*, 19 J.L. & Legal Educ. 219 (1990); Note, *Unfulfilled Promises: School Finance Remedies and State Courts*, 104 Harv. L. Rev. 1072, 1075–78 (1991)).

¶ 271        This Court "conclude[d] that the framers of our Constitution did not intend to set such an impractical or unattainable goal." *Id*. at 351, 488 S.E.2d at 257. Accordingly, we held that "Article IX, Section 2(1) of the North Carolina Constitution requires that all children have the *opportunity* for a sound basic education, but it *does not require* that equal educational opportunities be afforded students in all of the school districts of the state." *Id*. (emphasis added).

¶ 272        This Court was acutely aware of the potential dangers of its holding in *Leandro*. We defined the opportunity to receive a sound basic education with "some trepidation[ ]" because "judges are not experts in education and are not particularly able to identify in detail those curricula best designed to ensure that a child receives

_____

Washington make little sense as neither of those cases involve the judicial exercise of legislative authority over the public purse.

a sound basic education." *Id*. at 354, 488 S.E.2d at 259. Recognizing the General

Assembly's crucial role in this issue, this Court stated:

> We acknowledge that the legislative process provides a
> better forum than the courts for discussing and
> determining what educational programs and resources are
> most likely to ensure that each child of the state receives a
> sound basic education. The members of the General
> Assembly are popularly elected to represent the public for
> the purpose of making just such decisions. The legislature,
> unlike the courts, is not limited to addressing only cases
> and controversies brought before it by litigants. The
> legislature can properly conduct public hearings and
> committee meetings at which it can hear and consider the
> views of the general public as well as educational experts
> and permit the full expression of all points of view as to
> what curricula will best ensure that every child of the state
> has the opportunity to receive a sound basic education.

*Id*. at 355, 488 S.E.2d at 259.

¶ 273      As is clear from our opinion, this Court was well aware of the murky waters it

entered in *Leandro*. We took care to provide examples of what factors should be

considered by trial courts and what weight should be given to such factors. This

Court held that "[e]ducational goals and standards adopted by the legislature," "the

level of performance of the children of the state and its various districts on standard

achievement tests[,]" and "the level of the state's general educational expenditures

and per-pupil expenditures[ ]" were all relevant factors. *Id*. at 355, 488 S.E.2d at

259–60. We noted that one factor alone was not determinative.

¶ 274      Additionally, we directly addressed the basis of the trial court's order at issue

before us today—whether courts of this state may rely solely on expenditures as a remedy to an alleged violation of this right. In answering no, the Court stated:

> We agree with the observation of the United States Supreme Court that
>
> > The very complexity of the problems of financing and managing a statewide public school system suggests that there will be more than one constitutionally permissible method of solving them, and that within the limits of rationality, the legislature's efforts to tackle the problems should be entitled to respect. *On even the most basic questions in this area the scholars and educational experts are divided.* Indeed, one of the major sources of controversy concerns the extent to which there is a demonstrable correlation between educational expenditures and the quality of education . . . .

*Id.* at 355–56, 488 S.E.2d at 260 (cleaned up) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42–43, 93 S. Ct. 1278, 1301–02 (1973)).

¶ 275     This Court went further regarding the flawed notion of any reliable causal relationship between increased expenditures and educational outcomes:

> More recently, one commentator has concluded that "available evidence suggests that substantial increases in funding produce only modest gains in most schools." The Supreme Court of the United States recently found such suggestions to be supported by the actual experience of the Kansas City, Missouri schools over several decades. The Supreme Court expressly noted that despite massive court-ordered expenditures in the Kansas City schools which had provided students there with school "facilities and opportunities not available anywhere else in the county," the Kansas City students had not come close to reaching their potential, and "learner outcomes" of those students were "at or below national norms at many grade levels."

*Id.* (quoting William H. Clune, *New Answers to Hard Questions Posed by Rodriguez: Ending the Separation of School Finance and Educational Policy by Bridging the Gap Between Wrong and Remedy*, 24 Conn. L. Rev. 721, 726 (1992) and *Missouri v. Jenkins*, 515 U.S. 70, 70 115 S. Ct. 2038, 2040 (1995)).

¶ 276        This Court was gravely concerned with preventing judicial interference in the legislative realm. To that end, before reversing the decision of the Court of Appeals and remanding the case to Wake County Superior Court, we provided guidance to future courts:

> In conclusion, we reemphasize our recognition of the fact that *the administration of the public schools of the state is best left to the legislative and executive branches of government.* Therefore, the courts of the state *must grant every reasonable deference to the legislative and executive branches* when considering whether they have established and are administering a system that provides the children of the various school districts of the state a sound basic education. *A clear showing to the contrary* must be made before the courts conclude that they have not. *Only such a clear showing will justify a judicial intrusion* into an area so clearly the province, initially at least, of the legislative and executive branches as the determination of what course of action will lead to a sound basic education.

*Id.* at 357, 488 S.E.2d at 261 (emphasis added).

¶ 277        Thus, this Court in *Leandro* explicitly stated that: (1) there are multiple methods of ensuring children's opportunity to receive a sound basic education; (2) the legislature's efforts to do so are entitled to great deference; (3) any reliance on a correlation between educational spending and education quality is suspect at best;

and (4) a clear showing that children's opportunity to receive a sound basic education has been violated must be made before a court takes any action.

**B. *Hoke County***

¶ 278        Seven years after deciding *Leandro*, we again addressed children's opportunity to receive a sound basic education in *Hoke County Board of Education v. State*, 358 N.C. 605, 599 S.E.2d 365 (2004) (*Hoke County*).  At the conclusion of *Leandro*, this Court had remanded the case to Wake County Superior Court to decide the following claims:

> (1) [W]hether the State ha[d] failed to meet its constitutional obligation to provide an opportunity for a sound basic education to plaintiff parties; (2) whether the State has failed to meet its statutory obligation, pursuant to Chapter 115C of the General Statutes, to provide the opportunity for a sound basic education to plaintiff parties; and (3) whether the State's supplemental school funding system is unrelated to legitimate educational objectives and, as a consequence, is arbitrary and capricious, resulting in a denial of equal protection of the laws for plaintiff-intervenors.

*Id*. at 612, 599 S.E.2d at 374–75.  This Court noted the issues were further refined because "[t]he issue of whether the State has failed in its statutory duty to provide Hoke County school children with a sound basic education has been subsumed . . . by the constitutional question[,]" and the supplemental funding issue was not ripe.  *Id.* In so stating, we recognized that education policy as set forth in the relevant statutes was consistent with the constitution.

¶ 279    Upon remand, "two of the trial court's initial decisions limited the scope of the case[.]" *Id.* at 613, 599 S.E.2d at 375. First, the trial court, with the consent of the parties, bifurcated the case into two separate actions—one addressing the claims of the plaintiffs from rural school districts and one addressing the claims of the plaintiff-intervenors from larger urban districts. *Id.* Because of this bifurcation, and because plaintiff-intervenors' trial had not yet been held, "our consideration of the case [wa]s properly limited to those issues raised in the rural districts' trial." *Id.* Second, "the trial court ruled that the evidence presented in the rural districts' trial should be further limited to claims as they pertain to a single district." *Id.* Hoke County was "designated as the representative plaintiff district," and the "evidence in the case w[as] restricted to its effect on Hoke County." *Id.*

¶ 280    Then, to determine the Hoke County claims, the trial court held a trial which "lasted approximately fourteen months and resulted in over fifty boxes of exhibits and transcripts, an eight-volume record on appeal, and a memorandum of decision that exceeds 400 pages." *Id.* at 610, 599 S.E.2d at 373.

¶ 281    This procedural posture had a significant effect on the impact of our holdings in *Hoke County*. As this Court made abundantly clear at the outset, "our consideration of this case is properly limited to the issues relating *solely* to Hoke County as raised at trial." *Id.* (emphasis added). As the case before us today is a continuation of *Hoke County*, and because *Hoke County* constitutes the law of this

case, we are bound by this Court's previous language:

> [B]ecause this Court's examination of the case is premised on evidence as it pertains to Hoke County in particular, *our holding mandates cannot be construed to extend to the other four rural districts named in the complaint*. With regard to the claims of named plaintiffs from the other four rural districts, the case is remanded to the trial court for further proceedings that include, but are not necessarily limited to, *presentation of relevant evidence by the parties, and findings and conclusions of law by the trial court.*

*Id.* n.5 (emphasis added).

¶ 282        What this means in plain language is that our decision in *Hoke County* concerned *only* Hoke County and that no part of that decision attempted to determine whether any other county was failing to provide students with the opportunity to a sound basic education. Consistent with our holding in *Leandro*, a "judicial intrusion" into any other county's system would require an adversarial hearing complete with the presentation of relevant evidence and findings of fact. The evidence and factual findings would then need to support the conclusion of law that a "clear showing" had been made that the county was denying children the opportunity to a sound basic education. *See Leandro*, 346 N.C. at 357, 488 S.E.2d at 261. Absent any separate trial for another county, the assertion that the trial court's order reviewed in *Hoke County* addressed any county other than Hoke County is plainly wrong and blatantly contradicts the clear language of this Court.

¶ 283        Not only did our decision in *Hoke County* only address the Hoke County claims,

but we also noted that the trial court's order was limited to claims involving "at-risk" students in Hoke County. Accordingly, we stated that:

> As a consequence, while we must limit our review of the trial court's order to its conclusions concerning 'at-risk' students, we cannot and do not offer any opinion as to whether non 'at-risk' students in Hoke County are either obtaining a sound basic education or being afforded their rightful opportunity by the State to obtain such an education.

*Hoke County*, 358 N.C. at 634, 599 S.E.2d at 388.

¶ 284 After these express limitations, we first examined whether the evidence established "a clear showing" supporting "the trial court's conclusion that the constitutional mandate of *Leandro* has been violated in the Hoke County School System . . . ." *Id.* at 623, 599 S.E.2d at 381 (cleaned up). We next reviewed two categories of evidence presented at trial.

¶ 285 First, we reviewed the trial court's consideration of evidence of "comparative standardized test score data[,] . . . student graduation rates, employment potential, [and] post-secondary education success" for Hoke County and its comparison of that data to data regarding North Carolina students statewide. *Id.* We determined that evidence of this type fell "under the umbrella term of 'outputs,' a term used by educators that, in sum, measures student performance." *Id.* Second, we reviewed the trial court's use of evidence of "deficiencies pertaining to the educational offerings in Hoke County schools" and "deficiencies pertaining to the educational

administration of Hoke County schools." *Id.* We determined that evidence of this type fell "under the umbrella term of 'inputs,' a term used by educators that, in sum, describes what the State and local boards provide to students attending public schools." *Id.*

¶ 286 This Court examined: (1) whether these types of evidence were relevant in determining Hoke County's *Leandro* compliance; and, if so, (2) whether the evidence presented supported the trial court's determination that *Leandro*'s mandate was being violated in Hoke County.

¶ 287 We first determined that the trial court was correct in using various standardized test scores to compare the proficiency of Hoke County students to that of other students in North Carolina. The trial court determined that the comparison "clearly show[ed] Hoke County students are failing to achieve [grade-level] proficiency in numbers far beyond the state average." *Id.* at 625, 599 S.E.2d at 383. Further,

> [i]n analyzing the test score data and the opinions of those who testified about them, the trial court noted that the score statistics showed that throughout the 1990s, Hoke County students in all grades trailed their statewide counterparts for proficiency by a considerable margin. For example, in 1997–98, only 46.9% of Hoke students scored at Level III or above in algebra while the state average was 61.6%. Similar disparities occurred in other high school subjects such as Biology, English, and American History. Other test data reflected commensurate results in lower grades. For example, in grades 3–8, Hoke County students trailed the state average in each grade, with gaps ranging

from 11.7% to 15.1%.

*Id.* at 625–26, 599 S.E.2d at 383.

¶ 288          A wide range of tests confirmed that Hoke County students were deficient when compared to statewide averages. The trial court made extensive detailed findings of fact that this deficiency was confirmed by evidence regarding Hoke County graduation rates, dropout rates, employment rates and prospects, and post-secondary education performance. *Id.* at 625–30, 599 S.E.2d at 382–386. We stated that

> [i]n the realm of "outputs" evidence, we hold that the trial court properly concluded that the evidence demonstrates that over the past decade, an inordinate number of Hoke County students have consistently failed to match the academic performance of their statewide public school counterparts and that such failure, measured by their performance while attending Hoke County schools, their dropout rates, their graduation rates, their need for remedial help, their inability to compete in the job markets, and their inability to compete in collegiate ranks, constitute a clear showing that they have failed to obtain a Leandro-comporting education.

*Id.* at 630, 599 S.E.2d at 386.

¶ 289          We then addressed "inputs," asking whether the evidence supported the trial court's conclusion that the defendants were responsible for the deficiency of Hoke County students in comparison to other students statewide. First, and most relevant to the current appeal, this Court affirmed the trial court's conclusion that the statewide education policy and funding were constitutionally sound.

In sum, the trial court found that the State's general

> curriculum, teacher certifying standards, funding
> allocation systems, and education accountability standards
> met the basic requirements for providing students with an
> opportunity to receive a sound basic education. As a
> consequence, the trial court concluded that "the bulk of the
> core" of the State's "Educational Delivery System ... is
> sound, valid and meets the constitutional standards
> enumerated by *Leandro*."

*Id*. at 632, 599 S.E.2d at 387. Simply stated, we held that the General Assembly's statutory schemes creating and funding our education system complied with our state constitution as interpreted in *Leandro*.

¶ 290        Despite the trial court's conclusion on this issue, it determined that neither the State, nor the Hoke County School System, were "strategically allocating the available resources to see that at-risk children have the equal opportunity to obtain a sound basic education." *Id*. at 635, 599 S.E.2d at 388.[3] We summarized the trial court's remedial action as such:

> Although the trial court explained that it was leaving the
> "nuts and bolts" of the educational resources assessment in
> Hoke County to the other branches of government, it
> ultimately provided general guidelines for a *Leandro*-
> compliant resource allocation system, including the
> requirements: (1) that "every classroom be staffed with a
> competent, well-trained teacher"; (2) "that every school be

---

[3] The "available resources" are the funds appropriated by the General Assembly in the State Budget. The failure to "strategically allocate[]" these available funds is a failure on the part of the State Board of Education—not the General Assembly. *See* N.C.G.S. § 115C-408(a) ("The [State] Board shall have general supervision and administration of the educational funds provided by the State . . . ."). As the trial court stated, "the funds presently appropriated and otherwise available are not being effectively and strategically *applied* so as to meet the [ ] principles from *Leandro*." (emphasis added).

led by a well-trained competent principal"; and (3) "that every school be provided, in the most cost effective manner, the resources necessary to support the effective instructional program within that school so that the educational needs of all children, including *at-risk* children, to have the equal opportunity to obtain a sound basic education, can be met." Finally, the trial court ordered the State to keep the court advised of its remedial actions through written reports filed with the trial court every ninety days.

*Id*. at 636, 599 S.E.2d at 389 (emphasis added).

¶ 291 Notably, the trial court "refused to step in and direct the 'nuts and bolts' of the reassessment effort." *Id*. at 638, 599 S.E.2d at 390. The trial court "deferred to the expertise of the executive and legislative branches" because it "acknowledg[ed] that the state's courts are ill-equipped to conduct, or even to participate directly in, any reassessment effort." *Id*. This Court explicitly approved of such deference in affirming the trial court's order:

> [W]e note that the trial court also demonstrated admirable restraint by refusing to dictate how existing problems should be approached and resolved. Recognizing that education concerns were the shared province of the legislative and executive branches, the trial court instead afforded the two branches an unimpeded chance, "initially at least," to correct constitutional deficiencies *revealed at trial*. In our view, the trial court's approach to the issue was sound and its order reflects both *findings of fact that were supported by the evidence* and *conclusions that were supported by ample and adequate findings of fact*. As a consequence, we affirm those portions of the trial court's order that conclude that there has been a clear showing of the denial of the established right of *Hoke County students* to gain their opportunity for a sound basic education and

> those portions of the order that require the State to *assess*
> its education-related allocations to the county's schools so
> as to correct any deficiencies that presently prevent the
> county from offering its students the opportunity to obtain
> a *Leandro*-conforming education.

*Id*. at 638, 599 S.E.2d at 390–91 (emphasis added).

¶ 292        This Court entered two additional holdings. First, we reversed the trial court's decision that it could specifically determine the age for school eligibility. This Court held the issue was nonjusticiable, stating that "[o]ur reading of the constitutional and statutory provisions leads us to conclude that the determination of the proper age for school children has indeed been squarely placed in the hands of the General Assembly." *Id*. at 639, 599 S.E.2d at 391. We noted that an issue is nonjusticiable when either "the Constitution commits an issue, as here, to one branch of government," or "satisfactory and manageable criteria or standards do not exist for judicial determination of the issue." *Id*. (citing *Baker v. Carr*, 369 U.S. 186, 210, 82 S. Ct. 691, 706 (1962)). This Court determined that the issue of the proper age for school children met both tests for nonjusticiability. *Id*. In addition, we affirmed the trial court's decision to consider all available resources, including those provided by the federal government, when evaluating our state's educational system. *Id*. at 645–47, 599 S.E.2d at 395–96.

¶ 293        This Court's clear and deliberate language established several crucial points that should control our determination of the instant case. First and foremost,

education policy and funding are legislative responsibilities, while the executive is tasked with administration of the education system. *Id.* at 643, 599 S.E.2d at 393. Second, our holding in *Hoke County* was based on review of a 400-page, detailed order, which resulted from the trial court receiving evidence over a fourteen-month period on whether at-risk students in Hoke County were receiving the opportunity to a sound basic education. The trial court determined that the educational opportunities provided by Hoke County were deficient when it compared Hoke County to their contemporaries across the state. Finally, our holding in *Hoke County* was expressly limited to Hoke County.

¶ 294          We concluded our opinion by directing the trial court to conduct proceedings, consistent with the strictures above, monitoring Hoke County compliance and holding trials. Executive branch agencies were required to propose methods to reallocate existing resources to address the deficiencies in Hoke County. In addition, the trial court was to hold trials "involving either other rural school districts or [the five] urban school districts, . . . in a fashion that is consistent with the tenets outlined in this opinion." *Id.* at 648, 599 S.E.2d at 397.

¶ 295          Thus, this case as refined by our opinions in *Leandro* and *Hoke County* did not present a statewide claim that the education system in North Carolina was deficient, and there has never been any such holding. To the contrary, the Court approved the use of statewide averages to help determine if students in a particular county were

underperforming.[4]

## C. Post-*Hoke County*

¶ 296      Following our decision in *Hoke County*, this matter was remanded to Wake County Superior Court for further proceedings under Judge Howard E. Manning, Jr. Unfortunately, none of the trials required by this Court's decision occurred between July 2004 and October 7, 2016, when Judge Manning had to withdraw. While no trial occurred and no formal order was rendered—unlike the trial that led to *Hoke County*—there were various hearings and reports during this twelve-year period which the majority erroneously claims amounted to a trial and order. A careful reading of the record reveals that there was no trial and the trial court made no findings of fact or conclusions of law amounting to an appealable order. We address the four trial court filings highlighted by the majority.

¶ 297      On September 9, 2004, the trial court entered one of several filings entitled "Notice of Hearing and Order Re: Hearings." In that filing, the Court "noticed"

---

[4] In reviewing the trial court's conclusion that at-risk students in Hoke County were denied the opportunity to a sound basic education, this Court explicitly approved of Judge Manning's use of a comparative analysis in which Hoke County was measured against other counties in this state. This use of better-performing counties as measuring sticks was only possible because students in these other counties were receiving a *Leandro* conforming education, and this fact is reflected in Judge Manning's determinations regarding funding adequacy and implementation inadequacy.

No such analysis could conceivably support Judge Lee and the education establishment's assertion that students in all counties in this state are being denied the opportunity to a sound basic education—without at least one *Leandro* compliant county, the measuring stick evaporates. Put another way, the existence of *Leandro* compliant counties for which comparison is possible defeats any suggestion that there is a statewide violation.

hearings to occur on October 7 and 25, 2004, and "ordered" the parties to attend. The trial court recounted some of the history of the case, including excerpts from this Court's then recent *Hoke County* decision. In reviewing certain data, the trial court made the following observation:

> This Court believes that DPI and the State Board of Public Instruction are heading down the right track towards assessing problems, developing common sense solutions and providing LEAS with guidance and assistance in developing cost-effective, targeted solutions that can be measured for success and accountability.

> Now that the appeal is over and Leandro II is in full force and effect, it is time for the DPI and State Board to outline and present its plans as to how it will continue to proceed to ensure that the children of North Carolina will be afforded the opportunity to a sound basic education.

¶ 298        On February 9, 2005, certain Mecklenburg County parents and students (Penn Intervenors), represented by current Justice Anita Earls, filed a complaint seeking to intervene and raising education and race-based claims. On August 19, 2005, the trial court allowed intervention solely for the education claim and denied participation concerning any race-based claims.

¶ 299        Thereafter, on September 30, 2005, Justice Earls filed an amended complaint on behalf of the Penn Intervenors, which further developed the education claim

allowed by the trial court and sought to add additional plaintiffs.[5]  On May 4, 2006, all of the original intervening parties, except the Charlotte-Mecklenburg Board of Education, voluntarily dismissed their claims.

¶ 300    The next trial court filing referenced by the majority was again entitled "Notice of Hearing Order Re: Hearing."  The "order" again simply ordered the parties to appear at the noticed hearing.  The trial court noted that the hearing was "non-adversarial" and explained its purpose was to provide executive branch defendants the "opportunity to report to the court concerning the actions that the Executive Branch will take with regard to the Halifax County Public School system."  The trial court made the following observations concerning Halifax County Schools:

> The bottom line is that Halifax County Public School children are suffering from a breakdown in system leadership, school leadership and a breakdown in classroom instruction by and large from elementary school through high school.
>
> . . .
>
> Financial data furnished by DPI shows that the cost to the taxpayers to provide school level expenditures, the majority of which are salaries and benefits, has exceeded $75,000,000.00 for the past three years.
>
> . . .
>
> With all of this expense being paid to the adults whose responsibility it is to provide an equal opportunity to obtain

---

[5] That claim remains part of this case, and Justice Earls' former clients participated in this appeal.

a sound basic education to each and every child in the Halifax County Public School system, there seems to be little trickle down benefit to the children entrusted to the adults in these schools.

. . .

[I]t is time for the State to exert itself and exercise command and control over the Halifax County Public Schools beginning in the school year 2009-2010, nothing more and nothing less.

. . .

[T]he Court is providing the Executive Branch the opportunity, initially at least, to exercise its constitutional authority over the Halifax County School system to remedy the academic disaster which is occurring there[.]

. . .

The Court will entertain no excuses or whining by the adults in the educational establishment in Halifax County about how it's the children's fault, not theirs, for failing to provide the academic environment where children can obtain a sound basic education. If these children had Leandro compliant school leadership and teachers, they could learn and obtain a sound basic education rather than fail and drop out of school doomed to a lifetime of poverty and its multiple damages.

¶ 301      Subsequently, on May 5, 2014, the trial court entered a filing entitled "Report from the Court Re: The Reading Problem." In it, the trial court observed that the goal of N.C.G.S. § 115C-83.1 et. seq. was "on all fours with the Leandro I definition of a sound basic education." After citing with approval the legislative enhancements to education, the trial court placed the blame for students' reading shortfalls squarely

on principals and teachers.

> The bottom line is that the principals that sit in the office, fail to analyze the assessment data a[t] their fingertips and do not become proactive in seeing the K-3 assessment system is being properly and effectively used by all teachers to drive individualized instruction in literacy, are not performing at a level that is expected to provide their students and faculty with the leadership needed to be successful and have all children obtain a sound basic education and proficiency in reading. This principal is not a Leandro compliant principal.

Similarly, teachers who fail to utilize the assessment tools properly "are not Leandro compliant."

¶ 302 The trial court issued this summary observation directed to school principals and teachers:

> Bottom line requirement: Do the formative assessment and use the information to meet the needs of the individual child. Do not put the data in the folder and continue on with the instruction for the entire class on one level. (What about this do you not understand?)

¶ 303 The final trial court filing relied on by the majority was another "Notice of Hearing and Order Re: Hearing" dated March 17, 2015. In that filing, the trial court expressed concern that the State Board of Education and the Department of Public Instruction were diminishing educational standards.

> Regardless of whatever excuse or reason reducing or eliminating academic standards and assessments may be based on, including education leaders and parent pressure, politics or an unconditional desire to reduce children's equal opportunities to obtain a sound basic education, the

reduction of academic standards and elimination of assessments and EOC and EOG tests would be a direct violation of the Leandro mandate regarding assessments and testing to determine whether each child is obtaining a sound basic education.

The bottom line is that in 2014, the SBE and DPI through their actions in redefining achievement levels, has begun to nibble away at accountability and academic standards[.]

Judge Manning further noted:

As a result of today's heightened awareness and available data relating to individual school and student academic achievement in each classroom, the natural reaction by the affected adults who are in education, is to seek a way to eliminate the source of the data that holds them accountable. The only way out from under the microscope of accountability is to eliminate the assessments and the tests themselves.

Helping non[-]Leandro compliant teachers and principals escape from public scrutiny and accountability by eliminating is invalid, simply wrong and in violation of the children's rights[.]

Teaching to the test is a "red herring' phrase to draw attention away from the real problem – a failure of basic classroom instruction.

Judge Manning's filings reflect his summary of the proceedings in the trial court. Notably, in a memorandum he provided the trial court judge who succeeded him, Judge Manning stated:

Our children that cannot read by the third grade are by and large doomed not to succeed by the time they get to high school. As shown by the record in this case, that is a failure of classroom instruction.

. . .

> Reduced to essentials, in my opinion the children are not being provided the opportunity because after all the millions spent, 90% of school costs are for adult salaries and benefits, and the data show as it did years ago and up to now the educational establishment has not produced results.

¶ 306    Judge Manning, who presided over this case for almost 20 years, reiterated time and time again that the problem is not education policy or funding. The problem is a failure of the educational establishment and classroom instruction, i.e., implementation and delivery.

¶ 307    During the twelve years between this Court's decision in *Hoke County* and the case's reassignment to Judge Lee, the record reveals that Judge Manning entered sixteen Notices of Hearings and Orders re: Hearings, four Court Memos Confirming Hearing Date and Time, one Memorandum of Decision and Order Re: Pre-Kindergarten Services for At-Risk Four Year Olds,[6] and one Report from the Court Re: The Reading Problems. The record demonstrates that, contrary to this Court's express direction, no trials were conducted for any other school districts or counties, and the parties have failed to point this Court to anything in the record indicating that any such trials ever occurred. Moreover, at oral argument in this case, the

---

[6] This amounted to the only actual court order, and it was vacated on appeal as discussed herein. *See Hoke Cnty. Bd. of Educ. v. State*, 367 N.C. 156, 749 S.E.2d 451 (2013).

parties were unable to direct this Court to any order finding a statewide violation. *See* Oral Argument at 36:20, *Hoke Cnty. Bd. of Educ. v. State of North Carolina*, No. 425A21-2, https://www.youtube.com/watch?v=NOuFCf2rYdY.

¶ 308        Significant to a proper analysis by this Court of the current appeal, on August 15, 2011, the General Assembly sought to intervene in this action. Prior to 2011, the General Assembly, the Governor, and other executive branch entities involved in formulating education policy were all of the same political party. However, as a result of the 2010 midterm elections, the majority in the State House and Senate changed parties.

¶ 309        The Attorney General notified the legislature that it would no longer represent the General Assembly's interests in the case. The Attorney General noted a conflict of interest between the General Assembly and the remaining State defendants, and that neither the Governor nor the Department of Public Instruction would waive the conflict. Thereafter, the General Assembly moved to intervene.

¶ 310        In denying the General Assembly's motion to intervene, the trial court acknowledged that the "obligation[ ] to establish and maintain public schools is the 'shared province of the executive and legislative branches,' " but specifically declined to "put[ ] itself, or the judiciary, in the middle of this political dispute." The trial court denied the motion to intervene, in part because it recognized that the case concerned implementation of policy, and, therefore, focused on executive branch defendants.

Thus, the legislative defendants were denied an opportunity to participate in this litigation.

¶ 311        This case again reached this Court in 2013. *See Hoke Cnty. Bd. of Educ. v. State*, 367 N.C. 156, 749 S.E.2d 451 (2013). There, we vacated an actual order entered by the trial court finding unconstitutional certain limitations on access to early childhood education. *Id.* at 159–60, 749 S.E.2d at 454–55. Because the General Assembly had revised the contested statute, we held the case should be dismissed as moot with the orders of the Court of Appeals and the trial court vacated. *Id.* at 160, 749 S.E.2d at 455.

¶ 312        Of note, Justice Earls filed an amicus brief in this matter on behalf of an organization she had founded, the Southern Coalition for Social Justice. Justice Earls argued that the trial court had the constitutional authority to order remedial relief by the legislative branch, just as the majority holds today. *See* New Brief of *Amici Curiae*, at 11, *Hoke Cnty. Bd. of Educ. v. State*, 367 N.C. 156 (2013) (No. 5PA12-2). In the brief, she contended that when "the other branches refuse to fulfill [constitutional] obligations, our state courts are not only empowered, but are obligated, to act to ensure the constitutional rights of North Carolinians are not compromised." Interestingly, she made various arguments in the brief similar to those now adopted by the majority, citing many of the same cases and using some of the same quotes. *Compare* New Brief of *Amici Curiae*, at 11–13*, Hoke Cnty.*, 367 N.C.

156 (No. 5PA12-2) *and supra* ¶¶ 162–71.[7]

¶ 313        At the time of Judge Manning's medical retirement, the remaining plaintiffs in this matter were the original five rural counties, the Charlotte-Mecklenburg Board of Education, and certain students from Mecklenburg County (the Penn Intervenors). The state defendants were executive branch defendants who were represented by the Attorney General. The General Assembly was not represented and was not a participant in the action due to the prior denial of its motion to intervene.

¶ 314        After being appointed, Judge David Lee took the litigation in a far different direction, appointing a third-party consultant to make education policy and funding decisions. This was done despite this Court's explicit holding in *Hoke County* that the state's education policy and its funding met constitutional standards. *See Hoke County*, 358 N.C. at 387, 599 S.E.2d at 632. The trial court did not limit its directives to the specific plaintiffs or their specific claims; rather, the trial court greatly expanded the scope of this litigation while knowing that the branch designated by the constitution to make education policy and funding decisions was not a party to the proceedings.

_____

[7] Justice Earls also signed an amicus brief in this case in December 2004 while representing the UNC School of Law Center for Civil Rights. *See* Memorandum of Law as *Amici Curiae*, at 15, *Hoke Cnty. Bd. of Educ. v. State*, No. 95-CVS-1158 (N.C. Wake County Sup. Ct. Dec 3, 2004). There, her brief criticized executive branch defendants for not seeking significantly more money from the General Assembly and urging immediate court action. Subsequently, the Center for Civil Rights moved to participate as if it represented a party and also began to represent new plaintiffs seeking to intervene in this action.

¶ 315    The following occurred after Judge Lee was assigned to preside over this case on October 7, 2016:

(1)    July 24, 2017: The State Board of Education filed a Motion for Relief from Judge Manning's 2002 Judgment, based on its assertion that "the factual and legal landscapes have significantly changed," and that "the original claims, as well as the resultant trial court findings and conclusions, are divorced from the current laws and circumstances."

(2)    February 1, 2018: Judge Lee entered a Case Management and Scheduling Order noting that "the Plaintiff parties [including Penn-Intervenors] and the State have jointly nominated, for the Court's consideration and appointment, an independent, non-party consultant to develop detailed, comprehensive, written recommendations for specific actions necessary to achieve sustained compliance with constitutional mandates articulated in this case."

(3)    March 13, 2018: Judge Lee denied the State Board of Education's Motion for Relief from Judgment.

(4)    March 13, 2018: Judge Lee entered a consent order appointing WestEd as an "independent, non-party consultant" to assist with the case.

(5)    December 2019: WestEd submits its plan for North Carolina.

(6)    January 21, 2020: The parties, including the State Board of Education, enter a consent order that "[b]ased upon WestEd's findings, research, and recommendations and the evidence of record in this case, the Court and parties conclude that a definite plan of action for the provision of the constitutional *Leandro* rights must ensure a system of education," that, at a minimum, included seven components described in the order. The order required the parties to submit a status report on the "specific actions that State Defendants must implement in 2020 to begin to address the issues identified by WestEd."

(7)    June 15, 2020: Parties submitted a Joint Report to the Court on remedial steps the State planned to take in the next year.

(8)     September 1, 2020: Judge Lee entered a consent order, noting that the parties agreed that the steps outlined in the June 15, 2020 Joint Report "are the necessary and appropriate actions needed in Fiscal Year 2021 to begin to adequately address the constitutional violations in providing the opportunity for a sound basic education to all children in North Carolina." The Court ordered defendants to implement the remedial actions in the Joint Plan by June 30, 2021, and required the parties to develop a Comprehensive Remedial Plan (CRP) by December 31, 2020.

(9)     March 15, 2021: State defendants submitted a Comprehensive Remedial Plan to the Court.

(10)    June 11, 2021: Judge Lee entered an order providing that the "actions, programs, policies, and resources propounded by and agreed to [by] the State Defendants, and described in the Comprehensive Remedial Plan are necessary to remedy the continuing constitutional violations and to provide the opportunity for a sound basic education . . . ." Judge Lee ordered that the "Comprehensive Remedial Plan shall be implemented in full" and set forth deadlines for doing so.

(11)    August 6, 2021: The State filed its first progress report on the status of implementing the Comprehensive Remedial Plan.

(12)    September 8, 2021: Judge Lee held a hearing on the status of implementing the Comprehensive Remedial Plan.

(13)    September 22, 2021: Judge Lee entered an order on the First Progress report filed by the State. He noted that the parties had not yet secured full funding for the first two years of the Comprehensive Remedial Plan but noted that the State "has available fiscal resources needed to implement Years 2 and 3 of the" Plan. Judge Lee ordered that another hearing be held on October 18, 2021 "to inform the Court of the State's progress in securing the full funds necessary to implement the" CRP. Judge Lee noted that "in the event full funds necessary to implement the CRP are not secured by that date, the Court will hear and consider any proposals for how the Court may use its remedial powers to secure funding."

(14)    October 18, 2021: Judge Lee entered an order finding that the CRP had not, as of that date, been fully funded by "an appropriations bill." Judge

Lee gave the parties until November 8, 2021, to submit memoranda of law what on remedial steps the court could take.

(15) November 10, 2021: Judge Lee entered the order requiring relevant State actors to transfer over a billion dollars from the General Fund to appropriate State agencies to fund years 2 and 3 of the CRP. Judge Lee stayed the order for 30 days.

(16) November 18, 2021: The General Assembly passed the Budget Act of 2021. The budget appropriated $10.6 billion in FY 2021-2022 and $10.9 billion in FY 2022-2023 for K-12 education. These figures do not include over $3.6 billion dollars in federal coronavirus funding for North Carolina school districts. The budget was signed by the Governor.

(17) November 30, 2021: Judge Lee entered an order noticing a hearing for December 13, 2021, for the State "to inform the Court of the specific components of the Comprehensive Remedial Plan for years 2 & 3 that are funded by the Appropriations Act and those that are not." Judge Lee also ordered that his November 10, 2021 transfer order be stayed for ten days after the December 13, 2021 hearing.

(18) December 7, 2021: The State appealed from the November 10, 2021 order.

(19) December 8, 2021: The intervening legislative defendants filed a notice of appeal from the November 10, 2021 order.

¶ 316 As is evident from the timeline above, after the case was reassigned to Judge Lee, no trials or adversarial hearings took place to determine whether a statewide violation of *Leandro* existed. The State Board of Education raised this exact issue before the trial court as part of its Motion for Relief filed July 10, 2017. The State Board of Education requested that the trial court "relinquish [remedial] jurisdiction," in part because "[f]or over a decade, the Superior Court has retained and exercised jurisdiction in this case, [but] this Superior Court has not [ ] held a trial as to any

other plaintiff school board." Further, the State Board of Education noted the current direction of the case far

> "exceed[ed] the jurisdiction established by the original pleadings in this action." The State Board of Education recognized numerous statutory and administrative changes since the Hoke County decision. It stated that "[t]he cumulative effect of these changes is that the State's current educational system is so far removed from the factual landscape giving rise to the complaint, trial, and 2002 Judgment that the superior court is now retaining jurisdiction over a 'future school system' which was not the subject of the original action."

¶ 317      On March 13, 2018, eight months after the State Board filed its motion, Judge Lee denied the motion without addressing these crucial issues. In a footnote to the order, Judge Lee indicated that all of the parties were now working together; the proceedings were now taking on a radically different character. The record reflects that the parties entered into three consent orders, with the first occurring on March 13, 2018.[8] In this first consent order, the trial court, upon the parties' request, appointed a San Francisco-based consulting company, WestEd, to serve as an "independent non-party consultant." According to a Case Management and Scheduling Order dated February 1, 2018, WestEd's role was to recommend "specific actions" that the state should take:

---

[8] Notably, as discussed further below, the legislature was not a party to the case at this point because its motion to intervene was denied in 2011. Therefore, both its interests and, commensurately, the interests of the taxpayers, voters, and people of this State, were not represented.

    a. To provide a competent, well-trained teacher in every classroom in every public school in North Carolina;

    b. To provide a well-trained, competent principal for every public school in North Carolina; and

    c. To identify the resources necessary to ensure that all children in public school, including those at risk, have an *equal* opportunity to obtain a sound basic education, as defined in *Leandro I*.[9] (emphasis added).

¶ 318     In December 2019, WestEd released its "Action Plan for North Carolina."[10] This report became the basis for two further consent orders between the parties—a Consent Order Regarding Need for Remedial, Systemic Actions for the Achievement of *Leandro* compliance, filed January 21, 2020, and a Consent Order on Leandro Remedial Action for Fiscal Year 2021, filed September 11, 2020.

¶ 319     In addition, WestEd's report formed the basis for the "Comprehensive Remedial Plan." The CRP resulted from the trial court's order for "State Defendants, in consultation with Plaintiffs to develop and present a Comprehensive Remedial

---

[9] It is notable that the trial court misconstrued our holding in *Leandro*. As discussed above, this Court expressly rejected the contention that our constitution requires all students to have "an *equal* opportunity to obtain a sound basic education." *See Leandro*, 346 N.C. at 350, 488 S.E.2d at 256–57 (emphasis added) ("A constitutional requirement to provide substantial equality of educational opportunities . . . would almost certainly ensure that no matter how much money was spent on the schools of the state, at any given time some of those districts would be out of compliance.").

[10] On the first page of its report, WestEd wrongly asserted that this Court's decision in *Leandro* "affirmed that the state has a constitutional responsibility to provide every student with an *equal opportunity* for a sound basic education and that the state was failing to meet that responsibility." (Emphasis added.) This is simply wrong. This Court has never affirmed a *Leandro* violation outside of Hoke County, let alone a violation occurring on a statewide basis.

Plan to be fully implemented by the end of 2028 . . . ." There is no doubt that the CRP was crafted by the parties, as "State Defendants ha[d] regularly consulted with the plaintiff-parties in the development of the Comprehensive Remedial Plan." The CRP contains hundreds of action steps for the state to complete over the course of eight years, which would require billions of dollars in taxpayer money to fund. On June 7, 2021, the trial court entered its Order on Comprehensive Remedial Plan and directed that "the Comprehensive Remedial Plan shall be implemented in full and in accordance with the timelines set forth therein . . . ."

¶ 320        The CRP includes definitions of "responsible parties" who must implement the plan's "action steps." While our state constitution provides that the General Assembly has exclusive authority to allocate taxpayer money, the General Assembly is consistently identified by WestEd as a responsible party for each of these action steps. However, the General Assembly was never joined as a necessary party by the trial court, nor was it consulted during the development of the CRP. As previously noted, the legislature had moved to intervene in this case in 2011, but the trial court denied its motion to intervene.

¶ 321        Following the trial court's June 7 2021 order directing that the CRP be implemented in full, the trial court entered an order on November 10, 2021, in which it ordered that:

> The Office of State Budget and Management and the
> current State Budget Director ("OSBM"), the Office of the

State Controller and the current State Comptroller ("Controller"), and the Office of the State Treasurer and the current State Treasurer ("Treasurer") shall take the necessary actions to transfer the total amount of funds necessary to effectuate years 2 & 3 of the Comprehensive Remedial Plan, from the unappropriated balance within the General Fund to the state agents and state actors with fiscal responsibility for implementing the Comprehensive Remedial Plan as follows:

(a) Department of Health and Human Services ("DHHS"): $189,800,000.00

(b) Department of Public Instruction ("DPI"): $1,522,053,000.00

(c) University of North Carolina System: $41,300,000.00

¶ 322 In addition to ordering the transfer of more than $1.7 billion in state funds, the trial court also ordered that "OSBM, the Controller, and the Treasurer, are directed to treat the foregoing funds as an appropriation from the General Fund . . . ."

¶ 323 The day before Judge Lee entered the November 10 order, Judge Manning sent a memorandum to the General Assembly, the Governor, and the Superintendent of Public Instruction. Judge Lee was copied on the memorandum, which stated:

> At the present time there is a media-induced frenzy about the Leandro judge proposing to enter an order requiring the General Assembly to appropriate over $1 billion for the educational establishment. As the press is licking its lips for 15 minutes on the 6:00 news, I will refer all to the following decisions from our Supreme Court and other decisions relating specifically to the power of the Judicial Branch.
>
> You might enjoy reading Able Outdoor, Inc. v. Harrelson 341 N.C. 167 (1995) by Justice Webb (a Democrat) as

follows:

*We hold, however, that the Court of Appeals erred in affirming Judge Cashwell's orders allowing execution against the State. In Smith v. State, 289 NC 303 (1976), we held that . . . if a plaintiff is successful in establishing his claim, he cannot obtain execution to enforce the judgment. We said '[t]he judiciary will have performed its function to the **<u>limit</u>** of its constitutional powers. Satisfaction will depend upon the manner in which the General Assembly discharges its constitutional duties.' Pursuant to Smith, we do **<u>not believe</u>** the Judicial Branch of our State government has the power to enforce an execution against the Executive Branch.*

You should also read the following decisions attached to this memorandum, which also declare the limits of the Court's power to execute or require the Legislative and Executive branches of government to appropriate money.

Finally, Leandro requires that the children, not the educational establishment, have the Constitutional right to the equal opportunity to obtain a sound, basic education. This has not and is not happening now as the little children are not being taught to read and write because of a failure in classroom instruction as required by Leandro. 358 NC 624, 625, 626 ("First, that every classroom be staffed with a competent, certified, well-trained teacher who is teaching the standard course of study by implementing effective educational methods that provide differentiated individualized instruction, assessment and remediation to the students in that classroom.").

This is not happening now.

Our children that cannot read by the third grade are by and large doomed not to succeed by the time they get to high school. As shown by the record in this case, that is a failure of classroom instruction. This conclusion is supported further by the Report from the Court: The Reading Problem (2014) as well as annual statewide academic

performance data, including ACT statewide results for 2020–21 and several years before.

Reduced to essentials, in my opinion the children are not being provided the opportunity because after all the millions spent, 90% of school costs are for adult salaries and benefits, and the data shows as it did years ago and up to now the educational establishment has not produced results.

*'A Failure of Classroom Instruction.' Read Retired Judge's Memo on NC School Funding*, The News & Observer (Nov. 10, 2021, 6:36 PM), https://www.newsobserver.com/news/local/education/article255713686.html. [11]

¶ 324    Eight days after the trial court entered the November 10 order, the General Assembly passed, and the Governor signed, the Current Operations and Appropriations Act of 2021, 2021 N.C. Sess. L. 180 (State Budget).

¶ 325    The State appealed to the Court of Appeals.[12]   It was at this point that Legislative Intervenors intervened as of right pursuant to N.C.G.S. § 1-72.2(b) and

---

[11] History and common sense tell us that increased funding alone is not a silver bullet. By way of example, a young baseball player can have the best bat, glove, batting gloves, cleats, and helmet money can buy.  Mom and dad can fork out a fortune for top-notch hitting and pitching coaches, showcase teams, and field time. But, if these coaches prioritize teaching the young player to cook or play a musical instrument, you will see little improvement in the sport of baseball.

The same is true with educating children. Schools can have the best teachers along with state-of-the-art programs, equipment, and materials, but educational outcomes will not improve if use of available resources does not prioritize reading, writing, and arithmetic.

[12] This appeal is curious, as the November 10 order attempted to fund a plan that the State defendants crafted.  Counsel for the State could not provide an answer when asked why the State had appealed and stated "I don't think the State disagreed with the adoption of that plan."

also filed a Notice of Appeal.[13]

¶ 326        The State Controller, who was not a party to this action, also petitioned the Court of Appeals for a writ of prohibition, temporary stay, and writ of supersedeas, arguing that the trial court lacked jurisdiction over the Controller and that the November 10 order violated our state constitution. On November 30, 2021, the Court of Appeals issued a writ of prohibition restraining the trial court from enforcing the transfer provisions of its November 10 order and stated that "[u]nder our Constitutional system, that trial court lacks the power to impose that judicial order."

¶ 327        Following the Court of Appeals' issuance of the writ of prohibition, multiple parties, including the State, filed petitions and notices of appeal in this Court, seeking review of the decision of the Court of Appeals and bypass review of issues arising from the November 10 order. On March 21, 2022, this Court allowed defendant State of North Carolina's and plaintiffs' petitions for bypass review (425A21-2) but held in abeyance the direct appeal of review of the writ of prohibition (425A21-1). However, this matter was first remanded to Wake County Superior Court "for the purpose of allowing the trial court to determine what effect, if any, the enactment of the State Budget has upon the nature and extent of the relief that the trial court granted . . . ." Judge Michael Robinson was assigned the task of overseeing the proceedings on

---

[13] It is notable that not only could the legislative defendants not intervene as of right prior to the passage of the State Budget, but their prior motion to intervene was denied in 2011.

remand.[14]

¶ 328    On remand, Judge Robinson concluded "that the 10 November order should be amended to remove a directive that State officers or employees transfer funds from the State Treasury to fully fund the CRP" but also concluded that "the State of North Carolina has failed to comply with the trial court's prior order to fully fund years 2 and 3 of the CRP." In addition, Judge Robinson concluded that because the State Budget in fact funded portions of CRP programs:

> The Order should be further amended to determine specifically that the additional amounts that are due to DHHS, DPI, and the UNC System for undertaking the programs called for in years 2 and 3 of the CRP should be modified and amended as follows:
>
> a.  The amount to be provided to DHHS should be reduced from $189,800,000 to $142,900,000
>
> b.  The amount to be provided to DPI should be reduced from $1,522,053,000 to [$]608,006,248
>
> c.  The amount to be provided to the UNC System should be reduced from $41,300,000 to $34,200,000.

¶ 329    With a proper understanding of the history and current posture of this case, our analysis is set forth below.

## II.    Analysis

## A. Collusion

---

[14] The matter was assigned to Judge Robinson because Judge Lee "had reached the mandatory retirement age for judges in January." *David Lee, Judge who Oversaw School Funding Case, Dies at 72*, North State Journal, Oct. 12, 2022, at A5.

¶ 330    The courts of this state "have no jurisdiction to determine matters purely speculative, enter anticipatory judgments, declare social status, [or] deal with theoretical problems . . . ." *Little v. Wachovia Bank & Trust Co.*, 252 N.C. 229, 243, 113 S.E.2d 689, 700 (1960), *overruled on other grounds by Citizens Nat'l Bank v. Grandfather Home for Children, Inc.*, 280 N.C. 354, 185 S.E.2d 836 (1972). When an issue has not been "drawn into focus by [court] proceedings," any decision of our courts would "be to render an unnecessary advisory opinion." *Wise v. Harrington Grove Cmty. Ass'n, Inc.*, 357 N.C. 396, 408, 584 S.E.2d 731, 740 (2003) (citing *City of Greensboro v. Wall*, 247 N.C. 516, 519, 101 S.E.2d 413, 416 (1958)). "It is no part of the function of the courts, in the exercise of the judicial power vested in them by the Constitution, to give advisory opinions . . . ." *Poore v. Poore*, 201 N.C. 791, 792, 161 S.E. 532, 533 (1931).

¶ 331    Because "*[c]lear and sound judicial decisions*" can only be reached when adverse parties and their legal theories "*are tested by fire in the crucible of actual controversy*," suits lacking adversity are properly barred from our courts. *State ex rel. Edmisten v. Tucker*, 312 N.C. 326, 345, 323 S.E.2d 294, 307 (1984) (emphasis in original) (quoting *City of Greensboro v. Wall*, 247 N.C. at 520, 101 S.E.2d at 416). "So-called friendly suits, where, regardless of form, all parties seek the same result, are quicksands of the law." *City of Greensboro v. Wall*, 247 N.C. at 520, 101 S.E.2d at 416.

¶ 332        Our State's long-standing judicial policy to decline consideration of issues not drawn into focus by adversarial court proceedings is in harmony with the approach of the Supreme Court of the United States. "[F]ederal courts will not entertain friendly suits, or those which are feigned or collusive in nature." *Flast v. Cohen*, 392 U.S. 83, 100, 88 S. Ct. 1942, 1953 (1968) (cleaned up). As stated by the Supreme Court in 1850 when voiding a judgment of the Circuit Court of the United States for the District of Maine:

> The court is satisfied, upon examining the record in this case . . . that there is no real dispute between the plaintiff and defendant. On the contrary, it is evident that their interest in question brought here for decision is one and the same, and not adverse; and that in these proceedings the plaintiff and defendant are attempting to procure the opinion of this court upon a question of law, in the decision of which they have a common interest opposed to that of other persons, who are not parties to this suit, who had no knowledge of it while it was pending in the Circuit Court, and no opportunity of being heard there in defence of their rights. And their conduct is the more objectionable, because they have brought up the question upon a statement of facts agreed on between themselves, without the knowledge of the parties with whom they were in truth in dispute, and upon a judgment pro forma entered by their mutual consent, without any actual judicial decision by the court.

*Lord v. Veazie*, 49 U.S. 251, 254 (1850).

¶ 333        As stated by Justice Brewer for the Supreme Court in 1892:

> Whenever, in pursuance of an honest and actual antagonistic assertion of rights by one individual against another, there is presented a question involving the

validity of any act of any legislature, state or federal, and the decision necessarily rests on the competency of the legislature to so enact, the court must, in the exercise of its solemn duties, determine whether the act be constitutional or not; but such an exercise of power is the ultimate and supreme function of courts. It is legitimate only in the last resort, and as a necessity in the determination of real, earnest, and vital controversy between individuals. It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act.

*Chicago & G.T. Ry. Co. v. Wellman*, 143 U.S. 339, 345, 12 S. Ct. 400, 402 (1892).

¶ 334        As stated by the Supreme Court per curiam in 1943:

Such a suit is collusive because it is not in any real sense adversary. It does not assume the honest and actual antagonistic assertion of rights to be adjudicated—a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court. Whenever in the course of litigation such a defect in the proceedings is brought to the court's attention, it may set aside any adjudication thus procured and dismiss the cause without entering judgment on the merits. It is the court's duty to do so where, as here, the public interest has been placed at hazard by the amenities of parties to a suit conducted under the domination of only one of them.

*U.S. v. Johnson*, 319 U.S. 302, 305, 63 S. Ct. 1075, 1076–77 (1943) (cleaned up).

¶ 335        Here, the trial court disregarded both this Court's precedent and the long-standing guidance of the Supreme Court of the United States by judicially sanctioning a collusive suit between friendly parties. While this case originally "was filed as a declaratory judgment action pursuant to section 1-253 of the General

Statutes," *Hoke County*, 358 N.C. at 617, 599 S.E.2d at 378, the Uniform Declaratory Judgment Act nevertheless "preserves inviolate the ancient and sound juridic concept that the inherent function of judicial tribunals is to adjudicate genuine controversies between antagonistic litigants . . . ." *Lide v. Mears*, 231 N.C. 111, 118, 56 S.E.2d 404, 409 (1949). Further, "an action for a declaratory judgment will lie only in a case in which there is an actual or real existing controversy *between parties having adverse interests in the matter in dispute.*" *Id.* (emphasis added).

¶ 336 An examination of the record in this case leaves no doubt that although the parties' interests may have once been adverse, any such adversity dissipated years ago. As early as February 1, 2018, the trial court's Case Management and Scheduling Order noted that "[t]he Plaintiff Parties and the State have jointly nominated . . . an independent, non-party consultant," i.e., WestEd, "to develop detailed, comprehensive, written recommendations for specific actions" to remedy the purported statewide violations of *Leandro*.

¶ 337 This Case Management and Scheduling Order was followed by multiple consent orders, including a Consent Order Regarding Need for Remedial, Systematic Actions For the Achievement of *Leandro* Compliance. In this consent order, the trial court stated "the parties to this case . . . are in agreement that the time has come" to proceed with WestEd's recommendations. This consent order also reveals that, despite executive branch defendants' alignment with plaintiff-parties, the trial court

was only "hopeful that the parties, with the help of the Governor, can obtain the support necessary from the General Assembly."

¶ 338        This was all done to the exclusion of the one entity that controlled what the parties wanted to accomplish—the General Assembly.  Put another way, executive branch bureaucrats and government actors, sanctioned by the court, agreed to a process that called for the expenditure of taxpayer money without consultation from the branch of government to which that duty is constitutionally committed.  The trial court's denial of the General Assembly's motion to intervene in 2011, and the majority's dismissal of legislative defendants' arguments today, raise the grave specter of executive and judicial collusion designed to subvert our constitutional framework and, by extension, the will of the people.  It is only when "the judiciary remains truly distinct from both the legislature and the Executive" that liberty is safeguarded.  *The Federalist* No. 78 (Alexander Hamilton).[15]

---

[15] It appears that the majority attempts to support its plundering of legislative authority by arguing that our Founding Fathers contemplated an ephemeral separation of powers. Such an interpretation is not just revisionist history; it is plainly wrong.  We could spend much time discussing the majority's misuse of selections from the Federalist Papers to justify judicial intrusion into the legislative arena. Discussion here, however, is intentionally limited.

        The Founding Fathers understood that "maintaining in practice the necessary partition of power among the several departments" was the primary protection against tyranny.  *The Federalist* No. 51 (James Madison).  To more clearly understand the founders' view of separation of powers, however, one must also appreciate the concern expressed by anti-federalist writers, to which the federalists responded, over the blending of functions in the Constitution.  *See* The Dissent of the Minority of the Convention of Pennsylvania, The Essential Anti-Federalist, Allen and Lloyed (2002) at 43. For example, the United States Constitution explicitly provides for the Senate's involvement in executive appointments and

¶ 339        Here, counsel for executive branch defendants admitted at oral argument that

the General Assembly had no "insight" into the crafting of the remedy because "the

General Assembly was not a party."  Oral Argument at 58:24, *Hoke Cnty. Bd. of Educ.*

*v.        State        of        North        Carolina,*        No.        425A21-2,

https://www.youtube.com/watch?v=NOuFCf2rYdY.        Further,        counsel        readily

admitted that executive branch defendants "certainly wanted plaintiffs to be involved

in th[e] process" of crafting the remedy because executive branch defendants "wanted

to have *dominion*[16] over the issue . . . and so getting sign-off from plaintiffs ensured

that the trial court would adopt this program."  Oral Argument at 59:15, *Hoke Cnty.*

*Bd.        of        Educ.        v.        State        of        North        Carolina,*        No.        425A21-2,

https://www.youtube.com/watch?v=NOuFCf2rYdY.  (emphasis added).

---

treaties, and its role in the trial of impeachments. Any encroachment upon the power of another branch was *expressly granted by the Constitution*, and, as Hamilton stated in *The Federalist* Nos. 65 and 66, involved not separation of powers concerns, but essential checks on power.  *See* George W. Carey & James McClellan, *Reader's Guide to The Federalist*, The Federalist, at lxxvii (George W. Carey & James McClellan, eds., Gideon ed. 2001).

Commandeering the appropriations clause through the judiciary's supposed "inherent authority" is a usurpation of a constitutionally committed function, not an essential check on power expressly granted by the constitution. As Madison stated in *The Federalist* No. 51, "[i]n framing a government which is to be administered by men over men, the great difficulty lies in this: You must first enable the government to controul the governed; and in the next place, oblige it to controul itself." There can be no rational argument that our Founding Fathers, the Constitution of the United States, or the Constitution of the State of North Carolina contemplated meaningless barriers which permit the aggrandizement of judicial power as accomplished by this Court's lack of restraint and control. After all, "the judiciary is beyond comparison the weakest of the three departments of power." *The Federalist* No. 78 (Alexander Hamilton).

[16] Dominion is defined by Webster's Dictionary as "supreme authority" or "absolute ownership."

¶ 340       Thus, this case presents a situation in which the parties' interests are aligned, and "[s]uch a suit is collusive because it is not in any real sense adversary." *U.S. v. Johnson*, 319 U.S. at 305, 63 S. Ct. at 1076–77. The legal issues involved in this case have been "determined" through entry of consent orders by outcome-aligned parties, not "tested by fire in the crucible of actual controversy." *City of Greensboro v. Wall*, 247 N.C. at 520, 101 S.E.2d at 417. The colluding parties agreed upon a remedy, one which directly involved the General Assembly, without ever seeking input from that third party. In so doing, they have attempted to "procure the opinion of" this Court "in the decision of which they have a common interest opposed to that of other persons, who are not parties to this suit," and based upon "a statement of facts agreed on between themselves . . . upon a judgment pro forma entered by their mutual consent." *Lord v. Veazie*, 49 U.S. 251, 254 (1850).

¶ 341       Further, it bears repeating that these collusive orders were entered without a trial on the merits to determine the validity of the actual plaintiffs' claims. A statewide violation was simply assumed without a trial or final order. The trial court erred in permitting this suit to continue after it became clear that the parties were working in concert to bypass the General Assembly and achieve their mutual goals via consent orders. As discussed further below, this collusion between plaintiffs, executive branch defendants, and the trial court grossly violated the General Assembly's due process rights. In addition, the trial court further erred in attempting

to achieve the parties' collusive efforts by imposing an unconstitutional remedy in its November 10 order.

## B. Separation of Powers

### 1. *The Trial Court*

¶ 342        Even if this case had not been transformed into a friendly suit, the trial court would still lack authority to impose its chosen remedy for four clear reasons. First, the trial court ignored this Court's explicit holdings that a remedy may be imposed only after the evidence establishes a clear showing of a *Leandro* violation. Second, the trial court violated the legislative defendants' right to due process, which requires that the General Assembly be joined as a necessary party when the essence of the case is whether the current education policy and funding are constitutionally adequate. Third, even if the trial court had properly held a trial with all parties in which such a clear showing established a statewide violation of *Leandro*, any judicial remedy ordering the transfer of state funds violates our constitution. Finally, even if a proper trial had been conducted, and even if the trial court's order did not otherwise offend our constitution, the trial court lacked jurisdiction to enter an order against the State Controller who was not a party.

#### a. *A Remedy Without a Violation*

¶ 343        As we made clear in *Hoke County*, our "examination of the case [wa]s premised on evidence as it pertain[ed] to Hoke County in particular." *Hoke County*, 358 N.C.

at 613 n.5, 599 S.E.2d at 375 n.5. "[O]ur holding mandates" in that case "cannot be construed to extend to the other four rural districts named in the complaint." *Id.* Thus, the establishment of alleged *Leandro* violations in any other district beyond Hoke County would require further proceedings that must include "presentation of relevant evidence by the parties, and findings and conclusions of law by the trial court." *Id.*

¶ 344          Further, the trial court's remedy goes far beyond that justified by the pleadings in this case. The remaining plaintiffs are the five Boards of Education in Hoke, Halifax, Robeson, Cumberland, and Vance counties and students from each county. The remaining intervening plaintiffs are the Charlotte-Mecklenburg Board of Education and some Mecklenburg County students and parents. In none of their surviving pleadings do they purport to represent all of the students of the State, or even all counties. To the contrary, they allege that they represent children in their own counties. This Court's decision in *Leandro*, affirming the dismissal of most of the original claims, significantly narrowed the remaining issue. As we said:

> This litigation started primarily as a challenge to the educational funding mechanism imposed by the General Assembly that resulted in disparate funding outlays among low wealth counties and their more affluent counterparts. With the *Leandro* decision, however, the thrust of this litigation turned from a funding issue to one requiring the analysis of the qualitative educational services provided to the respective plaintiffs and plaintiff-intervenors.

*Hoke County*, 358 N.C. at 609, 599 S.E.2d at 373. In other words, the issue became the methods chosen by school administrators to provide the classroom instruction that was needed should a deficiency be shown as to students in a particular county.

¶ 345        The proper standards for proving such alleged violations have been twice stated by this Court. First, the trial court "must grant every reasonable deference to the legislative and executive branches when considering whether they have established and are administering a system that provides . . . a sound basic education." *Id.* at 622–23, 599 S.E.2d at 381 (quoting *Leandro*, 346 N.C. at 357, 488 S.E.2d at 261). Second, plaintiffs must prove their allegations by making "a clear showing to the contrary," i.e., plaintiffs must make a clear showing that the strictures of *Leandro* are being violated in their districts. *Id.* (quoting *Leandro*, 346 N.C. at 357, 488 S.E.2d at 261). Finally, the imposition of a remedy is expressly barred absent such a clear showing, as "[o]nly such a clear showing will justify a judicial intrusion[.]" *Id.* (quoting *Leandro*, 346 N.C. at 357, 488 S.E.2d at 261).

¶ 346        It is notable that, in *Hoke County*, the trial court's determination that at-risk students were not receiving the opportunity to a sound basic education was premised on fourteen months of adversarial hearings. That ultimate determination was reached in a 400-page Order that recounted these hearings.

¶ 347        Here, the record is devoid of any proceedings in which the trial court concluded as a matter of law that plaintiffs had presented relevant evidence establishing a clear

showing of *Leandro* violations in other districts beyond Hoke County.  There was no

trial establishing a violation in any other county and certainly no trial establishing a

statewide violation.  If it took the trial court fourteen months and a 400-page Order

to determine that a subsection of students in one county were not receiving the

opportunity to a sound basic education, then surely a clear showing of a statewide

violation would require exponentially more.  The fact that the record below fails to

establish a similar in-depth adversarial hearing for *any* other county, and contains

no trace of the kind of monumental undertaking needed to demonstrate a statewide

violation, speaks volumes.  Absent such a clear showing of a statewide violation, the

trial court lacked authority to impose *any* remedy.[17]

¶ 348          The majority ignores this.  By failing to hold an actual *trial* for any other county

in the last fourteen years, the trial court judges failed to abide by this Court's express

directions in *Hoke County*.  The majority apparently imagines the existence of trial

court orders from nonexistent trials.  The majority's focus on the title of the trial

court's routine scheduling "Notice of Hearing and Orders" completely misses the

mark.  A *trial* is required for appellate review of this extremely fact-intensive issue

---

[17] One could argue that this Court's finding of a statewide violation, despite the failure of any party to plead such a claim, raises jurisdictional concerns. There has never been a finding in the trial court that violations through implementation and delivery occurred outside of Hoke or Halifax counties. Without the presence of the other unrepresented counties, the remaining plaintiffs and plaintiff intervenors may lack standing to plead a statewide violation, and the trial court therefore may lack jurisdiction to consider such a claim.

because an appellate court requires a record from which it may *meaningfully* review the trial court's findings and conclusions. Certainly, given the significance of the subject matter of this case and the separation of powers concerns, this Court should require at least a standard record of a trial and a final order.

¶ 349        The record in this case is not the record of an adversarial trial. It is the record of trial court judges accepting studies and statistics, taking them at face value without any real inquiry into their veracity, and then opining about the condition of this State's education system.[18] If the General Assembly had been allowed to intervene, then perhaps there would be a record which reflects facts derived from the crucible of an adversarial trial.

¶ 350        It is judicial malpractice for the majority to suddenly ignore the importance of court orders when it comes to appellate review. The majority simply declares that the trial court "properly concluded based on an abundance of clear and convincing evidence that the State's *Leandro* violation was statewide." The majority declines to

---

[18] Each year, U.S. News ranks "how well states are educating their students." North Carolina is ranked seventh out of fifty states overall and fifteenth out of fifty states with respect to Pre-K to 12th grade education. Brett Ziegler, *Education Rankings*, U.S. News, https://www.usnews.com/news/best-states/rankings/education (last visited Oct. 24, 2022). One wonders how the trial court and the San Francisco based consulting firm's diminished view of our education system can be so inconsistent. U.S. News, whose rankings of North Carolina's universities are celebrated, concludes that North Carolina has one of the best K-12 education systems in the country. A cynic could argue that WestEd's mercenary report only utilized data from 44 of North Carolina's one hundred counties. But, this is the type of information that is best tested in an actual trial instead of blindly accepted by the parties and court that hired the consultant.

explain *what* this evidence was, when it was produced, or how the majority knows it is reliable enough to form the basis of an explosive change in constitutional order and massive transfer of taxpayer monies to fund a program crafted by a San Francisco based consulting firm. Fundamentally, this Court cannot determine whether a "clear showing" has been made establishing a statewide *Leandro* violation because the lack of an adversarial trial renders our review purely speculative.

¶ 351        As but one example, it would have been inconceivable for this Court to review the proceedings in *Harper v. Hall*, 380 N.C. 317, 2022-NCSC-17, if the trial court had failed to hold an adversarial hearing and instead merely accepted at face value the arguments and evidence presented by the legislative defendants in that case. So too here. Issues of constitutional magnitude require facts and arguments to be "tested by fire in the crucible of actual controversy." *City of Greensboro v. Wall*, 247 N.C. at 520, 101 S.E.2d at 417. These requirements cannot be cast aside for political or judicial expediency.

¶ 352        However, even if the trial court had properly conducted a trial in which a statewide violation of *Leandro* had been established, the trial court would still lack the authority to impose *this* remedy. The problem arises not only because the trial court imposed a remedy without first establishing a violation, but because the chosen remedy clearly violates our constitution.

　　　　　*b. The Limitation on Judicial Power*

¶ 353    Separation of powers is fundamental to our republican system of self-governance, and our constitution accordingly provides that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. This division of governmental power acknowledges that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, selfappointed, or elective, may justly be pronounced the very definition of tyranny." *The Federalist* No. 47 (James Madison).

¶ 354    In *Hoke County*, this Court acknowledged the separation of these various powers and recognized the outer boundaries of our judicial power. We stated:

> The state's legislative and executive branches have been endowed by their creators, the people of North Carolina, with the authority to establish and maintain a public school system that ensures all the state's children will be given their chance to get a proper, that is, a *Leandro*-conforming, education. As a consequence of such empowerment, those two branches have developed a shared history and expertise in the field that dwarfs that of this and any other Court. While we remain the ultimate arbiters of our state's Constitution, and vigorously attend to our duty of protecting the citizenry from abridgments and infringements of its provisions, we simultaneously *recognize our limitations in providing specific remedies for violations committed by other government branches* in service to a subject matter, such as public school education, that is within their primary domain.

358 N.C. at 644–45, 599 S.E.2d at 395 (emphasis added).

¶ 355    "The legislative power of the State shall be vested in the General Assembly[.]"

N.C. Const. art. II, § 1. This Court has long acknowledged that one of the many powers designated exclusively to the legislative branch is the power to spend public funds. *See Wilson v. Jenkins*, 72 N.C. 5, 6 (1875) ("The General Assembly has absolute control over the finances of the State."); *see also Shaffer v. Jenkins*, 72 N.C. 275, 279 (1875) ("[T]he money in the Treasury is within the exclusive control of the General Assembly.").

¶ 356      "No money shall be drawn from the State Treasury but in consequence of appropriations made by law[.]" N.C. Const. art. V, § 7. The interpretation of this clause has never before been a matter of debate in this Court. In fact, Justice Ervin recently stated for the Court that:

> In light of this constitutional provision, the power of the purse is the exclusive prerogative of the General Assembly, with the origin of the appropriations clause dating back to the time that the original state constitution was ratified in 1776. In drafting the appropriations clause, the framers sought to ensure that the people, through their elected representatives in the General Assembly, had full and exclusive control over the allocation of the state's expenditures. As a result, the appropriations clause states in language no man can misunderstand that the legislative power is supreme over the public purse.

*Cooper v. Berger*, 376 N.C. 22, 37, 852 S.E.2d 46, 58 (2020) (cleaned up).

¶ 357      In the realm of educational funding, the constitution is even more explicit. "The General Assembly shall provide by taxation and otherwise for a general and uniform system of free public school . . . ." N.C. Const. art. IX, § 2(1). The constitution

provides two funding mechanisms to supplement state tax revenue on a county level.

¶ 358    County school funds are supplied by "the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the State, [which] shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools." N.C. Const. art IX, § 7(a). In addition, "the clear proceeds of all civil penalties, forfeitures, and fines which are collected by State agencies . . . shall be faithfully appropriated by the General Assembly, on a per pupil basis, to the counties, to be used exclusively for maintaining public schools." N.C. Const. art. IX, § 7(b). In contrast, the "State school fund" is ultimately funded by "so much of the revenue of the State as may be set apart for that purpose . . . [and] faithfully appropriated and used exclusively for establishing and maintaining a uniform system of free public schools." N.C. Const. art. IX, § 6.[19]

¶ 359    Of course, the "revenue" contemplated by Article IX's funding provisions must primarily be "provided by taxation . . . ." N.C. Const. art. IX, § 2(1). On this point, the constitution is clear. "Only the General Assembly shall have the power to classify

---

[19] The constitution also provides that the State school fund shall be funded by "the proceeds of all lands that have been or hereafter may be granted by the United States to this State . . . ; all moneys, stocks, bonds, and other property belonging to the State for purpose of public education; the net proceeds of all sales of the swamp lands belonging to the State; and all other grants, gifts, and devises that have been or hereafter may be made to the State [ ] and not otherwise appropriated by the State . . . ." N.C. Const. art. IX, § 6.

property for taxation, which power shall be exercised only on a State-wide basis and shall not be delegated." N.C. Const. art. V, § 2(2).

¶ 360    The constitution commits these dual powers—the power to raise state funds for education, and the power to spend state funds on education—exclusively to the General Assembly.[20]  That is why this Court recognized its "limitations in providing specific remedies for violations committed by other government branches in service to a subject matter, such as public school education, that is within their primary domain." *Hoke County*, 358 N.C. at 645, 599 S.E.2d at 395.  Such limitations are a necessary consequence of our constitutional structure that separates government functions to preserve government by the people.

¶ 361    Without such limitations, there would be no conceivable constraints to this Court's power.  Consider the situation in which the state found itself in 2009, when Governor Perdue "ordered a half-percent pay cut for all state employees and teachers" to try and reduce a "$3 billion-plus shortfall for the [ ] fiscal year." *Governor Cuts Pay, Calls for Furloughs for State Employees*, WRAL News (Apr. 28, 2009, 7:02 PM), https://www.wral.com/news/local/story/5037937/.  If this Court had determined that such a pay cut violated children's right to the opportunity to a sound basic education, could this Court have exercised its power to increase education funding by raising

---

[20] While the General Assembly is primarily responsible for *funding* education, the State Board of Education "ha[s] general supervision and administration of the educational funds provided by the State . . . ." N.C.G.S. § 115C-408(a).

taxes? Could this Court rewrite the State Budget and reappropriate funds from other programs to fund education?

¶ 362        No, our constitution says. The constitution commands all branches of our government to stay within their spheres of power, and this command must be heeded with extreme obedience by the judiciary. As this Court is the final arbiter on what our constitution says, the people of this state must be ever wary of a court which declares "rare" or "extraordinary" the repeated usurpation of constitutional power.

¶ 363        Here, the trial court ignored both the clear language of the appropriations clause and this Court's binding precedent establishing the General Assembly's exclusive power to draw funds from the State Treasury. Rather than following our constitution, the trial court invented two novel theories to justify its unconstitutional exercise of legislative power.

¶ 364        First, the trial court determined that assumption of legislative duties was not barred by the appropriations clause because "Article I, Section 15 of the North Carolina Constitution represents an ongoing constitutional appropriation of funds" and constitutes an appropriation "made by law." This conclusion is a legal fiction created out of whole cloth and has no support in either our constitution or our directly on-point precedent. As discussed in more detail further below, the separation of powers clause and the legislative powers clause do not provide for any exceptions. These constitutional provisions do not merely encompass "some" or "most" of the

legislative powers—they encompass *all* legislative powers.

¶ 365   The entire text of Article I, section 15 provides that "[t]he people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." The plain language of this section makes no mention of educational funding, and to read in such non-existent language is an amendment of our constitution by judicial fiat.

¶ 366   "Our constitution clearly states that amending the constitution is a duty designated to the General Assembly and the people of this State." *Moore*, 2022-NCSC-99, ¶ 152 (Berger, J., dissenting). A trial court may not exercise this power. Neither may a trial court judge choose to "interpret" a constitutional provision in a manner that contradicts this Court's holdings.

¶ 367   In addition to its unconstitutional interpretation of Article I, section 15, the trial court stated that it could order the transfer of state funds as an exercise of its "inherent and equitable powers." This is nonsense. This usurpation of legislative authority is blatantly unconstitutional and threatens the very foundation of our republican form of self-governance.

> It is the proud boast of our democracy that we have "a government of laws and not of men." Many Americans are familiar with that phrase; not many know its derivation. It comes from Part the First, Article XXX, of the Massachusetts Constitution of 1870, which reads in full as follows:
>
> "In the government of this Commonwealth, the legislative

> department shall never exercise the executive and judicial powers, or either of them: The executive shall never exercise the legislative and judicial powers, or either of them: The judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."

*Morrison v. Olson*, 487 U.S. 654, 697, 108 S. Ct. 2597, 2622 (1988) (Scalia, J., dissenting).

¶ 368        The majority's response to our adherence to this fundamental requirement is simply that we have a "rigid interpretation of separation of powers." Indeed, we do, because separation of powers is not a suggestion. It is an inexorable command upon which the entire notion of government by the people either stands or falls. As this Court has stated:

> [T]he relief sought could not be obtained in any event without the exercise of legislative functions, and the plaintiff's fatal error is found in the assumption that such functions may be exercised by the courts, notwithstanding the constitutional separation of the several departments of the government. The Declaration of Rights provides: "The legislative, executive, and supreme judicial powers of the government ought to be forever separate and distinct from each other."
>
> As to the wisdom of this provision there is practically no divergence of opinion—it is the rock upon which rests the fabric of our government. Indeed, the whole theory of constitutional government in this state and in the United States is characterized by the care with which the separation of the departments has been preserved and by a marked jealousy of encroachment by one upon the other. . . .

> The courts have absolutely no authority to control or supervise the power vested by the Constitution in the General Assembly as a co-ordinate branch of government. They concede . . . that their jurisdiction is limited to interpreting and declaring the law as it is written. It is only when the Legislature transcends the bounds prescribed by the Constitution, and the question of the constitutionality of a law is directly and necessarily involved, that the courts may say, "Hitherto thou shalt come, but no further."

*Pers. v. Bd. of State Tax Comm'rs*, 184 N.C. 499, 502–04, 115 S.E. 336, 339 (1922).

¶ 369　　The majority justifies its assault on legislative authority in part by purporting to rely on *In re Alamance County Court Facilities*, 329 N.C. 84, 405 S.E.2d 125 (1991). It is clear, however, this case does not support the majority's position; it undermines it. *Alamance County*'s discussion of inherent judicial power destroys the majority's own argument. A thorough discussion of this case is warranted.

¶ 370　　The Alamance County Superior Court convened a grand jury to inspect the Alamance County court facilities and jail. *Id.* at 89, 405 S.E.2d at 126. The grand jury reported that there were "numerous courthouse and jail defects" and recommended that the courthouse, which was constructed in 1924, be "remodeled and converted to other uses, [and] that a new courthouse be built[.]" *Id.* Following the grand jury's report, the trial court scheduled a hearing "to make inquiry as to the adequacy of the Court Facilities" in Alamance County, and the sheriff served the five Alamance County Commissioners with notice of the hearing. *Id.* Four of the Commissioners made various motions to either dismiss the case or demand a jury

trial. *Id.* at 89, 405 S.E.2d at 127. However, the trial court "struck these motions, stating that the movants were not parties to the action and thus were without standing." *Id.*

¶ 371        At the hearing, the trial court reiterated the grand jury's findings regarding the Alamance County court facilities, which included:

> [C]itation to the statutory duties of the Clerk of Court to secure and preserve court documents, to statutory provisions requiring secrecy of grand jury proceedings, to statutory requisites that counties in which a district court has been established provide courtrooms and judicial facilities, and to the open courts provision—all of which were potentially violated by the condition of pertinent facilities in Alamance County. In addition, the findings stated that the right to a jury trial assured in Article I, §§ 24 and 25 of the N.C. Constitution was jeopardized where jury and grand jury deliberations were not dependably private and secure and that litigants' due process rights were similarly at risk for lack of areas where they could confer confidentiality with their attorneys.

*Id.* at 89–90, 405 S.E.2d at 127.

¶ 372        Additionally, the trial court stated that the county's failure to provide adequate court facilities violated the constitutional limitation under Article IV, section 1 of the North Carolina Constitution, which prohibits the General Assembly from "depriving the judicial department of any power or jurisdiction rightfully pertaining to it as a coordinate department of government." *Id.* at 90, 405 S.E.2d at 127. This prohibition extended to Alamance County, since it was delegated the legislative responsibility of providing adequate court facilities. *See id.*

¶ 373          The trial court determined that it possessed jurisdiction over the matter, in part, because of its "inherent power necessary for the existence of the Court, necessary to the orderly and efficient exercise of its jurisdiction, and necessary for this Court to do justice." *Id*. at 90, 405 S.E.2d at 127. In its order, the court concluded that the inadequacies of the court facilities "thwart[ed] the effective assistance of counsel to litigants in violation of the law of the land, jeopardize[ed] the right to trial by jury in civil and criminal cases, and . . . constituted a clear and present danger to persons present at criminal judicial proceedings as well as the public at large." *Id*.

¶ 374          Based upon these inadequacies and their effects, the trial court directed the county, "acting through its commissioners," to provide new facilities and modify the existing courthouse. *Id*. at 91, 405 S.E.2d at 128. Specifically, the trial court found that the county "was financially able to provide adequate judicial facilities" because there were "undesignated unreserved funds of $15,655,778.00 . . . with which the commissioners could begin construction of a new courthouse." *Id*. The trial court then ordered the county to "immediately" provide adequate facilities that met the Court's approved design features. *Id*. at 91−92, 405 S.E.2d at 128.

¶ 375          For example, the trial court determined that the adequate facilities must include a Superior Court courtroom of at least 1600 square feet with a minimum of two bathrooms, a Superior Court jury deliberation room of at least 300 square feet, a room for the Superior Court Court Reporter that was at least 80 square feet, and a

Superior Court Judge's Chambers "consisting of a conference area of at least 160 square feet, minimum, and a toilet of 40 square feet, minimum," among other similar requirements. *Id.* at 91, 405 S.E.2d at 128.

¶ 376      Members of the Alamance County Board of Commissioners petitioned this Court for a writ of supersedeas, which this Court granted. *Id.* at 92, 405 S.E.2d at 128. In reviewing the superior court's order, this Court described the issues presented as "whether this case presents the circumstances under which a court's 'inherent power' may be invoked and whether the superior court here followed proper procedures in the exercise of its power." *Id.* at 93, 405 S.E.2d at 128–29.

¶ 377      The majority's "analysis" of *Alamance County* quotes most of this Court's discussion of inherent power, and all of it need not be repeated here. However, some of this Court's precise language is ignored by the majority. This language clearly recognizes the constitutional limits of a court's inherent authority and is worthy of emphasis.

¶ 378      The judiciary's "inherent power" is "plenary *within the judicial branch*," which means that constitutional provisions—like the Apportionments Clause at issue here, "do not curtail the inherent power of the judiciary, plenary *within its branch*, but serve to delineate the boundary between the branches, beyond which each is powerless to act." *Id.* at 93, 95, 405 S.E.2d at 129–30 (emphasis added).

¶ 379      However, this Court noted that in the specific circumstances of *Alamance*

*County*, where the superior court was literally unable to properly fulfill its constitutional duties *within the judicial branch*, that boundary may be stretched to protect the judiciary's ability to exercise its *own* constitutionally committed powers. "In the realm of appropriations, some overlap of power between the legislative and the judicial branches is inevitable, for one branch is exclusively responsible for raising the funds that *sustain the other and preserve its autonomy*." *Id.* at 97, 405 S.E.2d at 131 (emphasis added).

¶ 380        Thus, this Court announced its limited holding that "when inaction by those exercising legislative authority threatens *fiscally* to undermine the integrity of the judiciary, a court may invoke its inherent power to do what is reasonably necessary for 'the orderly and efficient exercise of the administration of justice.' " *Id.* at 99, 405 S.E.2d at 132 (emphasis added) (quoting *Beard v. N.C. State Bar*, 320 N.C. 126, 129, 357 S.E.2d 694, 696 (1987)). In other words, when legislative inaction renders judicial branch facilities inadequate "to serve the functioning of the judiciary within the borders of those political subdivisions," the judiciary may take limited action *only* to ensure that the facilities are adequate to perform the court's constitutional duties. *Id.*

¶ 381        And, in part of this Court's holding the majority selectively omits, "[e]ven in the name of its inherent power, the judiciary may not arrogate a duty reserved by the constitution exclusively to another body." *Id.*

¶ 382 Moreover, following its general discussion of inherent power, this Court asked whether, "[u]nder the circumstances, [ ] an *ex parte* order *implicitly* mandating the expenditure of public funds for *judicial facilities* [was] reasonably necessary for the proper administration of justice?" *Id*. at 103, 405 S.E.2d at 135 (emphasis added).

¶ 383 In answering this question in the negative, this Court first noted that:

> The means chosen by a court to compel county commissioners to furnish suitable court facilities is of critical importance to the question whether the court has unreasonably exercised its inherent power, for it signals the extent of the judiciary's intrusion on the county's legislative authority. The efficacy of mandatory writs or injunctions, unlike *ex parte* orders and contempt proceedings, rests less on the expansive exercise of judicial power than on the statutory and constitutional duties of those against whom they are issued. Their use thus avoids to some extent the arrogance of power palpable in an *ex parte* order. Moreover, they compel the performance of the ministerial duty imposed by law, but give the defaulting officials room to exercise discretionary decisions regarding how that duty may best be fulfilled.

*Id*. at 104–05, 405 S.E.2d at 135–36.

¶ 384 This Court also emphasized that because the superior court's order in *Alamance County* "stopped short of ordering the commissioners to release funds," it also stopped short of "leaving the constitutional sphere of its inherent powers." *Id*. at 106, 405 S.E.2d at 137. Nevertheless, the "*ex parte* nature of the order overreached the minimal encroachment onto the powers of the legislative branch that must mark a court's judicious use of its inherent power," because "[n]o procedure or practice of

the courts, however, even those exercised pursuant to their inherent powers, may abridge a person's substantive rights." *Id.* at 106–07, 405 S.E.2d at 137. This remedy was a misuse of the judiciary's inherent authority. Thus, this Court held that the superior court's order "must be, and is VACATED." *Id.* at 108, 405 S.E.2d at 138.

¶ 385        Thus, *Alamance County* does not support the unconstitutional judicial assumption of the legislative spending power.[21] *Alamance County* instead reaffirms the following fundamental principles:

¶ 386        First, the judiciary's "inherent power" applies only to matters within the judicial branch. Second, a legislative failure to fiscally support the judicial branch, when such failure threatens the judiciary's existence, may justify a *limited* exercise of "inherent power" to preserve the judiciary. Third, even under such circumstances,

---

[21] As with *Alamance County*, the other cases on which the majority relies do not justify its extreme remedy. *See Wilson v. Jenkins*, 72 N.C. 5, 10 (1875) (affirming a trial court's denial of the plaintiff's request for a writ of mandamus to compel the State Treasurer to pay certain coupons on state bonds because "[t]he General Assembly has absolute control over the finances of the State" and "[t]he Public Treasurer and Auditor are mere ministerial officers, bound to obey the orders of the General Assembly"); *White v. Worth*, 126 N.C. 570, 36 S.E. 132, 136 (1900) (relying heavily on *Hoke v. Henderson*, 15 N.C. 1 (1833), a case that was expressly overruled in 1903 by *Mial v. Ellington*, 134 N.C. 131, 46 S.E.2d 961 (1903)). *See also Hickory v. Catawba Cnty.*, 206 N.C. 165, 173–74, 173 S.E. 56, 60–61 (1934) (affirming a trial court's writ of mandamus that required Catawba County to assume payment for a local school building as required by the constitution and General Statutes but did not require the spending of specific funds for specific expenditures), *Mebane Graded Sch. Dist. v. Alamance Cnty.*, 211 N.C. 213, 226–27, 189 S.E.2d 873, 882 (1937) (affirming a trial court's writ of mandamus that required Alamance County to assume the debt of its local school district but did not direct the spending of specific funds for specific expenditures). These cases in no way support the majority's proposition that this Court's precedent sanctions the judicial exercise of legislative power.

that limited exercise of "inherent power" may not assume legislative powers, such as the spending power, as doing so would depart from the court's "constitutional sphere of its inherent powers." Finally, even if the exercise of limited inherent power is justified by such a threatened underfunding of the judiciary, and even if the court does *not* order a state actor to spend funds, any such court action must be vacated if the action is carried out via an *ex parte* order, as such an order violates the substantive rights of the relevant state actor.

¶ 387      Thus, faithfully applying *Alamance County* to this case renders the decision a simple one. The trial court's order must be vacated because: (1) its exercise of "inherent power" does not relate to matters within the judicial branch; (2) its exercise of "inherent power" is not justified by a legislative failure which threatens the judiciary's existence; (3) its exercise of "inherent power" departs from the judiciary's "constitutional sphere" because it assumes the legislative spending power; and (4) its exercise of "inherent power" was carried out via an *ex parte* order that violated the substantive rights of the State Controller and the General Assembly.

¶ 388      This straightforward analysis did not make its way in the majority's nearly one-hundred-and-forty-page opinion, and the majority summarily dismisses the State Controller's arguments with a conclusory statement that his rights were not violated. The trial court's order must be vacated for violating the Controller's substantive rights, and the failure to properly discuss the Controller's arguments demonstrates a

hastily crafted opinion by the majority.

¶ 389          As this Court has stated, the power to transfer state funds is a power designated exclusively to the legislative branch. *See Cooper v. Berger*, 376 N.C. at 37, 852 S.E.2d at 58 ("[T]he appropriations clause states in language no man can misunderstand that the legislative power is supreme over the public purse."). In fact, we announced this fundamental truth nearly one hundred and fifty years ago:

> If the Legislature by way of contract, has specifically appropriated a certain fund, to a certain debt, or to a certain individual, or class of individuals, and the State Treasurer having that fund in his hands, refuses to apply it according to the law, he may be compelled to do so by judicial process.
>
> If any case goes farther than this, we conceive that it cannot be supported on principal, and that it *oversteps the just line of demarcation between the legislative and judicial powers*.

*Shaffer v. Jenkins*, 72 N.C. 275, 280 (1875) (emphasis added).

¶ 390          The inherent remedial and equitable powers of our courts may be vast, but "[e]ven in the name of its inherent power, the judiciary may not arrogate a duty reserved by the constitution exclusively to another body," nor may the judiciary "abridge a person's substantive rights." *Alamance County,* 329 N.C. at 99, 107, 405 S.E.2d at 133, 137.[22]

---

[22] While the majority attempts to cabin its exercise of "inherent authority" as an "extraordinary remedy," *supra* ¶ 178, this newfound power may be wielded by any future majority of this Court. Moving forward, now that the constitutional boundaries enshrining separation of powers are demolished, any four members of this Court could invoke "inherent

### c. *Due Process*

¶ 391 "No rule of procedure or practice shall abridge substantive rights or abrogate or limit the right of trial by jury." N.C. Const. art. IX, § 13(2). One of the substantive rights enjoyed by the people of this state is found in Article I, section 19 of our constitution, which provides in relevant part that "[n]o person shall be taken . . . in any manner deprived of his life, liberty, or property, but by the law of the land."

¶ 392 "Procedural due process restricts governmental actions and decisions which 'deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.'" *Peace v. Emp't Sec. Comm'n*, 349 N.C. 315, 321, 507 S.E.2d 272, 277 (1998) (quoting *Matthews v. Eldridge*, 424 U.S. 319, 322, 96 S. Ct. 893, 901 (1976)). "The fundamental premise of procedural due process protection is notice and the opportunity to be heard." *Id.* at 322, 507 S.E.2d at 278 (citing *Cleveland Bd. of Educ. V. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 1493 (1985)).

¶ 393 The State Controller's authority to transfer or spend funds is set forth in Chapter 143C of our General Statutes, which ensures that "[i]n accordance with

---

authority" to exercise powers constitutionally committed to other branches as they desire. If this Court can exercise power under the appropriations clause, it could also invoke its "inherent authority" to deem ratified a vetoed budget or increase statutory court fines because they fund the education system under Article IX, section 7. Further, any majority could increase judicial branch salaries The abuse of such power is exactly why our constitution demands that the legislative, executive, and judicial powers "shall be forever separate and distinct from each other." N.C. Const. art. I, § 6.

Section 7 of Article V of the North Carolina Constitution, no money shall be drawn from the State treasury but in consequence of appropriations made by law." N.C.G.S. § 143C-1-2(a) (2021). "This Chapter establishes procedures for the following: (1) [p]reparing the recommended State budget[;] (2) [e]nacting the State budget[;] [and] (3) [a]dministering the State budget." N.C.G.S. § 143C-1-1(c).

Chapter 143C includes penalties for violating the procedures contained therein. In relevant part, "[i]t is a Class 1 misdemeanor for a person to knowingly and willfully . . . (1) [w]ithdraw funds from the State treasury for any purpose not authorized by an act of appropriation." N.C.G.S. § 143C-10-1(a). Further, "[a]n appointed officer or employee of the State . . . forfeits his office or employment upon conviction of an offense under this section." N.C.G.S. § 143C-10-1(c).

Here, as is evident from Chapter 143C of our General Statutes, the State Controller would be subject both to a Class 1 misdemeanor and termination of employment were he to comply with the November 10 order. As the State Controller was never made a party to the proceedings in the trial court, was never given notice of the proceedings, and was never afforded an opportunity to be heard in these proceedings, the trial court had no jurisdiction to enter an order that affected the State Controller's substantive rights in this manner. As the Court of Appeals correctly noted in its order granting the State Controller's petition for a writ of prohibition, "the trial court's conclusion that it may order petitioner to pay

unappropriated funds from the State Treasury is constitutionally impermissible and beyond the power of the trial court."

¶ 396      In addition to violating the State Controller's due process rights, the trial court also violated the due process rights of the General Assembly.[23]  The majority makes much of the fact that the General Assembly was not represented in this suit until after the Nov. 10 order—but rather than recognizing the obvious due process concerns, the majority insists that the General Assembly itself is to blame.  Such an interpretation ignores factual and legal realities.

¶ 397      As discussed in much detail above, neither the proceedings under Judge Manning that led to our decision in *Hoke County*, nor the proceedings under Judge Manning that followed, implicated the General Assembly or its constitutionally committed functions.  Judge Manning consistently found, and this Court agreed, that the legislative funding mechanisms and education policies were sound and complied with our constitution.  In fact, when the General Assembly *did* move to intervene in this case because it was no longer represented by the Attorney General, Judge Manning denied its motion specifically because the issue was never that the General Assembly's funding mechanisms or education policies were inadequate—the issue was, and remains, the implementation and delivery of these policies and the

---

[23] In addition, it is arguable the trial court also violated the due process rights of all counties not represented in this suit, yet nonetheless responsible for any implementation or funding under WestEd's CRP.

application of these funds by the education establishment.

¶ 398 The majority would apparently prefer that the General Assembly renewed its motion to intervene on a regular basis, despite Judge Manning's denial and despite the absence of any issue implicating the General Assembly's authority or actions. However, the *status quo* was radically altered once Judge Lee took over the case and this became a collusive suit. The consent order entered by Judge Lee appointing WestEd fundamentally changed the nature of the proceedings. This was an egregious error that necessitated input from the General Assembly.

¶ 399 At this point, or, at the very latest, when he received the WestEd report naming the General Assembly as the primary "responsible party," Judge Lee erred by failing to join the General Assembly as a necessary party. *See* N.C.G.S. §1A-1, Rule 19(a) and (d); see *also Gaither Corp. v. Skinner*, 238 N.C. 254, 256, 77 S.E.2d 659, 661 (1953) ("Necessary or indispensable parties are those whose interests are such that no decree can be rendered which will not affect them, and therefore the court cannot proceed until they are brought in.").

¶ 400 The trial court's failure to join the General Assembly in this matter created a situation where the people of this State, acting through their elected representatives, were not afforded notice and the opportunity to be heard. Rather than allow the General Assembly, which is the policymaking branch of our government, to defend its heretofore adjudged adequate educational funding policies, Judge Lee delegated

the task of policymaking to an out-of-state third party. In delegating this crucial task to WestEd, Judge Lee effectively usurped legislative authority by appointing a special master—not unlike the special masters appointed in redistricting. To delegate such authority to an out-of-state third party, to fail to join the General Assembly as an obviously necessary party, and to attempt to enforce what was, in essence, an *ex parte* order that exercises a power constitutionally committed exclusively to the General Assembly, is to abandon all pretense of judicial propriety.

¶ 401    Thus, the trial court erred in multiple ways. Because the trial court never conducted a trial and never concluded as a matter of law that plaintiffs had made a clear showing of a statewide *Leandro* violation, the trial court never had jurisdiction to impose any remedy in this case. Further, even if such a conclusion had been reached after a trial, the trial court's chosen remedy far exceeds the judiciary's inherent power and violates our constitution. Finally, the transfer provisions of the November 10 order cannot be permitted to stand because they violated the State Controller's substantive rights and arguably denied the General Assembly due process of law.

¶ 402    Accordingly, the transfer provisions of the trial court's November 10 order were properly struck by Judge Robinson on remand. However, Judge Robinson nevertheless also erred on remand.

¶ 403    Although the trial court on remand properly considered the Court of Appeals'

writ of prohibition and properly struck the transfer provisions, it nevertheless erred in upholding the CRP as an appropriate remedy.

### 2. *The Trial Court on Remand*

¶ 404 After granting the State's bypass petition, this Court remanded this case to Judge Robinson "for the purpose of allowing the trial court to determine what effect, if any, the enactment of the State Budget ha[d] upon the nature and effect of the relief that the trial court granted." Thus, the trial court's proper role on remand was to consider how the passage of the State Budget, a valid law passed by the General Assembly, affected the trial court's conclusion that the CRP was the appropriate remedy for the alleged statewide violation of *Leandro*. Because the trial court on remand failed to properly analyze the effect of this valid legislative act, it erred in concluding that the CRP was an appropriate remedy.

¶ 405 When reviewing whether a valid legislative act violates a constitutional right, "we presume that laws enacted by the General Assembly are constitutional, and we will not declare a law invalid unless we determine that it is unconstitutional beyond a reasonable doubt." *Cooper*, 376 N.C. at 33, 852 S.E.2d at 56. "All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution." *State ex rel. Martin v. Preston*, 325 N.C. 438, 448–49, 385 S.E.2d 473, 478 (1989) (citing *McIntyre v. Clarkson*, 254 N.C. 510, 515,

119 S.E.2d 888, 891 (1961)).

¶ 406        Thus, to comport with our precedent, the trial court on remand was required to afford the State Budget a presumption of constitutionality.  In this context, that required the trial court to presume the State Budget comported with *Leandro* and provided students statewide an opportunity to receive a sound basic education.  Only a clear showing by plaintiffs that the State Budget and the programs within failed to provide this opportunity would trigger the trial court's consideration of the CRP as a remedy as directed by this Court.

¶ 407        Instead of following established framework for analyzing constitutional challenges to legislative acts, the trial court on remand stated:

> The Court also declines to determine, as Legislative Intervenors urge, that the Budget Act as passed presumptively comports with the constitutional guarantee for a sound basic education. To make a determination on the compliance of the Budget Act with the constitutional right to a sound basic education would involve extensive expert discovery and evidentiary hearings. This Court does not believe that the Supreme Court's Remand Order intended the undersigned, in a period of 30 days, or, as extended, 37 days, to perform such a massive undertaking.

In other words, the haste with which this Court was determined to act prevented proper consideration and resolution of the issues by the trial court.

¶ 408        Setting aside the fact the trial court on remand mischaracterized the right announced in *Leandro*, which was the right to the *opportunity* to receive a sound basic education, the trial court on remand got the analysis backwards.  Affording the State

Budget the presumption of *Leandro* conformity requires no extensive expert discovery and evidentiary hearings—hence the word "presumption." The need for expert discovery, evidentiary hearings, findings of fact, and conclusions of law arises precisely to overcome this presumption. The "massive undertaking" required is the burden plaintiffs bear to make a clear showing that the State Budget resulted in a statewide violation of *Leandro*. As plaintiffs have not yet met this burden, the trial court on remand should have vacated the November 10 order and allowed plaintiffs to bring claims actually challenging the State Budget.

¶ 409        Instead, the trial court on remand erred by seemingly affording the CRP, not the State Budget, this presumption of *Leandro* conformity. The trial court on remand used the CRP as a *Leandro* benchmark and analyzed whether the State Budget funded each of the CRP's measures. In so doing, it not only got the analysis backwards but also ignored our guidance in *Leandro* that "there will be more than one constitutionally permissible method of solving" statewide public school issues, 346 N.C. at 356, 488 S.E.2d at 260, and our holding in *Hoke County* that any remedy for an alleged violation must "correct the failure with minimal encroachment on the other branches of government." 358 N.C. at 373–74, 588 S.E.2d at 610.

¶ 410        The majority merely brushes away this Court's directly on point and well-established precedent. Bafflingly, the majority states that "[n]either the Plaintiff-parties nor the State dispute the presumed constitutionality of the passage of the

2021 Budget Act as a general procedural matter." *Supra* ¶ 228. What then, is this case about? Surely the majority must concede, at the very least, that if the State Budget is *constitutional*, then it does not violate the *constitutional* right of children to have the opportunity to receive a sound basic education. The majority simply cannot have its cake and eat it too. Either the State Budget is constitutional, and there is no statewide violation of *Leandro*, or there *is* a statewide violation of *Leandro* because the State Budget fails to afford children the opportunity to a sound basic education.

¶ 411        This case, when boiled down to its irreducible core, must be about the state failing to provide *Leandro* conforming expenditures. That is why the CRP requires the transfer of such vast amounts of taxpayer dollars. The only way for the state to provide educational expenditures is through the State Budget. Thus, plaintiff-parties challenge *must* be related to the adequacy of the State Budget's ability to provide constitutional, i.e., *Leandro* conforming, educational expenditures.

¶ 412        However, according to the majority, "that was not the issue before the trial court and is not the issue before this Court." *Supra* ¶ 228. Rather than analyzing the State Budget in accordance with our long-standing precedent of presumptive constitutionality, i.e., *Leandro* conformity, the majority decrees that "the Budget Act must be assessed against the terms of the only comprehensive remedial plan thus far presented by the parties to the court." *Supra* ¶ 229.

¶ 413　　Again, nonsense. Shall every legislative act now be compared not to our constitution, but to whatever "plan" or "standard" that friendly parties agree to and present to a trial court? The majority's position is a perversion of this Court's proper role. Because the trial court on remand failed to afford the State Budget the presumption of *Leandro* conformity, its analysis and decision were error.

¶ 414　　Finally, this Court not only sanctions due process violations but exacerbates the error by, on its own initiative, deciding the appeal in 425A21-1. The Court had previously held this direct appeal in abeyance while we considered discretionary review in 425A21-2. Now, without briefing or argument, the majority summarily decides the issue it had previously held in abeyance, and for which there exists a right to appeal based upon the dissent in the Court of Appeals. *See* N.C.G.S. § 7A-30. Once again, the majority wields its unbounded power in the face of fundamental fairness and basic legal tenets.

¶ 415　　As stated only a few months ago:

> The majority restructures power constitutionally designated to the legislature, plainly violates the principles of non-justiciability, and wrests popular sovereignty from the people.
>
> When does judicial activism undermine our republican form of government guaranteed in Article IV, Section 4 of the United States Constitution such that the people are no longer the fountain of power? At what point does a court, operating without any color of constitutional authority, implicate a deprivation of rights and liberties secured under the Fourteenth Amendment?

*Moore*, 2022-NCSC-99, ¶¶ 153–54 (Berger, J., dissenting).

### III.    Conclusion

Today's decision is based on a process that was grossly deficient.  Hearings were not held as required by our decision in *Hoke County*.  The rush to find a statewide violation in the absence of input by the legislature, the collusive nature of this case, the ordering of relief not requested by the parties in their pleadings or permitted by our prior decisions, and the blatant usurpation of legislative power by this Court is violative of any notion of republican government and fundamental fairness.  The trial court orders dated November 10, 2021 and April 26, 2022 should be vacated, and this matter should be remanded for a remedial hearing on the Hoke County claims as required by our decision in *Hoke County*.  In addition, because there have never been hearings held or orders entered as to any other county, those matters must be addressed separately as per our decision in *Hoke County*.

Under no circumstance, however, should this Court take the astonishing step of proclaiming that "inherent authority" permits the judiciary to ordain itself as super-legislators.  This action is contrary to our system of government, destructive of separation of powers, and the very definition of tyranny as understood by our Founding Fathers.

Chief Justice NEWBY and Justice BARRINGER join in this dissenting opinion.